UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| MORRIS & DICKSON CO., LLC | CIVIL ACTION NO. _____ |
| v. | JUDGE_____ |
| JEFFERSON B. SESSIONS, III, ET AL | MAGISTRATE JUDGE_____ |

**COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiffs, Morris & Dickson Co., LLC and Morris & Dickson Co., LLC d/b/a Spark Drug, Inc., for its complaint against Defendants the Honorable Jefferson B. Sessions, in his official capacity as Attorney General of the United States, the U.S. Department of Justice, the Honorable Robert W Patterson, in his official capacity as Acting Administrator of the Drug Enforcement Administration, and the Drug Enforcement Administration ("DEA"), alleges as follows:

**INTRODUCTION**

1. This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), challenging an Order To Show Cause and Immediate Suspension of Registration (the "License Suspension Order") issued on May 2, 2018 and served on Morris & Dickson on May 3, 2018. Immediate relief from the License Suspension Order–which was issued and took effect without any notice or opportunity to be heard is necessary to prevent irreparable injury to Morris & Dickson, its customers, and the public.

2. The Controlled Substances Act ("CSA") permits the DEA (exercising authority delegated from the Attorney General) to issue an immediate suspension only where necessary to prevent "imminent danger to the public health or safety." 21 U.S.C. § 824(d). Unless this heightened standard is met, DEA cannot circumvent mandatory administrative procedures designed to give a registrant notice and an opportunity to be heard before it is suspended. *ld.*§ 824(c). DEA cannot meet the heightened standard here.

## PARTIES

3. Plaintiff, Morris & Dickson, LLC, is a Louisiana limited liability company, with its principal place of business at 10301 Highway 1 South, Shreveport, Louisiana, 71115.

4. Defendant Jefferson B. Sessions, III, is named in his official capacity as the Attorney General of the United States. Under 21 U.S.C. § 824(d), it is the Attorney General that is given the authority to "suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety." The Attorney General has delegated that authority to the DEA Administrator. See 28 C.F.R. § 0.100.

5. Defendant U.S. Department of Justice is an executive department of the United States. See 5 U.S.C. § 101; 28 U.S.C. § 501. The head of the Department of Justice is the Attorney General. See 28 U.S.C. § 503.

6. Defendant Robert W. Patterson is named in his official capacity as the Acting Administrator of the DEA. The Attorney General's authority to immediately suspend a registrant pursuant to 21 U.S.C. § 824(d) has been delegated to him. See 28 C.F.R. § 0.100.

7. Defendant DEA is a component of the U.S. Department of Justice. It was created by Executive Order 11,727. See 38 Fed. Reg. 18357 (July 10, 1973).

## JURISDICTION AND VENUE

8. This action arises under the Constitution of the United States, the CSA, and the APA This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

9. Venue is proper in this Court under 28 U.S.C. § 139l(e)(1)(B) because a substantial part of the events giving rise to the claim occurred in this District.

## BACKGROUND

### A. Regulatory Scheme

10. The CSA and its implementing regulations establish controls and restrictions on the import, export, manufacture, and distribution of controlled substances. 21 U.S.C. § 80 I et seq.; id. § 951 et seq.; 21 C.F.R. Part 1300 et seq. The distribution of controlled substances without a DEA registration is a felony offense. 21 U.S.C. § 84l(a). DEA is tasked with enforcing the CSA in a balanced manner that prevents the diversion of controlled substances from legitimate channels while ensuring their availability for legitimate medical purposes. 76 Fed. Reg. 39,318 (July 6, 2011).

11. Under the CSA, DEA can revoke, restrict, or suspend a registration upon one of five findings, only one of which is relevant here-that the registrant has committed acts that render the registration inconsistent with the public interest. 21 U.S.C. § 824(a)(4). Prior to revoking or restricting a DEA registration, DEA must generally follow procedures designed to provide a registrant with notice and an opportunity to be heard. It must issue an order to show cause setting forth the basis for the agency's proposed action and providing the registrant with the opportunity to request a hearing. See id. § 824(c). At such a hearing, the government has the burden of proving by a preponderance of evidence that registration is inconsistent with the public interest. 21 C.F.R. § 1301.44(d).

12. The DEA may issue a License Suspension Order without providing a registrant with prior notice or an opportunity to respond to the allegations against it only if the continued registration poses an "imminent danger" to the public health and safety. The relevant statutory

provision states:

> The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety. ... A suspension under this subsection shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

21 U.S.C. § 824(d) (emphasis added).

13. The governing regulation specifies:

> The Administrator may suspend any registration simultaneously with or at any time subsequent to the service upon the registrant of an order to show cause why such registration should not be revoked or suspended, in any case where he/she finds that there is an imminent danger to the public health or safety. If the Administrator so suspends, he/she shall serve with the order to show cause pursuant to § 1301.37 an order of immediate suspension which shall contain a statement of his findings regarding the danger to public health or safety.

21 C.F.R. § 1301.36(e) (emphasis added).

**B**.  **Morris & Dickson.**

14. Morris & Dickson was founded in, and has operated continually since, 1841, or for 177 years. It is a family owned and operated business, and is the largest independently owned and privately held drug wholesale distributor in the nation. It operates out of <u>a single distribution center</u> in Shreveport, LA.

15. Morris & Dickson holds two DEA licenses, one for the Shreveport distribution center, and one for a small regional transportation hub in Jefferson Parish, La. The DEA's suspension involves both licenses, and thus, enforcement of the License Suspension Order would completely and entirely prevent Morris & Dickson's from servicing its sector of the healthcare service industry.

16. One hundred percent of Morris & Dickson's drug volume is shipped out of its Shreveport warehouse. Morris & Dickson's Shreveport distribution center serves pharmacies, hospitals, and alternate care clinics such as nursing homes in 17 states. A suspension of Morris & Dickson's Shreveport DEA registration will function to completely stop the flow of necessary drugs for surgeries, pain treatment, nursing homes, hospice, and all other legitimate, medical uses for DEA licensed narcotic drugs for Morris & Dickson's entire market share in seventeen U.S. states.

C. **The License Suspension Order.**

16. On May 3, 2018, without any warning whatsoever, the DEA served Morris & Dickson with Order to Show Cause and Immediate Suspension of Registration" (hereinafter the "License Suspension Order"), a copy of which is attached hereto as **Exhibit A**. The License Suspension Order immediately suspends Morris and Dickson's Certificates of Registration Nos. RM0314790 and RM0335732. This, in turn, requires Morris & Dickson to *immediately* halt shipment of *all* controlled substances-including important medications used to treat seizures, cancer patients, and children with attention deficit disorder, to hundreds, if not thousands of customer accounts, including pharmacies and hospitals serving thousands of patients.

**MORRIS & DICKSON IS ENTITLED TO INJUNCTIVE RELIEF**

17. Morris & Dickson respectfully requests a temporary, preliminary, and permanent injunctive relief to enjoin enforcement of the License Suspension Order

18. DEA does not allege that Morris & Dickson has provided controlled substances to anyone not licensed by DEA to receive them. Rather, DEA has taken the extraordinary step of issuing the License Suspension Order because it contends that specified Morris & Dickson's DEA-registered pharmacy customers have filled "unusually large" prescriptions for oxycodone and

hydrocodone.  For the reasons explained below, all of the relevant factors for evaluating whether to issue a injunctive relief favor relief here.

19. **Likelihood of Success**. Morris & Dickson is likely to succeed on the merits of its challenge to the License Suspension Order. A License Suspension Order is DEA's most powerful enforcement sanction. It can be imposed without advance notice and without an opportunity for a hearing, and it has the potential to destroy businesses and livelihoods.  License Suspension Orders are therefore reserved for addressing only the most dangerous activities of the most serious violators.

20. The caselaw and the governing statute are clear: a License Suspension Order cannot be imposed unless DEA establishes that it is necessary to prevent an imminent danger to the public health or safety. *See* 21 U.S.C. § 824(d). Here, DEA cannot meet that burden for the following reasons.

21. Immediate suspension of the Morris & Dickson's licenses to distribute controlled substances is unnecessary to address the problem DEA alleges "unusually large" orders by the pharmacies identified in the License Suspension Order.

22. As set forth below, many of the facts alleged in the License Suspension Order are inaccurate and/or misleading. Specifically, the License Suspension Order identifies the following customers:

        a.    Wallace Drug Company, Inc. d/b/a Wallace Discount Drugs
        b.    Bordelon's Super-Save Pharmacy
        c.    Folse Pharmacy
        d.    Pharmacy Specialties Group, Inc.
        e.    Dave's Pharmacy
        f.    Hephzibah Pharmacy LLC
        g.    The Wellness Pharmacy, Inc.
        h.    Wilkinson Family Pharmacy

23.     Morris & Dickson no longer does business with Wilkinson Family Pharmacy (lost its license), The Wellness Pharmacy, Inc. (closed), and Hephzibah Pharmacy LLC (no longer a customer).

24.     With respect to the other customers cited in DEA's License Suspension Order:

### Wallace Drug Company

DEA intentionally misrepresents notes produced by Morris & Dickson Compliance Officer Clara Guinn by omitting material facts, which if quoted in full, would clearly show that shipments to Wallace Drug Company Inc. on January 9, 2018, were not in fact suspicious, and the potentially excessive orders were in fact returned to Morris & Dickson after shipment as a result of Ms. Guinn's due diligence.

Contrary to the DEA's statement that Morris & Dickson did not conduct any due diligence following a notation that Wallace Drug was ordering higher than normal amounts, Morris & Dickson pro-actively conducted due diligence by contacting the customer directly and obtaining a return of the drugs at issue. The full quotation below shows that Morris & Dickson Compliance officer Clara Guinn conducted due diligence regarding the potentially suspicious order by contacting the local salesman, Tommy Tingstrom, and then calling the pharmacist directly:

> FW6006363   1/9/2018     Might need to check on this guy he has ordered 12 bottles of 1,000 hydrocodone/apap 10/325 item 51627 the last two days and has another order in today for 12 more, so 36 bottles of 1,000 in three days  Vault
>
> FW6006363   1/9/2018     Also got 12 of the 5mg 1,000 and 24 of the 7.5mg 1,000………so looks like he is hitting this stuff hard!
>
> FW6006363   1/9/2018     I contacted his salesman, Tommy T. to find out what was going on.  Customer was stocking up because he had heard that Hydrocodone was in short supply, that other pharmacies were having problems getting shipments.  I told Tommy to let him know that we had stock & that we did not allow customers to 'Stock Up'.  I gave Tim a couple of scenarios to discuss with him.  1.  What if he was audited and had to explain the excessive stock?  2.  What if he were robbed and had to explain the excessive stock.  Tim will also let him know we have stopped today's shipment and that I recommend

> that he return these items for credit & continue his normal ordering habits. Within an hour, he sent a request for a return blank. CG

The final line, "Within the hour, he sent a request for a return blank" establishes that the Wallace Drug pharmacist was requesting a return blank to return the drugs which were over-ordered.

There was no indication to the Morris & Dickson Compliance team that the pharmacist was engaging in diversion. To the contrary, the pharmacist explained, in the telephone conversation with Clara Guinn, that he was ordering extra of certain narcotics to "stock up" in response to supply issues. Morris & Dickson's action, is a clear example of practical due diligence to address a potentially suspicious order and combat diversion. Morris & Dickson obtained a return of all excessive drugs ordered.

The full quotation of Clara Guinn's notes was provided in response to the DEA's second subpoena regarding potentially suspicious orders on March 30, 2018. The DEA's failure to include the entire quotation constitutes a material omission of fact, which if included would reasonably explain why Morris & Dickson did not regard this order as suspicious, and would also establish that Morris & Dickson conducted the required due diligence.

### Bordelon's Super-Save Pharmacy

DEA cites stale statistics. In the last six (6) months, Morris & Dickson's shipments of opioids to this pharmacy have reduced by 14%.

### Folse Pharmacy

DEA cites stale statistics. In the last six (6) months, Morris & Dickson's shipments of opioids to this pharmacy have reduced by 33%.

### Dave's Pharmacy

DEA cites stale statistics. In the last six (6) months, Morris & Dickson's shipments of opioids to this pharmacy have reduced by 6%.

25. In addition to the above, Morris & Dickson maintains a vigorous and robust anti-diversion system. Indeed, Morris & Dickson's anti-diversion system, in important aspects, is more comprehensive than DEA's own enforcement efforts. The quantity of opioids shipped by Morris & Dickson to pharmacies has significantly decreased in recent years. Attached as **Exhibit B** is a chart showing the reduction in quantities of opioids shipped to each state in the last two years. These reductions show that Morris & Dickson's systems are indeed working.

26. **More importantly, Morris & Dickson agrees to immediately terminate shipments of controlled substances to all customers identified in the License Suspension Order until such time as the Court holds a hearing and and/or the License Suspension Order is lifted.**

27. It is undisputed that Morris & Dickson has distributed controlled substances only to DEA-registered pharmacies and health care facilities. DEA does not allege that Morris & Dickson has sold or distributed a single dose of oxycodone or hydrocodone outside this closed system of authorized distribution. The sole bases for DEA's License Suspension Order against the Morris & Dickson is its allegations concerning "unusually large" orders and diversion of drugs.

28. The License Suspension Order will not halt or reduce diversion of controlled substances by anyone and, therefore, does not diminish the "imminent danger" that DEA alleges. The customers of Morris & Dickson that retain DEA registrations will continue to receive controlled substances from other distributors. In fact, because these distributors may not have the same robust anti-diversion controls as Morris & Dickson does, the License Suspension Order likely will exacerbate the risk of diversion, if it has any effect at all.

29. **Immediate Irreparable Harm**. A TRO is also necessary to prevent irreparable harm to Morris & Dickson and its customers. Morris & Dickson has one distribution facility in Shreveport, Louisiana. From that facility, Morris & Dickson supplies *all* of its customers—hundreds of hospitals, pharmacies, alternative care providers, and other health care providers. Morris & Dickson's customers require prompt delivery of controlled substances for thousands of oncology, surgery, urgent care, emergency room, and hospice care patients.

30. In the absence of a TRO, DEA's actions will cause serious disruption in the supply chain for controlled substances, resulting in delays in treatment for legitimate patients already facing drug shortages. Make no mistake—this is a life and death situation. Morris & Dickson services 30-40% of the hospital drug market in Louisiana and Texas alone. If Morris & Dickson cannot ship needed medications to these hospitals, these hospitals may face immediate drug shortages. Due to exclusive supply arrangements at some of these facilities, the hospitals and alternate care facilities will not have a source in the short term to obtain clinically necessary and life-saving medications outside of the Morris & Dickson supply chain.

31. Many of these of these customers are Louisiana and Texas Hospitals including University Health Center, Shreveport, Willis Knighton Health Systems, Shreveport, Children's Hospital, Touro Infirmary, University Medical Center, and Jefferson Medical Center in New Orleans, Baton Rouge General Hospital, Baton Rouge, LA, Lafayette General Medical Center, Children's Hospital in New Orleans and Dallas, Texas Children's Hospital, Houston, University of Texas Southwest Medical Center, Dallas, Methodist Hospital System, Houston and many others. Hospital customers are dependent on receiving next day and same day shipments from Morris & Dickson. In addition, in urgent situations, *i.e.* where the hospital emergency room had a sudden shortage in a particular medication, the Shreveport distribution center could provide an

emergency shipment to that customer in as little as three to six (6) hours. If this suspension of licensing is enforced, Morris & Dickson could not make emergency shipments to any hospitals in Louisiana, Texas, or any other of the 17 states it serves. Due to Morris & Dickson's single distribution point model, it has no alternate method to get shipments to hospitals, pharmacies or nursing homes.

32. Any delays in delivery of shipments by Morris & Dickson to hospital customers will cause delays in treatment of patients, including seriously ill or terminally ill patients in need of medication. A hospital's needs for controlled substances are ever-changing and unpredictable. Most hospitals do not store large volumes of controlled substances but rather have "just-in-time" inventory levels. Therefore, many hospitals place daily or even more urgent orders with Morris & Dickson as their needs change, i.e. as patients present themselves in the emergency room with unforeseen injuries and illnesses. These hospitals will not receive deliveries of any kind, including rush deliveries, if the suspension is enforced.

33. If a hospital fails to receive timely orders of controlled substances, patients will experience delays in treatment, and hospitals will experience immediate drug shortages. Unlike outpatients, hospital inpatients cannot seek relief from a neighboring pharmacy when the hospital is experiencing delays or shortages in pain medications. Thus, when a hospital experiences a shortage, its only choices are to delay treatment with pain medication, to administer a less effective treatment, or to delay other therapies, such as surgery, until the hospital receives an adequate supply. With no ability to ship controlled drugs, hospitals within Morris & Dickson's distribution network will be denied access to critically necessary, and lifesaving medication.

34. If remedy is not granted to Morris & Dickson to stay the license suspension, Morris & Dickson Hospital, pharmacy and nursing home customers will have to contract with a new DEA licensed wholesaler. The transition process between vendors, during which the wholesaler procures an adequate supply to meet the demands of the hospital, takes no less than two weeks and up to one month. In the meantime, hospitals currently supplied by Morris & Dickson will face drug shortages.

35. This also would also cause severe and irreparable harm to Morris & Dickson. The company would suffer significant damage to its business reputation and loss of customer goodwill. Some customers will likely stop doing business with Morris & Dickson and never return. Additionally, the License Suspension Order will cause Morris & Dickson to lose significant revenue that it could never recover. Morris & Dickson has no adequate remedy at law if this Court does not immediately enjoin DEA from enforcement of the License Suspension Order.

36. **Balance of Hardships.** The balance of hardships also supports issuing a TRO. As explained above, there is no imminent danger to the public health that requires an immediate suspension of Morris & Dickson's licenses. Also, in the same notice as the License Suspension Order, DEA served an Order to Show Cause, initiating a DEA administrative process for considering whether revocation of the Morris & Dickson's registration is appropriate. *See* Ex. A. In either case, DEA would be required to give advance notice to Morris & Dickson and provide it an opportunity to respond to the allegations against it. But in the absence of an imminent danger to the public, there is no need or legal basis to deprive Morris & Dickson of the process afforded by law.

37.     **Public Interest**.  Finally, the public interest weighs heavily in favor of granting a TRO.  As noted above, the License Suspension Order is not necessary to prevent any imminent harm to the public. By delaying shipments, however, a TRO would cause injury to the numerous patients that depend on Morris & Dickson for an uninterrupted supply of medications for their legitimate medical needs. Accordingly, Morris & Dickson respectfully requests that the Court temporarily enjoin enforcement of the License Suspension Order until the Court can rule on a motion for a preliminary injunction to be filed by Morris & Dickson.

### COUNT I (No Statutory Authority)

38.     Morris & Dickson incorporates the preceding paragraphs as if fully set forth herein.

39.     The License Suspension Order is agency action made reviewable by 21 U.S.C. § 824(d).

40.     Morris & Dickson is adversely affected and aggrieved by the License Suspension Order.

41.     The License Suspension Order is not authorized under 21 U.S.C. § 824(d) because Defendants did not demonstrate that immediate suspension of Morris & Dickson's licenses, without prior notice or an opportunity to be heard, was necessary to prevent "imminent danger to the public health or safety."

42.     Defendants accordingly did not have the statutory authority to issue the License Suspension Order.

43.     The License Suspension Order also therefore exceeds the statutory jurisdiction of defendants and the limits imposed in 21 U.S.C. § 824(d).

44.     As a result, the License Suspension Order is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and is in excess of statutory authority, jurisdiction, and limitations, in

violation of 5 U.S.C. § 706(2)(C).

## COUNT II (Due Process)

54. Morris & Dickson incorporates the preceding paragraphs as if fully set forth herein.

55. The License Suspension Order is agency action made reviewable by 21 U.S.C. § 824(d).

56. Morris & Dickson is adversely affected and aggrieved by the License Suspension Order.

57. The License Suspension Order denied Morris & Dickson prior notice of the allegations against it and a meaningful opportunity to contest those allegations prior to its suspension.

58. Depriving Morris & Dickson of prior notice of the allegations against it and a meaningful opportunity to contest those allegations prior to its suspension was not necessary to further any governmental interest, increased significantly the prospect of an erroneous deprivation of Morris & Dickson's rights, and impaired the property interests of Morris & Dickson.

59. Accordingly, the License Suspension Order is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

## COUNT III (Arbitrary and Capricious)

60. Morris & Dickson incorporates the preceding paragraphs as if fully set forth herein.

61. The License Suspension Order is agency action made reviewable by 21 U.S.C. § 824(d).

62. Morris & Dickson is adversely affected and aggrieved by the License Suspension Order.

63. Defendants' decision to issue the License Suspension Order was arbitrary and capricious. Defendants failed to engage in reasoned decision-making; to consider important aspects of the problem they believed they faced; to consider more narrowly tailored remedies and the impact that the License Suspension Order would have on the public health; and to provide an adequate explanation for their decision. The License Suspension Order is also premised upon data that Morris & Dickson has not had adequate opportunity to review.

64. Accordingly, the License Suspension Order is arbitrary, capricious, and otherwise are not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT IV (Inadequate Findings)

65. Morris & Dickson incorporates the preceding paragraphs as if fully set forth herein

66. The License Suspension Order is agency action made reviewable by 21 U.S.C. § 824(d).

67. Morris & Dickson is adversely affected and aggrieved by the License Suspension Order.

68. An order under 21 U.S.C. § 824(d) immediately suspending a registrant "shall contain a statement of his findings regarding the danger to public health or safety." 21 C.F.R.§ 1301.36(e).

69. The License Suspension Order lacked an adequate statement of the Administrator's findings regarding the danger to public health or safety that allegedly would be caused by Morris & Dickson's continued use of its controlled substance distribution licenses.

70. Therefore, the License Suspension Order was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## **PRAYER FOR RELIEF**

WHEREFORE, Morris & Dickson prays that this Court:

1. Declare the License Suspension Order unlawful.

2. Vacate and set aside the License Suspension Order.

3. Issue all process necessary and appropriate to postpone the effective date of the License Suspension Order and to maintain the status quo pending the conclusion of this case, including issuance of a temporary restraining order, preliminary and permanent injunctions.

4. Award Morris & Dickson its costs and reasonable attorneys' fees as appropriate.

5. Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,

/s/ *Reid A. Jones*
Frank H. Spruiell, Jr. (#1611)
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
333 Texas Street, Suite 2350 (71101)
P. O. Box 21990
Shreveport, Louisiana 71120-1990
(318) 226-9100, telephone
(318) 424-5128, facsimile
Email: fspruiell@wwmlaw.com
Email: rjones@wwmlaw.com

*Counsel for Morris & Dickson Co., LLC*