# EXHIBIT 1

```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF LOUISIANA
 2                          SHREVEPORT DIVISION

 3

 4   MORRIS & DICKSON CO., LLC          :
                                        :     CIVIL ACTION
 5   VS.                                :     NO. 5:18-cv-00605
                                        :
 6   JEFFERSON B. SESSIONS, III, ET AL :
     .................................:.............................
 7

 8

 9

10

11

12                       HEARING ON MOTION FOR
                     TEMPORARY RESTRAINING ORDER [2]
13               OFFICIAL TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE ELIZABETH E. FOOTE
14                 UNITED STATES DISTRICT JUDGE
                     8 MAY 2018, 10:00 A.M.
15                     SHREVEPORT, LOUISIANA

16

17

18

19

20

21
     Reported by:   Barbara A. Simpson, RPR, CRR
22                  Federal Official Court Reporter
                    300 Fannin Street, Room 4209
23                  Shreveport, Louisiana  71101
                    Phone:  (318) 226-8003
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25   PRODUCED BY COMPUTER.
```

```
 1                         APPEARANCES

 2   FOR MORRIS & DICKSON, LLC:

 3        MR. FRANKLIN H. SPRUIELL, JR.
          MR. REID ALLEN JONES
 4        Wiener Weiss & Madison
          P.O. Box 21990
 5        Shreveport, Louisiana  71120-1990

 6        MS. JODI L. AVERGUN
          Cadwalader, Wickersham & Taft, LLP
 7        700 Sixth Street, NW
          Washington, D.C. 20001
 8

 9   FOR JEFFERSON B. SESSIONS, III, ET AL:

10        MS. KATHERINE W. VINCENT
          Assistant U.S. Attorney
11        U.S. Attorney's Office (Lafayette)
          800 Lafayette Street, Suite 2200
12        Lafayette, Louisiana 70501

13   ALSO PRESENT:

14        MR. PAUL A. DEAN
          Senior Attorney
15        U.S. Department of Justice
          Drug Enforcement Administration
16        Office of Chief Counsel
          Diversion and Regulatory Litigation Division
17        8701 Morrissette Drive
          Springfield, Virginia 22152
18
          MR. JOHN E. BEERBOWER
19        U.S. Department of Justice
          Drug Enforcement Administration
20        Office of Chief Counsel
          Diversion and Regulatory Litigation Division
21        8701 Morrissette Drive
          Springfield, Virginia 22152
22

23

24

25
```

```
 1                              8 MAY 2018

 2                (Court called to order, parties present)

 3           THE COURT:  Good morning.  Please be seated.

 4       We are here this morning in case number 18-605, Morris &

 5   Dickson Company, on a TRO.

 6       Would counsel for Morris & Dickson please make their

 7   appearances on the record.

 8           MR. SPRUIELL:  Good morning, Your Honor.  Frank

 9   Spruiell; Wiener, Weiss & Madison.

10           MR. JONES:  Reid Jones; Wiener, Weiss & Madison.

11           MS. AVERGUN:  Your Honor, good morning.  I'm Jodi

12   Avergun from the law firm of Cadwalader, Wickersham & Taft.

13           THE COURT:  And, Ms. Avergun, the Court did see your

14   motion to enroll pro hac vice, and the Court would grant that

15   motion at this time.

16           MS. AVERGUN:  Thank you very much, Your Honor.

17           MR. SPRUIELL:  Thank you, Your Honor.

18           THE COURT:  And then for the Government.  Ms.

19   Vincent?

20           MS. VINCENT:  Your Honor, Katherine Vincent for the

21   Department of Justice and the Drug Enforcement Administration

22   and the Acting Director.

23       With me, I have, from chief counsel's office for DEA, Paul

24   Dean; and also from chief counsel's office, John Beerbower.

25   They have not yet been -- we may appoint them as AUSAs.  We
```

1    just did not have time to do that at this point.  They are

2    attorneys for the DEA.

3              THE COURT:  Who will be handling the hearing today?

4              MS. VINCENT:  I will, Your Honor.

5              THE COURT:  All right.  All right; well, then you can

6    take care of the housekeeping matter later, of going ahead and

7    filing motions on their behalf.

8              MS. VINCENT:  Okay.

9         And also as the agency representative, Joel Dunn.  He is a

10   DEA diversion investigator -- supervisory investigator.

11             THE COURT:  Thank you.  Please be seated.

12        All right.  And I understand that the plaintiffs have one

13   witness, and that's Mr. Dickson?

14             MR. SPRUIELL:  That's correct, Your Honor.

15             THE COURT:  All right.  And Mr. Dickson is present?

16             MR. SPRUIELL:  Yes, ma'am.

17             THE COURT:  All right.

18        Mr. Dickson, you can sit at counsel table --

19             MR. SPRUIELL:  Thank you, Your Honor.

20             THE COURT:  -- if that is what you wish to do.

21        All right.  The Court had some initial background

22   questions that it needs to ask in order to understand

23   everything about what is going on in this case.

24        Did Morris & Dickson -- Mr. Spruiell, are you going to be

25   lead counsel?

1           MR. SPRUIELL:  Yes, Your Honor.

2           THE COURT:  Did Morris & Dickson request the

3    administrative hearing as it's still set for July 9th?

4           MR. SPRUIELL:  We have not formally made that request

5    as of yet, but we would certainly anticipate doing that.  Our

6    attention has been obviously focused on this hearing.

7           THE COURT:  And the controlled substances have been

8    placed under seal, all controlled substances?

9           MR. SPRUIELL:  Yes.  As of May 3rd.

10          THE COURT:  Mr. Spruiell, I was a little confused by

11   some of the correspondence I got.  One is the letter this

12   morning that we received from North Mississippi Health Services

13   that seems to imply that all of the drugs that Morris & Dickson

14   would supply them are not being shipped, and that was not the

15   Court's understanding of the scope of the ISO.

16          MR. SPRUIELL:  That would be correct, Your Honor.

17   I'm not particularly familiar with that letter exactly if it

18   just got here.  We obviously attached a number to Mr. Dickson's

19   affidavit that was filed yesterday.  The ISO only governs the

20   schedule drugs.  We are able to ship non-schedule drugs.  So

21   I'm not sure exactly of the representation, if they meant to

22   say that, but --

23          THE COURT:  Perhaps it just says:  This is what you

24   normally ship to them, but I just -- it gave rise to my

25   question.

 1           MR. SPRUIELL:  Yes, ma'am.

 2           THE COURT:  And you will be putting on evidence,

 3  then, about the schedule drugs, the effect on your business, et

 4  cetera; is that right?

 5           MR. SPRUIELL:  Yes, ma'am.

 6           THE COURT:  Okay.  All right.

 7       Then, Ms. Vincent, the question I have for you is:  The

 8  ISO applies to all of the controlled substances and not simply

 9  the opioids in question?

10           MS. VINCENT:  Yes, Your Honor.  The regulation

11  applies to all controlled substances.

12           THE COURT:  Does the Government have the option of

13  having it apply to only those substances?

14           MS. VINCENT:  The -- excuse me, Your Honor, were you

15  finished?

16           THE COURT:  I was going to name the hydrocodone and

17  the oxycodone, which are the ones in --

18           MS. VINCENT:  There is a regulation to that extent.

19  But the controlled substances, the failure, the due diligence

20  failure applied to all controlled substances.  And I believe

21  we'll have some testimony on that today.

22       For instance, one of the suspicious -- I think we all will

23  agree that there were two or three suspicious reports made, and

24  one of them was not even a oxycodone or a hydrocodone report.

25  It was pseudoephedrine, which is also a controlled substance.

1          THE COURT:  All right.  Now, Ms. Vincent has raised

2     an interesting point that the Court needs clarified by all

3     counsel.

4          Thank you, ma'am.

5          And that is that she obviously intends to put on evidence

6     that would expand the nature of the ISO that the Court has in

7     front of it.

8          The Court is of the opinion, but invites contradiction,

9     that the evidence that it can hear as to the four factors for

10    the -- necessary for the Plaintiff to prove in order to get a

11    TRO, that as to the review of the substantial likelihood of

12    success on the merits, that the Court is limited to the

13    administrative record or -- and all it has in front of it of

14    the administrative record is the ISO.  So the Court is of that

15    opinion that perhaps, though, as to the other three elements,

16    the Court can hear any evidence.

17         And the Court would invite comment from Morris & Dickson

18    on that issue and then from the Government.

19              (Mr. Spruiell and Ms. Avergun confer.)

20         MS. AVERGUN:  Your Honor, may I respond?

21         THE COURT:  Yes, ma'am.

22         MS. AVERGUN:  We agree with your contention.  Your

23    Honor, the case of *Cardinal Health* in the District of Columbia

24    is very clear about what can be part of the record for a

25    temporary restraining order.  And it is our position that the

 1    Court and the Government is limited to the four corners of the

 2    document in front of it for purposes of addressing whether it

 3    has met its burden to show that the immediate suspension order

 4    is appropriately in place.

 5              THE COURT:  Thank you.  And I think, Ms. Vincent, you

 6    take that position in your brief?

 7              MS. VINCENT:  Your Honor, would you like me to come

 8    up to the podium?

 9              THE COURT:  Yes.

10              MS. VINCENT:  Yes, Your Honor.  I do agree that

11    likelihood of success on the merits is limited to the

12    administrative record.  Obviously, as you noted, all we have

13    right now is the ISO and order to show cause.  So I do agree

14    with that.  And I think *Cardinal* says that, too.  Although I

15    don't necessarily agree that we're trying to expand the ISO.

16    I'm simply saying -- but I do agree that the ISO is what the

17    ISO is and it does what it purports to do.

18              THE COURT:  All right.  Well, we'll cross that bridge

19    when we get to it when you put on your testimony.  But I did

20    want that -- and you can make that determination at that time

21    as to whether or not you're putting on the testimony to expand

22    the ISO or whether it has other relevance for the Court on the

23    other factors.

24              MS. VINCENT:  Thank you.

25              THE COURT:  All right, good.

1       All right, then.  We would ask, then, for the Plaintiffs

2  to begin.

3              MR. SPRUIELL:  Your Honor, as a preliminary matter,

4  I'd like to, at this time, present to the Court an oral motion

5  in limine.

6       This Court yesterday issued an order that specifically

7  required both parties to the case to identify any witness they

8  intend to present at this hearing.  Morris & Dickson complied

9  with that order and identified Mr. Dickson as a witness.

10      The response of the Government was not in compliance,

11 whether directly or in the spirit.  Their response was:  For

12 purposes of the hearing on plaintiff's motion for TRO on May 7,

13 2018, the Government may call -- may call a DEA diversion

14 investigator for purposes of rebuttal or impeachment only.

15      That does not comply with the Court's order.  We are

16 already at a disadvantage in having to proceed to trial on this

17 TRO on two business days' notice.  For the Government to sit

18 and hide a witness and not disclose the identity of a witness

19 in accordance with this Court's order should serve to bar the

20 DEA or the Government from calling a witness at this hearing.

21              THE COURT:  What is the prejudice to you by not

22 knowing the gentleman's name?  Would knowing his name have

23 given you any information?

24              MR. SPRUIELL:  It would have given us the opportunity

25 to do some investigation regarding that particular witness.  We

```
 1   could do search of prior testimony, prior cases in which he may
 2   have been involved.  We could have searched the administrative
 3   records to see about his testimony in prior cases.  We didn't
 4   have that opportunity.  That is our --
 5            THE COURT:  All right.  The Court will take that
 6   under advisement.  It may be one of those things, Mr. Spruiell,
 7   that the Court actually can't rule on until I hear his
 8   testimony as to whether or not the Court will consider it in
 9   the overall analysis --
10            MR. SPRUIELL:  Yes, ma'am.  Thank you.
11            THE COURT:  -- as to determine whether or not you are
12   prejudiced in any way by his testimony.
13       The Court understands that.  The nature of the Court's
14   inquiry was for scheduling purposes; I will say that.
15       All right.  So Mr. Spruiell, are you going to begin, then,
16   for the Plaintiff?
17            MR. SPRUIELL:  Yes, ma'am.  We would call Mr. Paul
18   Dickson to the stand.
19            THE COURT:  Mr. Dickson, please come forward and
20   raise your right hand and be sworn.
21         PLAINTIFF'S WITNESS, PAUL MEADE DICKSON, SWORN
22            MR. SPRUIELL:  You ready, Your Honor?
23            THE COURT:  Yes, sir.
24                          DIRECT EXAMINATION
25   BY MR. SPRUIELL:
```

1   Q    Mr. Dickson, would you please give the Court your full

2   name and business address for the record.

3   A    Paul Meade Dickson, Post Office Box 51367, Shreveport,

4   Louisiana.

5   Q    And are you currently the president of Morris & Dickson

6   Company, LLC?

7   A    That is correct.

8         THE COURT:  Mr. Dickson, if you would please -- that

9   bar in front of you is the microphone.  If you would pull it

10  closer to you.

11        Thank you, sir.

12        THE WITNESS:  Yes, Your Honor.

13  BY MR. SPRUIELL:

14  Q    And, Mr. Dickson, how long have you served in the capacity

15  as the president of Morris & Dickson?

16  A    Four years, I think.

17  Q    Are you an owner of the company?

18  A    I am.

19  Q    How long have you been in association with Morris &

20  Dickson?

21  A    43 years.

22  Q    How long has Morris & Dickson been in business?

23  A    177 years.

24  Q    Is it a public or private company?

25  A    It's a privately-owned company.

1    Q    Is it a family-owned company?

2    A    It's a family-owned company.

3    Q    And in your 40-something years' service with Morris &

4    Dickson, what other positions and job responsibilities have you

5    had generally?

6    A    I swept the floor when I was 13 and stocked product on the

7    shelf.  And I was sales in the field.  I've worked in the

8    warehouse.  I've managed the warehouse.  I've built our

9    automation, developed our automation.  Developed the operations

10   of the business.  And now I am the president and so I'm

11   responsible for all the business.

12   Q    And would you please explain to the Court what is the

13   business of Morris & Dickson.

14   A    We are a distributor of pharmaceuticals.  That means

15   that -- and a full-line distributor means that we carry

16   everything, 33,000, thereabouts, 30,000, 33,000 SKUs. We

17   service all forms of pharmaceutical distribution.  So that

18   means hospital, retail, and alternate care, which is a catchall

19   category that would involve hospice, nursing homes, mental

20   health facilities, prisons.  Basically, we service everywhere

21   that pharmaceuticals are distributed through pharmacies.

22   Q    Is there any other privately-owned wholesale distributor

23   that is a full-line distributor as you?

24   A    No, sir.  We are the last remaining.

25   Q    I have heard the distinction between a primary wholesaler

1    and a secondary wholesaler.  Could you please explain the

2    difference to the Court.

3    A     It's both legal and regulatory -- I mean, excuse me, both

4    economic and regulatory.

5          A primary wholesaler for a pharmacy provides usually

6    90 percent of the needs, or more, sometimes 100 percent, of the

7    given pharmacy.  There is sometimes a need or a desire by a

8    pharmacy to buy a few items somewhere else.  The reason that

9    there's not -- that this is significant is because -- and this

10   is the legal side -- that through the evolution of the

11   controlled drugs -- it's not a regulation, it's a practice.

12   Through the evolution of wholesaler's desire to keep controlled

13   drugs within legal channels and within ethical channels,

14   wholesalers all developed a practice of only selling controlled

15   drugs to their primary customers.

16         And the reason for that is if a pharmacy was buying

17   equally from two different wholesalers, neither would know what

18   the pharmacy was buying from the other, because we are blind to

19   the data of what the other wholesalers might be selling.  So by

20   restricting controlled drug sales solely to a primary

21   purchaser, we know that 100 percent of the controlled drugs are

22   the ones they buy from us.  So that's the distinction.

23         The secondary classification, we would only carry a

24   secondary account if we were hoping to win the favor of that

25   account and give them a chance to see what doing business with

```
 1    us would be like.  And that would only be with non-controlled

 2    drugs.

 3    Q    You do not sell controlled drugs on a secondary basis?

 4    A    (Shakes head from side to side)  I'm not going to say

 5    absolutely; but, no, not as a regular practice.

 6    Q    And where does Morris & Dickson's pharmaceutical business

 7    operate?  Where is its business --

 8    A    The Shreveport area.

 9    Q    Has it always been in the Shreveport area?

10    A    Since 1841.

11    Q    Where is your pharmaceutical distribution warehouse?

12    A    It's at the Port of Shreveport.

13    Q    And is that a relatively new facility?

14    A    We built it in 2003.  We most recently added to it.  We

15    built a new addition in just last year.

16    Q    And how much did Morris & Dickson invest in that physical

17    structure?

18    A    $32 million.

19    Q    Does Morris & Dickson do any other lines of business other

20    than pharmaceuticals?

21    A    Yes.  We have extensive information technologies

22    offerings, both at the retail and the hospital and the

23    alternate care level.  Pioneer Rx Pharmacy Systems, which has

24    got 3,000 pharmacy systems in all 50 states that actually

25    operates retail pharmacies.  We have hospital software and we
```

```
 1   have alternate care and PBM management software.
 2   Q    But in turn --
 3             THE COURT:  Are you the same company?  I thought that
 4   the companies that we're involved with are Morris & Dickson,
 5   LLC, and then the sub company which is called --
 6             MR. SPRUIELL:  Spark, I think.
 7             THE COURT:  -- spark.
 8             THE WITNESS:  Well, Spark Drug no longer exists.
 9   That is a location, and the name is sort of -- the name is
10   Spark from the legacy of it.  But that is a Morris & Dickson
11   owned facility in New Orleans.
12             THE COURT:  Okay.
13             THE WITNESS:  And it is only a hub.  We don't -- when
14   we move controlled substances in returns or perhaps maybe
15   there's an emergency hospital needing something other than
16   usual, we are able to maintain that registered location so we
17   can secure those controlled substances there in transit.  But
18   it's not used as a regular inventory distribution facility.
19             THE COURT:  Does it have regular employees down
20   there?
21             THE WITNESS:  Yes, there are just a few, just a small
22   number.
23             THE COURT:  So it's Morris & Dickson, LLC, that
24   operates all of these businesses, including these, what you
25   refer to as the extensive information technology offerings?
```

1          THE WITNESS:  Yes.  Actually, there's also very

2   recently M&D Holding Company.  And M&D Holding Company and the

3   M&D LLC, Morris & Dickson LLC.

4          THE COURT:  All right.  I'm now really confused.  And

5   then Pioneer is what?

6          THE WITNESS:  Currently, it's a product actually

7   currently of New Tech Computers, which is part of Morris &

8   Dickson, LLC.  Wholly-owned subsidiary.

9          THE COURT:  All right.  Yes, sir.

10  BY MR. SPRUIELL:

11  Q    In terms of actual distribution of pharmaceuticals,

12  including Schedule II drugs, where do you distribute from?

13  A    We distribute from the Port of Shreveport to all seventeen

14  states.

15  Q    Now, in terms of Morris & Dickson employment information,

16  I'm going to take a moment to hand you a document for you to

17  review.

18         MR. SPRUIELL:  May I approach?

19         THE COURT:  Yes.  And if you would give a copy to Ms.

20  Vincent.

21      She has a copy?  Very good.

22         MS. VINCENT:  I just need to know which one it is.

23  Okay.

24         MR. SPRUIELL:  And I, with the Court's permission,

25  I'd let you have a copy.

```
 1              THE COURT:  Thank you.
 2   BY MR. SPRUIELL:
 3   Q    Mr. Dickson, in terms of the number of employees of
 4   Morris & Dickson, could you give the Court that actual figure?
 5   A    787.
 6   Q    How many of those employees are in the Shreveport
 7   facility?
 8   A    508 -- well, it -- yes, in the Shreveport area, yes, 508.
 9   Q    And how about total in Louisiana?
10   A    552.
11   Q    And how about total in Texas?
12   A    149.
13   Q    In terms of new jobs created in the Shreveport market in
14   the past five years, can you give the Court that number?
15   A    In the last five years, we have added 207 jobs in
16   Shreveport and over 300 overall.
17   Q    What is the annual total payroll for Morris & Dickson?
18   A    About 60 million.  I think you've got fifty-eight two
19   thirty-six.
20   Q    $58,236,501?
21   A    That's correct.  That was -- yes.
22   Q    And how much is, of that total is related to the
23   Shreveport employees?
24   A    37,264,800.
25   Q    And in terms of the age of your employees --
```

1      MR. SPRUIELL:  And I apologize; this appears to have

2  cut off --

3      MS. VINCENT:  Your Honor, I would just object on the

4  basis of relevance.  I mean, the number of employees might be

5  relevant, but I don't know about the age, why that would be

6  relevant.

7      THE COURT:  The Court is going to overrule the

8  objection.  The Court believes this goes to the fourth element

9  of the criteria for the TRO.

10      MR. SPRUIELL:  Thank you, Your Honor.

11  BY MR. SPRUIELL:

12  Q    In terms of the average tenure of your employees, would

13  you agree that the average tenure of your employees is thirteen

14  years?

15  A    Would I agree?  I'm sorry?

16  Q    Thirteen years is the average tenure of --

17  A    That's correct.

18  Q    And in terms of the total number of employees, how many of

19  your employees are 40 years of age or older?

20  A    130.  Older?  Excuse me.  40 or older, approximately 400.

21  Q    And how many Morris & Dickson employees earn over $40,000

22  in annual compensation?  Is that 558?

23  A    Thank you.  You didn't put that in front of me.

24  Q    Let's talk a little bit about Morris & Dickson in terms of

25  its business and its customers.  Where does Morris & Dickson do

```
 1   business?

 2   A    Morris & Dickson does business in seventeen states.

 3   Q    And where are those states?

 4   A    Principally, the south central and southeastern United

 5   States.  We distribute from this one distribution center in

 6   Shreveport.  We must get there, to every account, the next

 7   morning, hospitals by 6:00 a.m.  Businesses usually do their

 8   ordering at the end of the day.  So we have a built-in range

 9   that's determined by our ability to pick the order and

10   transport it there by the next morning, which results in a

11   roughly 500-mile radius around Shreveport.  So that's where

12   those seventeen states are.

13   Q    In terms of your largest states in terms of sales volume,

14   what are the two largest --

15   A    Texas and Louisiana.

16   Q    Okay.  And you have already testified that there are three

17   types of classifications of your customers?

18   A    Yes.  Retail, retail drug stores; that could be anywhere

19   from a single-owner store to somebody that owns a small chain

20   of say a dozen stores.  We don't serve large chains like CVS or

21   Walgreens.  So retail is owner stores, the single-owner stores

22   generally.

23        Hospital, or health systems, are large, multi-bed,

24   inpatient facilities.

25        The other category that we use is called alternate care.
```

1    It's a bit of a catch-all category.  As I said before, it

2    includes a wide variety of things: nursing homes, hospice

3    facilities, closed shop pharmacies that serve clinics and the

4    like.

5    Q    In terms of retail pharmacies, what is the number of

6    retail pharmacies you service?  It won't be on that.

7    A    Yeah, I'm going to have to do it off the top of my head.

8    The number of retail pharmacies is approximately 600 primary,

9    okay, and another probably 200 secondary that fluctuates.

10   Q    And how many customers do you have in the classification

11   of alternate care facilities?

12   A    Approximately the same number.  It's roughly -- in

13   percentages, it's roughly thirds, though it's actually skewed

14   heavily to hospitals.  We're about 42 percent hospitals, and

15   about 28 percent retail, and the remainder are alternate care.

16   Q    In terms of your percentage of sales in those

17   classifications, how much of your total business is related to

18   hospitals and alternate care?

19   A    As I said, about -- oh, hospital and alternate care?

20   Q    Yes.

21   A    Roughly 70 -- 68 percent.

22   Q    All right.  And the remainder would be your independent --

23   A    Would be retail, that's right.

24   Q    In terms of your hospital business in Louisiana and Texas,

25   can you give the Court some examples of hospitals that your

1    company services?

2    A    As I say, we have the majority market share in the state

3    of Texas.  We service 38 percent of the hospital beds in the

4    state of Texas.  We service the Houston Medical Center because

5    of the high concentration of those beds are there.  We service

6    large hospitals in Dallas, such as Parkland.  Texas Children's

7    Hospital in Houston.  Methodist Hospital in Houston.  As well

8    as hospitals in the rural areas as well, rural areas of Texas

9    as well.

10        In Louisiana, we service Willis-Knighton in Shreveport.

11   We service University Health in Shreveport, as well as the

12   similar hospital in New Orleans.  We have a number of other

13   hospitals in New Orleans.  West Jefferson.  I could go on.

14   Q    Including Touro?

15   A    Touro.  Lafayette.  Children's Hospital.  We have largest

16   market share -- we have a 25 percent national market share in

17   children's hospitals.  We actually have the largest pediatric

18   inventory in the world.  We happen to specialize in pediatric

19   hospitals, and they particularly like our high level of

20   service.  So that's a specialty of ours, is children's

21   hospitals.

22   Q    Let's turn our attention if we could, Mr. Dickson, to your

23   competition.  Who do you characterize as your competition as a

24   distributor of pharmaceuticals?

25   A    Right now, our only competition are what's called "the big

1    three," the global companies.  They're McKesson, who is the

2    number five in Fortune 500 corporations in the world.

3    AmerisourceBergen, who is part of what's called "WBAB alliance"

4    that's owned by Walgreen Boots and AmerisourceBergen.  And

5    Cardinal Health.

6    Q    And is there something unique about the alignment of "the

7    big three" in terms how they compete with you?

8    A    Yes.  Very recently the big three wholesalers have aligned

9    with retailers, PBMs, and insurance companies.

10            THE COURT:  What's a PBM?

11            THE WITNESS:  That's a prescription benefit

12    management company, such as Express Scripts.

13        Walgreens is a part-owner of AmerisourceBergen.  Cardinal

14    has a alignment with CVS of retail pharmacies and Caremark,

15    PBM.  McKesson works with Wal-Mart, Kroger.  So they've all

16    aligned up with a partner just in the last three years.  Which

17    has had a significant effect on the industry of contracting the

18    industry to a few choices.

19            THE COURT:  And what do you mean "aligned with"?

20            THE WITNESS:  Well, they have -- it's a little

21    different in each case.  As I said, the Walgreens Boots

22    Alliance owns, actually owns part of AmerisourceBergen.

23        In the case of Cardinal and CVS, it's kind of a long-term

24    contract.

25        The same is the case with McKesson and Wal-Mart.  And in

1    the case of both Cardinal/CVS and McKesson/Wal-Mart, they have

2    a joint venture, each of them, with their party from which they

3    buy pharmaceuticals; so they collectively buy.  Very

4    integrated, and it's frankly very complicated and deeply

5    entangled relationships.  But all different between the three.

6    Q    Does Morris & Dickson have any of those alignment

7    agreements?

8    A    No, we do not.

9    Q    In terms of, we've talked about Morris & Dickson having

10   one distribution facility in the Shreveport area that you ship

11   from.  Do the big three -- McKesson, Cardinal, and

12   AmerisourceBergen -- have multiple distribution centers across

13   the United States?

14   A    Yes, they do.

15   Q    And based on your understanding and experience in the

16   market, are each of those locations licensed or registered, if

17   you will, for controlled substances through the DEA?

18   A    That's my understanding.

19   Q    In terms of total pharmaceutical sales, how much is

20   attributable to "the big three" in the United States?

21   A    It's over 90 percent, and it's increased in very recent

22   years.  I hate to give the exact; I think it's 93 or

23   94 percent.

24              THE COURT:  And is that in terms of dollars or units?

25              THE WITNESS:  Your Honor, it would be very close to

 1   both.  It would be over 90 percent of both.

 2   BY MR. SPRUIELL:

 3   Q    Of total pharmaceutical sales, in the same context of the

 4   Court's question, how much is attributable to Morris & Dickson

 5   in the United States?

 6   A    Less than 2 percent.

 7   Q    In terms of Schedule II drugs, how long has Morris &

 8   Dickson had its DEA registration?

 9   A    Well, since before I was there.  I would assume since

10   1969, the Dangerous Drugs Control Act of 1969.

11            THE COURT:  So with the origin of the classification?

12            THE WITNESS:  Yes, ma'am.

13   BY MR. SPRUIELL:

14   Q    In terms of the daily operation of business by Morris &

15   Dickson, is Morris & Dickson required to notify the DEA of all

16   Schedule II drug orders?

17   A    Yes; it's ARCOS reporting, which we do regularly and have,

18   as far as I know, since 1969.

19   Q    And just for --

20            THE COURT:  Mr. Spruiell, I'm going to ask you to

21   back up for the Court's edification, and that is you talk about

22   a Schedule II drug.  Does the ISO address only Schedule II

23   drugs or is it broader than Schedule II drugs?

24            MR. SPRUIELL:  It applies to all.  But as we know,

25   the ISO only references two components of Schedule II drugs:

 1    oxycodone and hydrocodone.

 2              THE COURT:  All right.  If you would, then, help me

 3    by telling me:  What are the classification of drugs that fall

 4    under controlled substances which are in fact the subject of

 5    the ISO?

 6              MR. SPRUIELL:  I'm going to let Mr. Dickson do that,

 7    Your Honor.

 8              THE COURT:  Yes.

 9              THE WITNESS:  Would you repeat the question, please,

10    Your Honor.

11              THE COURT:  The ISO, in its language, applies to all

12    controlled substances.

13         And my question is:  That suspension of your registration

14    talks about controlled substances.  Could you tell me about

15    what the different schedules of drugs are that would fall

16    within the purview of the ISO suspension?

17              THE WITNESS:  Well, all controls.  That would be

18    Schedules II through VI.

19              THE COURT:  II through VI?

20              THE WITNESS:  They sealed all of our -- if I may

21    explain?

22              THE COURT:  Please.  I'm asking.

23              THE WITNESS:  Schedule II and -- there's a Schedules

24    I through VI.  Schedule I are non-commercial drugs.  We don't

25    have those.

1          THE COURT:  Give me an example.

2          THE WITNESS:  I believe marijuana; but since I don't

3    sell them, I can't name you all the other ones because I don't

4    know, because these are non-commercial drugs.

5          THE COURT:  Okay.

6          THE WITNESS:  Schedule II are certain narcotics that,

7    because of the danger involved or potential for addiction or

8    potential from some other harm, have special both storage and

9    ordering requirements and reporting requirements.

10          THE COURT:  Storage, ordering, and reporting?

11          THE WITNESS:  That's correct.  Such as ARCOS data,

12    which is our buying and selling information, 100 percent.  We

13    send to the DEA 100 percent of our information across ARCOS.

14      Schedules III through VI are generally medicines which

15    contain a component that would be commonly known as a narcotic.

16    But there's a number, for instance, of steroids and some other

17    things that don't require the same as stringent of storage and

18    ordering and documentation control.

19      So it's sort of two levels of seriousness, if you want to

20    say it that way, where Schedule II's are the most serious; III

21    through VI less so, but still subject to the controlled drugs

22    classification and regulations.

23      I hope I wasn't too wordy.  Is that clear?

24          THE COURT:  So III through VI.  Is the degree of

25    control lessened as you increase numerically?

1           THE WITNESS:  Not as -- not as I as a distributor

2    deal with III through VI.  I'm not a pharmacist.  We don't do

3    that; we don't dispense prescriptions, nor write prescriptions,

4    so I am not aware of what that, effect that has at that level.

5           But at my level, we collectively call those "cage items"

6    because the regulations gives the minimum storage requirement.

7    It's literally a wire cage.  Now, we store them in a much

8    stronger steel building, but it -- that exceeds those.  But

9    those are collectively called "cage."  Schedule II's are called

10   "vault."  We keep those in a concrete vault, again, per C.F.R.

11   21.

12          THE COURT:  Thank you.  That's helpful.

13   BY MR. SPRUIELL:

14   Q    And back to the issue.  ARCOS stands for Automation of

15   Reports and Consolidated Order System.

16   A    That's -- sounds right.

17          THE COURT:  And who has ARCOS?  Is that something

18   that your business has?  Is it nationwide?

19          THE WITNESS:  It's a standard.  It's a standard

20   produced by the DEA, a standard format, a protocol.  Prior to

21   computerization, it was done manually.  I don't think it was

22   called ARCOS back then but the data was moved.  And then once

23   it became computerized, I guess it was given the name

24   automated, as far as I know the history.

25          But it is all of our information.  It's all of the

```
 1    information of what we bought and from whom and how much and

 2    all of the information of what we sold and to whom and how

 3    much.

 4              THE COURT:  And this only applies to Schedule II?

 5              THE WITNESS:  That's right.

 6              THE COURT:  I got you off on the others.  Okay.

 7    BY MR. SPRUIELL:

 8    Q    And in terms of ARCOS reporting, is that on a daily,

 9    weekly, or how is that done?

10    A    Monthly, I believe.  To tell you the truth, up here on

11    this witness stand, I went blank.

12         ARCOS goes out from the computer.  It's automated.  I

13    believe it goes out monthly.

14    Q    So in the sense of the DEA having notice or knowledge of

15    your business --

16    A    Yes.  I know it's not less than that.  I'm sorry.  As the

17    president of the company, I sometimes, all these facts, I can't

18    keep them all on the top of my head.  But it's at least

19    monthly; I believe it's monthly.

20    Q    And in that information, does that also include the dosage

21    units of Schedule II drugs?

22    A    Yes.

23    Q    And so if an order went out to "ABC Pharmacy" on a given

24    day, the DEA knows how many dosage units of hydrocodone or

25    oxycodone that was shipped to that pharmacy in realtime?
```

1    A    Not in realtime.  They know it after the fact.

2    Q    Shortly after --

3    A    Shortly after, but not the same day that it happened.

4    Q    Since January 1, 2014 -- and those are some dates that

5    would obviously come out of the suspension order.  Since

6    January 1, 2014, to the day prior to the service of the ISO,

7    did the DEA ever inform Morris & Dickson that it deemed any

8    order of hydrocodone or oxycodone was excessive?

9    A    No.

10            THE COURT:  I'm sorry; that was prior to what date?

11            MR. SPRUIELL:  May 2, 2018.  So it would be between,

12   Your Honor, January 1, 2014, through May 2, 2018.

13   BY MR. SPRUIELL:

14   Q    And, Mr. Dickson, for that same time frame, did the DEA

15   ever inform Morris & Dickson, based on ARCOS reporting, that it

16   deemed any order of hydrocodone or oxycodone to be unusually

17   large?

18   A    No.

19   Q    Prior to the service of the suspension order on May 3,

20   2018, had the DEA ever communicated to Morris & Dickson, either

21   verbally or in writing, that any order it shipped was

22   excessive, unusually large, or was questionable?

23   A    No.

24   Q    Does the DEA share ARCOS reporting data with distributors?

25   A    They didn't up until a couple of months ago.  A couple of

1    months ago, under heavy pressure from the industry and because

2    of the opioid epidemic, they did begin to share it.  It's

3    actually in a form that so far, it has not proved to be

4    anything that's useable for the distributors.  But we're

5    working on that.

6    Q    And I reference the ISO.  And there were, as you recall,

7    references to averages by state for hydrocodone and oxycodone

8    orders and there were averages by ZIP code referenced there as

9    well?  Is any of that information made available to you, as a

10   distributor, by the DEA?

11   A    You're referring to all ARCOS, in other words, for all

12   distributors?  Obviously, I have my own data.

13   Q    Sure.

14   A    But, no, it was not available to me in the global sense.

15           THE COURT:  I don't understand when we are talking

16   about the other distributors' information.

17           MR. SPRUIELL:  Your Honor, if ARCOS report has

18   information, the DEA references in their particular ISO state

19   averages and ZIP code averages for all distributors, as I

20   appreciate the information as presented.

21       The point of the question and Mr. Dickson's testimony on

22   that subject is:  We don't have that information; only the DEA

23   has that information, and they don't share it with my client.

24           THE COURT:  Okay.

25           MR. SPRUIELL:  And as a result, they can't utilize

1    that information to analyze potentially suspicious orders.

2    BY MR. SPRUIELL:

3    Q    Would that be correct, Mr. Dickson?

4    A    That's correct.

5    Q    And would you deem that information --

6         THE COURT:  Overall by ZIP code, all those things

7    that are referenced?  Okay.

8         MR. SPRUIELL:  Yes, ma'am.

9    BY MR. SPRUIELL:

10   Q    And would Morris & Dickson deem that information important

11   or valuable or at least useful in its work?

12   A    It would be useful, yes, sir.

13   Q    Let's talk about Morris & Dickson's suspicious order

14   monitoring program.

15        MR. SPRUIELL:  And for the Court's benefit, Your

16   Honor, sometimes I reference this with the acronym SOM; that's

17   "suspicious order monitoring."

18        THE COURT:  I'd prefer you didn't.

19        MR. SPRUIELL:  Okay.  I'll do my best.

20   BY MR. SPRUIELL:

21   Q    In terms of a suspicious order monitoring program, is that

22   required by the DEA?

23   A    Yes, it is.

24   Q    And what is the purpose of a suspicious order monitoring

25   program?

1    A    To avert the diversion of drugs out of the medicinal or

2    ethical channels to illicit channels.

3    Q    From intended purposes to unintended purposes?

4    A    Yes.  To try to keep that from happening.

5    Q    And does Morris & Dickson have a suspicious order

6    monitoring program?

7    A    Yes, we do.

8    Q    In terms of how long that particular program has been in

9    place, could you kind of go back and give us a little bit of a

10   history of that program.

11   A    (Nods head up and down.)  I came to work permanently at

12   Morris & Dickson in 1984, when I got out of college.  I would

13   say within six months, I was involved in our suspicious order

14   monitoring program.  At the time it wasn't an acronym and it

15   wasn't a term.  I know that I have our report and our

16   suspicious order letters that date back to 1992, with my name

17   on it.  It's hard for me to peg a date, honestly, as to when we

18   began -- when I began calling it that, we began doing it.  But

19   I would say it was somewhere back about that period of time in

20   the late 1980s to 1990s.  And I have been involved with it ever

21   since.

22   Q    Could you tell us who was primarily responsible at Morris

23   & Dickson for the development of that program.

24   A    Me.

25   Q    In terms of the program and its evolution, has it changed

1  over time?

2  A    Oh, very much so.  I mean, it's changed with

3  computerization; it's changed with volume.  When we began, our

4  Schedule II vault was a little wall safe about this big

5  (indicating).  We were a much, much smaller company back then,

6  located in a 90-year-old building on Travis Street.  Now we

7  have a massive 20,000 square foot Schedule II vault.

8       So both the magnitude, as well as the focus and intensity,

9  for obvious reasons, and then the automation opportunity, data

10  management opportunity, has evolved constantly and continues to

11  evolve, we continue to improve.

12  Q    In terms of the suspicious order monitoring program, has

13  Morris & Dickson made a formal presentation of its program then

14  in existence to the DEA?

15  A    Yes --

16       MS. VINCENT:  Your Honor, I'm just going to object on

17  the basis of clarification.  I'm not sure what time period he's

18  talking about.  Is this current or when?

19       THE COURT:  Certainly, you will have a chance to ask

20  questions.

21       MS. VINCENT:  Okay.

22       THE COURT:  I thought you were going to object to

23  leading.

24       MS. VINCENT:  Well, he did that, too, but I will

25  allow -- I haven't --

1   A     My most recent and most formal was in August of 2016, when

2   I had the director of diversion for the Drug Enforcement

3   Administration, I invited him to come to Shreveport, and he

4   did, with the assistant deputy director and the supervisor I

5   believe of diversion investigations from New Orleans.  And they

6   all three came to my facility in August, and we gave them a

7   formal PowerPoint slide program on our suspicious order

8   monitoring program.

9   Q     Do you remember the names of those individuals?

10  A     Yes.  At the time the director of diversion was Louis

11  Milione.  The assistant deputy director was Denetra Ashley.

12  And the -- I'm sorry.  The New Orleans -- Jackson.

13  Q     Sonya Jackson?

14  A     Sonya Jackson.  Thank you.  Got the last name; didn't get

15  the first name.  I blocked out there.

16  Q     And could you tell the Court what happened at this

17  meeting.

18  A     We had an agenda and we followed that agenda.  And the

19  first portion of that agenda was our presentation of our

20  suspicious order monitoring.  The second part was our offer to

21  utilize our IT capabilities to advance the DEA's identification

22  of physicians, patients, pharmacies who may be diverting.  We

23  felt like that the rapid evolution of communication and

24  adjudication of pharmacy claims was providing a tool that

25  wasn't -- that the DEA might not be aware of and we had direct

1    access to.  And I offered to them that we could provide them

2    collated, ordered information within two weeks.  Or it could be

3    done by an outside contractor with specifically with shield

4    straps.  And I have continued to preach that on the national

5    level at Washington and offer this as an idea to this day.  I

6    was in Washington two weeks ago at the drug czar's office doing

7    the same thing --

8           MS. VINCENT:  Your Honor, I'm not sure it's relevant

9    and it's nonresponsive.

10          THE COURT:  This is not a jury trial, Ms. Vincent.

11   The Court needs as much information as it can get.

12       The objection is overruled.

13          MR. SPRUIELL:  Your Honor, may I approach to hand the

14   witness an exhibit?

15          THE COURT:  Yes.

16          THE WITNESS:  There were earlier presentations.

17   Should I --

18   BY MR. SPRUIELL:

19   Q   Well, I will get to that.  I think we have a typographical

20   error on the first page, so I just -- it has the 17th date.

21          THE COURT:  Mr. Spruiell, were you going to offer and

22   introduce the other exhibit?

23          MR. SPRUIELL:  Yes, ma'am, at the conclusion.  I can

24   do it now if you prefer.

25          THE COURT:  All right.

```
 1              THE WITNESS:  Yeah.  16, not 17.

 2   BY MR. SPRUIELL:

 3   Q    Right.  The document you have in front of you, the first

 4   page has the name "A Wholesaler's Perspective" and it shows the

 5   date of August 17, 2017.

 6   A    It was '16.

 7   Q    It was '16?

 8              THE COURT:  So why does it say '17?

 9              MR. SPRUIELL:  It was a typographical error, Your

10   Honor.

11              THE WITNESS:  I think it was ours originally, Your

12   Honor.  This came off a file off my son Jacob's computer, and I

13   believe it was his original date error from 2016.  And I

14   believe they took it verbatim.

15   BY MR. SPRUIELL:

16   Q    And could you tell the Court what this particular document

17   represents.

18   A    This was the agenda and the presentation that we made to

19   the three leaders from the DEA at that meeting.  As I mentioned

20   before, we presented the SOM.

21        We also showed what our results were and how successful it

22   had been.

23        And then we did -- the discussion phase was the part where

24   we offered up the capabilities we had with our information

25   technologies businesses.
```

1   Q    Does this particular document fairly describe and

2   represent Morris & Dickson's suspicious order monitoring

3   program as of August 17, 2016?

4   A    Yes.  This fairly represents it as of the time.

5   Q    After the presentation of that program, was there any

6   dialogue or feedback with the DEA representatives in

7   attendance?

8   A    Yes, there was.

9   Q    Could you tell the Court what was discussed.

10  A    Principally Director Milione was interested in, or

11  informed me that the DEA was considering promulgating

12  additional regulations as it related to SOMs --

13        MS. VINCENT:  Your Honor, objection.  It's hearsay,

14  and I am not even sure it's relevant.

15        THE COURT:  The Court is not in a position to

16  determine relevance at this time.  This is not a matter for

17  which there has been any pretrials or anything, and the Court,

18  the information that the Court is getting, it's going to have

19  to determine the relevance as it gets ready to make its

20  decision.

21        Of course, I should inform you-all and everyone that I do

22  have a 2:00 hearing and I have a 3:00 hearing.  But we can work

23  around that if necessary, but we need to confine ourselves to

24  the most important facts.  At the same time the Court does need

25  the information.

```
 1              MR. SPRUIELL:  Thank you, Your Honor.  Go ahead, Mr.
 2    Dickson.
 3              THE WITNESS:  I'm sorry.  You're going to have to
 4    remind me where I was; I'm sorry.
 5    BY MR. SPRUIELL:
 6    Q    It was about the discussion and feedback you had --
 7    A    Oh, yes.
 8    Q    -- with Director Milione with the DEA.
 9    A    Oh, yes, okay.  Director Milione informed me that they
10    were considering promulgating regulations that would give
11    wholesalers better guidance.  This had been a complaint of the
12    industry for a very long period of time.  And personally, it's
13    something that was difficult for me, that we had no direct
14    guidance from the DEA on what they wanted our suspicious order
15    monitoring to look like.  And he told me that they were
16    considering that, and he gave me the opportunity to give input.
17    And we had some of that discussion about that potential
18    guidance that they might --
19              THE COURT:  Is there, to this day, any such system?
20              THE WITNESS:  They did not do that.
21              THE COURT:  Is there, to this day, any regulation as
22    to an objective standard which would alert you to a suspicious
23    order, from the DEA?
24              THE WITNESS:  Understanding -- if I understand your
25    question correctly, no.  There is a statement that we must have
```

1    a suspicious order monitoring; and it defines that as orders of

2    unusually large -- unusual quantities, but it doesn't give a

3    number or any type of standards, any type of statistical or

4    numerical standards.  If that was your question, Your Honor.

5            THE COURT:  Well, the ISO refers to unusually large

6    orders for hydrocodone and oxycodone.  And the Court's question

7    is:  Does the DEA provide you with a procedure to determine

8    what is a "unusually large order" -- an objective standard?

9            THE WITNESS:  No, they don't.  I could give -- I

10   don't know if you want me to keep going, Your Honor.  Guide me

11   there.  I could give an example of why they -- well, I --

12           THE COURT:  What information do they do give you in

13   order to determine objectively what is a "unusually large

14   order"?

15           THE WITNESS:  They don't give us anything.

16           THE COURT:  You've talked about how you had no

17   warning until May the 2nd.  There is referenced in the ISO that

18   they came in, in November of 2017, to ask you about your

19   suspicious orders.  Is that correct?

20           THE WITNESS:  I'm sorry, Your Honor.  I'm struggling

21   to hear you; I'm sorry.

22           THE COURT:  Okay.  The question is:  In the ISO, it

23   states that they came in, the DEA came in to talk to you about

24   your suspicious order reports.

25           THE WITNESS:  In October -- are you saying in

1    October?

2            THE COURT:  When was it?

3            THE WITNESS:  That wasn't coming in to talk.  That

4    was a biennial inspection.  That is a regular; it's in the

5    C.F.R.  And every two years, and it's at their discretion, so

6    it may not be exactly two years, and it's without notice.  This

7    is formal.  The DEA comes in and does what's called the

8    biennial audit.  In that biennial audit, they're principally

9    checking to see if our records are correct.  Did we have as

10   much as we say we did?  Did we buy and sell and have

11   inventories that all equal up?  It's just an audit.  Okay.  But

12   in that, there are certainly discussions of everything that we

13   do.

14           THE COURT:  Was there a request for your suspicious

15   order reports?

16           THE WITNESS:  Oh, how many letters we had sent?  Yes,

17   I think they did ask how many reports we had sent, yes.

18       I wasn't -- excuse me, Your Honor.  I wasn't in that

19   meeting.  The compliance officer was.  But -- actually, my son

20   Jacob Dickson was.  But it is my understanding that they did

21   discuss that.

22           THE COURT:  Okay.  Is it correct that they also --

23   that there was a subpoena?  Paragraph 16 of the ISO states that

24   there was a DEA subpoena issued to you --

25           THE WITNESS:  Yes.

1          THE COURT:  -- with regard to the potentially

2     suspicious orders.  Is that right?

3          THE WITNESS:  Yes.  The subpoena was issued in 2018.

4          THE COURT:  And when was that in 2018?

5          THE WITNESS:  I believe it was February.

6          THE COURT:  All right.  And was it your response that

7     formal records are not kept in the regular course of business

8     on the investigation of orders which do not result in the

9     finding of a suspicious order under DEA regulations?

10          THE WITNESS:  That's correct.

11          THE COURT:  And is it also correct, as alleged in

12     paragraph 17, that there were in fact only three suspicious

13     orders reported to the DEA between January of 2014 and

14     September of 2017?

15          THE WITNESS:  That's correct.

16          THE COURT:  And in each case, your company had gone

17     ahead and shipped the order even though you reported it as

18     being suspicious?

19          THE WITNESS:  There were three reports.  I believe

20     that the answer is two and one; I believe that's correct.  I

21     believe that in two of them, it was shipped; and one, it

22     wasn't.

23          THE COURT:  All right; thank you, sir.

24          THE WITNESS:  That's to the best of my memory, Your

25     Honor.

1    BY MR. SPRUIELL:

2    Q    And just to finish the line of questioning dealing with

3    the meeting with the director of diversion in August of 2016.

4    Following the PowerPoint presentation, was there any criticism

5    of your suspicious order monitoring program from the director

6    of diversion of the DEA at that meeting?

7    A    No, there was not.

8    Q    Was there some discussion about there would be follow-up

9    feedback with the DEA diversion office regarding additional

10   discussion on your --

11   A    I'm sorry.  Are you talking about August 2016 or --

12   Q    Yes, August 2016.

13   A    Oh, I'm sorry.  I thought you were talking about October

14   2017.

15        I'm sorry; in the August meeting of 2016 -- could you

16   repeat the question?

17   Q    Was there any discussion about any follow-up with the

18   director of --

19   A    Yes, there was.  Ms. Jackson was to follow up with us.

20   The director turned to Ms. Jackson and asked her to follow up

21   with us in terms of discussion of our suspicious order

22   monitoring because we asked for input and he directed her to

23   have that discussion with us.

24   Q    Did you ever have any additional discussion or contact

25   with Ms. Jackson after that meeting on August of 2016 --

```
 1   A     No, she never contacted me.

 2   Q     Now, Mr. --

 3              THE COURT:  I'm going to go back, Mr. Spruiell.  I

 4   apologize for interrupting you.

 5              MR. SPRUIELL:  Yes, ma'am.

 6              THE COURT:  I'm looking at the regulation itself,

 7   sir, and the language says -- this is the language of the

 8   regulation dealing with suspicious order reporting.

 9       It says:  Suspicious orders include orders of unusual

10   size, orders deviating substantially from a normal pattern, and

11   orders of unusual frequency.

12       Is there any guidelines ever given from the DEA as to what

13   objectively constitutes an order of unusual size, an order

14   deviating from the normal pattern, and an order of unusual

15   frequency?

16              THE WITNESS:  No, Your Honor.  In all of these

17   questions, I'm kind of -- I don't know how far you want me to

18   go.  But there is a really salient point to this I'd like to

19   make, if that's appropriate.

20              THE COURT:  Please.  I'm asking the question.

21              THE WITNESS:  Okay.  As you see, the regulation is

22   very brief.  The circumstances, the business models of

23   pharmacies vary widely.  Walgreens' and CVS' don't.  They're

24   all the same.

25       I service independent small businesses, which frequently
```

1    serve niche clienteles.  So they're not the same; they're very,

2    very different.

3         And to answer about one of those suspicious order reports

4    where we did ship it, that's a great example.  It's a very

5    unusual situation but a perfectly legitimate one.  It was a new

6    hospital; and as I understand it, they had a contract with this

7    pharmacy to supply methadone, if I remember right -- or

8    morphine -- morphine sulfate.  It was morphine sulfate.  That's

9    a hospital item; that's an injectable hospital item.  But they

10   have a con -- they were authorized, they're alternate care,

11   they had the contract.  And the emergency room was opening for

12   the first time; so on the opening order, they get so much

13   larger order than a refill order.  Obviously, you have to stock

14   the emergency room.

15        Well, it's very unusual to have an independent small

16   business like this, order I believe it's 60 of morphine

17   sulfate.  So we flagged it, and then we found out -- and we

18   looked very carefully and we called everybody involved.  Well,

19   they're stocking this legitimate emergency room; this is

20   perfectly normal.  It was still so unusual, we said let's just

21   send a letter anyway.  So there's a case where we sent a letter

22   when there nothing was wrong.

23        In the case where we identify an order of unusual size or

24   frequency and we don't send a letter, it's because that

25   pharmacy perhaps services a hospice.  Hospice is a situation

1    where people are dying of cancer and they're given these

2    opioids to the end of their lives to improve their quality of

3    life.  So it's perfectly normal for a hospice-serving pharmacy

4    to use a lot of opioids because they're serving these people.

5    One of the ones in question was -- it's right outside West

6    Jeff, excuse me, West Jefferson Hospital.  All of their

7    patients are being discharged from the hospital from various

8    surgeries and, yeah, they got opioid prescriptions.  That's

9    what they give people that come out of the hospital.  The

10   outside pharmacy is filling the prescription of the discharged

11   patient.

12       So each pharmacy is not the same.  And so to apply a

13   uniform standard, like a ZIP code or any of this other stuff,

14   it simply doesn't work.  And there are some pharmacies that fit

15   the Walgreen/CVS model, but there's a lot of them that don't.

16   And the DEA understands this, and they gave a directive that

17   they called "Know Your Customer".  And that's what this was

18   about, know your customer.

19            THE COURT:  I saw that in the presentation.

20            THE WITNESS:  Yes.  But that's what they meant by

21   this.  They understand this, and they meant that.  And we have

22   gone to a great length to know our customer.  And that means to

23   understand what their profile is, such that we know what would

24   be suspicious of wrongdoing, if they were doing it; but on the

25   other hand, we can discount something that for them is not

1    suspicious but might be for a different type pharmacy.

2         I hope that wasn't too much.  But I was kind of begging to

3    give that explanation.  Thank you.

4              THE COURT:  Thank you.

5    BY MR. SPRUIELL:

6    Q    And we've kind of skipped over this and I think it's very

7    important that we cover this.  Could you briefly review for the

8    Court the current suspicious order monitoring program utilized

9    by Morris & Dickson, the various components --

10   A    Yes, I will.

11   Q    -- discussion of those.

12   A    As orders come in to our facility electronically -- they

13   all come in electronically -- they pass through filters.  One

14   of those filters has the history for that particular pharmacy.

15   It has the average daily order quantity, or the monthly

16   quantity divided by the number of business days.  And it

17   compares the quantity ordered today with what the average for

18   that pharmacy is.

19        Most pharmacies order controlled II's, C-II's, from one to

20   seven times a month, though they order all their other stuff

21   every day.  But they don't tend to order the controlled drugs

22   every day because of the diff -- because a controlled drug, a

23   C-II, requires special documentation, a form DEA form 222.  The

24   electronic system is referred to by the acronym of CSOS.  So

25   that's an additional burden on the pharmacy and they don't tend

1    to do it every day.  So they'll order, on average, one to seven

2    times a month.

3        So when this order comes in and we're looking at this

4    quantity compared to a per-day average, so we set a factor of

5    10X, in other words, a third of a month.  So if they have

6    ordered more than a third of a month -- and remember, I said

7    seven times would be twice a week; once would be once a month.

8    The average would be three; would be a third of a month.  So if

9    they order more than a week's worth, then we check up on it.

10   If they order less than a week's worth, we don't.  This is

11   called a flag.

12       So if they order ten times the average day, or a week's

13   worth more than that, that flag is generated.  It comes to the

14   compliance officer's computer.  Additionally, it sends an

15   email.  So if she is not at her desk, it'll ping her on her

16   iPhone, and she then investigates that order to determine

17   whether we should ship it or not ship it.

18           THE COURT:  But you have no records, you keep no

19   record of those flags that come up?

20           THE WITNESS:  Only if she investigates it.

21       Frequently, the vast majority of the time, this is a

22   clerical error.  The person was entering, meant to enter a "3"

23   and they put a zero behind it, where it made "33."  The vast

24   majority of these are simple clerical errors.

25       And so if it's that, if it's obvious, we'll reduce the

1   quantity to 3 or they might call the pharmacy and say:  You

2   didn't mean to order 33, did you?  They say, oh, no, no, no;

3   meant to order 3.  So they change it to 3 and they send it.

4   And that's not documented.

5        If on the other hand, they did intend to order it and it

6   is a lot, then they may do other investigative matters.  Which

7   I'm supposed to be talking about the SOMs, so we'll move to

8   that.  But that is the large-order filter.

9        THE COURT:  Well, the Court did have concern, though,

10  that in paragraph -- about Morris & Dickson's operations, in

11  that paragraph 16, it does make that allegation that formal

12  records are not kept in the regular course of business on the

13  investigation of orders which do not result in the finding

14  of --

15       THE WITNESS:  And we've never even heard of anybody

16  saying or requiring that we should keep a record of something

17  that wasn't, didn't turn out to be suspicious, or that didn't

18  require any further investigation.

19       But if I may continue?

20       That takes us to another prong of the four-prong SOM.

21  That is that we do a retrospective analysis.  This is realtime.

22  What I just described was realtime.  As the order is coming in,

23  we're doing that.

24       Retrospectively, we review, at least monthly, the overall

25  purchases of the pharmacy.  Because I designed this and I've

```
 1    done this all my life.  And I care about this, Your Honor.  I

 2    have four sons.  Every one of them knows someone who has OD'd.

 3    This matters to me.  Okay?

 4         I'm sorry.

 5              THE COURT:  We can take a minute.

 6              THE WITNESS:  Could I have a glass of water?  I'm

 7    sorry.

 8         I knew most of those kids, too.  So it matters.

 9         So anyway, retrospectively, we have two methods:  One is

10    internal and one is external.  One uses a contractor.  The

11    other is internal.  The internal is my own creation.  And we

12    call it "the market basket."  We try to define what's normal.

13         Before, I said these pharmacies are all different.  Well,

14    we try to define just what are they.  We do that by what

15    percentage of their purchases are of heart-related drugs, blood

16    pressure, diabetes, of other things that have -- antibiotics,

17    things that have absolutely nothing to do with controlled

18    drugs, addiction, or any of that.  Just other medicines.

19         So we know what's normal and profile our whole book of

20    business by their class of trade and we provide "the market

21    basket."  And we then compare the percentage of controlled

22    drugs they're buying, and maybe specifically opioids, to the

23    normal stuff.  I mean, does this pharmacy have a normal

24    percentage based on our information?  And that's called a

25    "market basket analysis."
```

1          So retrospectively we would go look at their market basket

2     and say:  Are they high controls or low controls, high

3     hydrocodone or low hydrocodone?

4          And we also contracted, beginning in 2013, with a firm

5     called Pro Compliance.  That's an outside consultant.  They

6     look at a completely different aspect of this.  They go to the

7     pharmacy, the retail pharmacy, and through an allowance in the

8     HIPAA regulations, that pharmacy gives them their complete

9     prescription file.

10         Now, that's a distinct difference from what we are selling

11    the pharmacy.  This is what the pharmacy is dispensing.  So if

12    that pharmacy is buying from somewhere else and I don't know

13    about it, it's going to show up here.  Because if they are

14    dispensing more hydrocodone than I'm selling them, then I know

15    they're getting some from somewhere else -- if that makes

16    sense.

17              THE COURT:  So this is your third-party vendor that's

18    referred to in the ISO?

19              THE WITNESS:  Correct.  And they do an exhaustive

20    analysis.  It includes the physicians that are prescribing it.

21    So we get a report that, at least annually, at least

22    annually -- sometimes we run them as many as frequently as

23    monthly, depending on the situation -- that shows us doctor A,

24    B, C, D, and the doctors prescribed this, on a matrix, on a

25    spreadsheet.  Which doctors prescribing what, how many

1    prescriptions were cash, paid for by cash, how many were

2    workmen's comp.  These are all various flags for diversion.  So

3    it's very sophisticated and very complete.  That's called the

4    Pro Compliance report.

5         If we are concerned about that -- and let me go back to

6    that high volume order in the warehouse.  If that compliance

7    officer looks at that high number and says, ooh, this isn't

8    clerical and this is a lot, then she would probably immediately

9    go look at the file we have on that customer and she would look

10   at the Pro Compliance and she would look at "the market

11   basket."  We usually have a photograph of the store and we have

12   other notes that might have been generated in the field by our

13   field staff as to:  What is this place, what does it look like,

14   and how does it operate?

15        Lastly, she might, in either case, whether it's a large

16   order or whether it's a monthly review of "the market basket,"

17   she might call that pharmacy or call that field rep and ask

18   questions about what's going on.  So that is the retrospective

19   view.

20        Lastly, we have our employees.  And this is multifaceted.

21   Tim Wallace works in our Schedule II vault.  And he's a senior

22   member.  Tim has worked for us -- Tim is -- I think Tim is

23   about 50 -- no, he's probably 60-something, and I think he's

24   worked for us for 38 years; it might be more.  I know he's

25   worked as long as I can remember.  He's worked in the control

1    II vault.  He's intimately familiar with the flow and pattern

2    of -- and he watches these orders.  He is the one that clears

3    every Schedule II order.

4         Our truck drivers are asked to report anything unusual

5    they see, because they're the people that go to the store six

6    days a week.  In other words, they're truck drivers.  They're

7    not asked to do anything other than report if they see somebody

8    that looks like drug dealers coming in and out.  If they see

9    something odd, they report it and we tell them to.

10        Our field sales staff goes in on at least, on an average

11   of a monthly basis, sometimes more frequently, and talks to the

12   store owner.  He will carry in with him that store owner's

13   monthly sales report, which will include his controlled

14   substances sales.  And he'll talk to him about it.  So the

15   field staff is evaluating what's going on in the field

16   irrespective of the problem, unless we've identified one.

17        Now, if we've identified one, or potential, not identified

18   a problem -- a concern there might be a problem, the compliance

19   officer might ask that field rep to go to the store and ask the

20   store what's going on.

21             THE COURT:  What happens to the reports of the

22   third-party vendor?  When the third-party vendor flags

23   something, what happens?

24             THE WITNESS:  Well, the third-party vendor profiles;

25   it doesn't flag.  The third-party vendor profiles in

1    percentages of numbers what's going on.  They do have a small,

2    medium, and large; low, medium, high risk.  That's just back to

3    this standard norm again.  In other words, they apply it to a

4    national norm that they have in their files, which I'm unaware

5    exactly what that is, but I understand it that it's some sort

6    of national norm.

7              THE COURT:  So they profile the buyer, your buyer?

8              THE WITNESS:  Yes.  They profile the customer.

9              THE COURT:  And the buyer -- and they do that in

10   terms of high, medium, and low?

11             THE WITNESS:  Compared to a national average.

12             THE COURT:  All right.  And what is being categorized

13   as high, medium or low?

14             THE WITNESS:  That would be above or below the

15   national average.

16             THE COURT:  For what?

17             THE WITNESS:  Of each drug.  And they're looking

18   at --

19             THE COURT:  For each drug?

20             THE WITNESS:  Well, or they're looking at certain --

21   for instance, they're going to look at oxycodone and

22   hydrocodone, obviously, because those are problems.

23             THE COURT:  And it's orders for each drug, quantity

24   of each drug, dosages of the drug?  What is it?

25             THE WITNESS:  Well, they're going to collectively

 1    look at the substance, like oxy.  Okay.  They're going to

 2    collectively do that.  But for instance, they also look for

 3    flag problems.

 4         There's three drugs combined that's called "the trinity."

 5    And those three drugs, if somebody prescribes those, they --

 6    excuse me, if the pharmacy fills that, that's a troubled --

 7    that's trouble.  That's an indication of something other than

 8    medical use.  That combination of drugs, they would flag that.

 9              THE COURT:  So it's three drugs that are used if they

10    are given to the same --

11              THE WITNESS:  That particular three.

12              THE COURT:  -- recipient?

13              THE WITNESS:  Patient; I'm sorry.

14              THE COURT:  Patient.  Right.

15         All right.  And what are those three drugs?

16              THE WITNESS:  Your Honor, I haven't done this -- I

17    haven't looked at that in four years.  I do look at them on

18    occasion, but I'm not the compliance officer.  I --

19              THE COURT:  But you said that's the flag?

20              THE WITNESS:  I can't remember the three, the names

21    of the three.  It's Soma and -- I can't remember the other two.

22              THE COURT:  All right.  But that's what you called --

23    that's the flag?

24              THE WITNESS:  That is a -- that is a flag.

25              THE COURT:  A flag.

1           THE WITNESS:  A high percentage of cash prescriptions

2    could be a flag.

3        But again, Your Honor, these are deviations from the norm.

4    Okay?

5        Well, that happens all the time.  The contractor chooses

6    to use the word "risk," but that's actually not an accurate

7    word.  It's "deviation" is what it is.  And --

8           THE COURT:  And some just do deviate from the --

9           THE WITNESS:  (Nods head up and down)  And it may be

10   perfectly normal.  For instance, if they're serving -- for

11   instance, there's a number of pharmacies are in working class

12   neighborhoods where people do hard manual labor.  And by age 50

13   people are hurting, and they often don't have insurance, but

14   they get prescribed a pain killer and they come in and they pay

15   cash for it.  Well, that doesn't mean that they're abusing the

16   drugs; it just means they don't have insurance or don't have a

17   drug card or the drug card didn't cover it.

18       So sometimes a high percentage of cash means that, but it

19   can also have to do with where that particular pharmacy is

20   located and what style of patient is coming in.  So it's

21   deviating from the norm, but that doesn't mean that there's

22   diversion going on.  That's where we have to know our customer.

23   That's where the fact that we have these multiple facets to our

24   suspicious order monitoring program comes into play.

25       And when -- as I said a minute ago, it's because what I

```
 1    was trying to describe is:  I didn't design this to please the

 2    DEA.  I have to satisfy the DEA.  I designed this is to stop

 3    diversion.  And so I know I didn't do a perfect job.  I know it

 4    can be better than it is.  I know that we probably didn't

 5    document as much as we should have.  I can improve on that.

 6    But it was the best that I could do.  And I think it's dang

 7    good.  And I don't think a single person has gotten hurt by our

 8    drugs.  I sure don't know of one.  I've never heard and I've

 9    never been told of a single case where any of our goods got out

10    and caused harm.  So I think it works.

11              THE COURT:  Do you know -- and this may be beyond the

12    scope of your knowledge -- is diversion of the opioids a

13    greater problem at pharmacies than hospitals --

14              THE WITNESS:  That's correct.

15              THE COURT:  -- and the alternate care?

16              THE WITNESS:  That's correct.  Alternate care, again,

17    is multi -- diversion is highly unlikely except through

18    employees of an institution.

19              THE COURT:  Stealing it.  Right.

20              THE WITNESS:  In other words, the employee has got to

21    steal it.

22              THE COURT:  Yeah.

23              THE WITNESS:  A hospice has got a bunch of people

24    dying of cancer in there and so there's nobody floating in and

25    out other than family members.  I suppose a family member could
```

1    steal it, you know.  This is an internal theft issue, but it's

2    not the same thing as people walking in off the street with a

3    potentially --

4            THE COURT:  Fraudulent prescription?

5            THE WITNESS:  -- fraudulent prescription or other

6    things like that.

7        The other thing about diversion that's outside of our

8    ability to control:  A high percentage of diversion comes out

9    of the home medicine cabinet, where one family member takes

10   something that was meant for another.  All of that is outside

11   the scope of our control.

12       I mean, that's outside the scope of what you were asking

13   me, but --

14           THE COURT:  That was, but that's all right.

15   Hospitals and more likely in pharmacies.  Okay.

16       Please continue, Mr. Spruiell.

17   BY MR. SPRUIELL:

18   Q    And you touched upon this, Mr. Dickson.  Is there one

19   particular aspect of your suspicious order monitoring program

20   that you think does need improvement?

21   A    Yeah.  We should have documented better.  If we had

22   documented better, we would have been able to answer those

23   subpoenas better than we did.  We had the answers, but I didn't

24   make it easy on you.  We didn't have the documents to send in

25   with the answers.  We have the answer.  We can explain

 1   everything the DEA said.  I wish I had documented better and I

 2   sure would in the future if I get the chance.

 3   Q    Is that something you're certainly willing to improve?

 4   A    Overnight.

 5             THE COURT:  Mr. --

 6             THE WITNESS:  Actually, I already have.  I'm sorry.

 7             THE COURT:  And I'd like to hear about that.  But,

 8   Mr. Dickson, since the subpoena that was served on you in

 9   February, has the DEA done any other investigation?

10             THE WITNESS:  Not that I'm aware of.

11             THE COURT:  All right.  Thank you.

12   BY MR. SPRUIELL:

13   Q    And I think you were going to offer perhaps an explanation

14   of additional steps that you may have already taken to deal

15   with improving your suspicious order monitoring program.

16   A    Well, we realized after the subpoena that we didn't have

17   the documents that would have helped.  So we've started

18   documenting some of that.

19        At the moment, we can't ship controlled substances so

20   there's no way we can do it.  It's only if we're able to have

21   live data that we can add these enhancements.

22   Q    Have you taken steps to hire outside personnel to assist

23   in that --

24   A    Oh, yes, I have.

25   Q    What have you done in that respect?

1    A    I hired Guideposts, who is a retired DEA diversion

2    administrator, the director of diversion of the DEA.

3    Q    And what would be that individual or company's role?

4    A    Oh, Guidepost's role?  Well, they could come in, because

5    of their expertise, and he leads it but there's others, and

6    they have substantial DEA experience.  And as a result, they

7    could give us consultation and help us build a better SOM.

8    Q    And that's already been done?

9    A    We have already retained them, yes.

10            THE COURT:  I'm sorry, sir.  My attention was

11   diverted.  Would you repeat that answer.

12            THE WITNESS:  We have retained a firm by the name of

13   Guideposts that is led by a former director of diversion of the

14   DEA, recently retired, as well as staff with other former DEA

15   employees, retired.  And we have hired them to help us improve

16   our SOM.  Retained them as consultants.

17            THE COURT:  Thank you.

18   BY MR. SPRUIELL:

19   Q    Mr. Dickson, I take you back in time to the 2013, 2014

20   time frame.  Was there a point in time when Morris & Dickson

21   took steps to terminate business relationships with pharmacies?

22   A    Yes, we did.

23   Q    Why?

24   A    In 2008, the DEA came forth and firmly told distributors

25   that we needed to stem the opioid diversion problem, that they

1   were going to make us responsible to do it.  And I was called

2   to Washington and told that.

3         So we decided, okay, we'll do what we can to step up our

4   game.  And we began to do suspicious order monitoring and send

5   the letters.  We got no input and there was absolutely no

6   dialogue from the DEA.  It was just a black wall; we couldn't

7   get anything.  But we realized we were going to be held

8   accountable for what they wanted, but we didn't know what they

9   wanted.  We're going to be accountable if we break the rules,

10  but nobody is telling us what the rules are.

11        So finally I got to a point, I said:  Look, if there's any

12  suspicion of a customer of ours, I don't want them as a

13  customer.  I don't care if it hurts my profits.

14        So we eliminated -- it was 142 as of '17.  Okay.  We

15  eliminated 142 of our customers.  We sent them away; said I'm

16  sorry; you can't buy from us anymore because in some form or

17  fashion they might have been suspicious and diverting.

18  Therefore -- and we stepped up our vetting of new stores that

19  we might sell as new customers.  And we reject any that might

20  be possibly be suspicious.  Therefore, we are going to have a

21  set of customers who are not suspicious; and if we don't have

22  suspicious customers, it's far less likely that we're going to

23  have a suspicious order.

24  Q    Prior to 2014, had Morris & Dickson submitted a

25  significant number of suspicious order reports to the DEA?

1    A    Yes, we had.

2    Q    Could you quantify?

3    A    I got them out for this, and it's a stack about that high

4    (indicating).

5    Q    After the elimination of the 142 retail pharmacies who had

6    been customers, do you believe, in terms of your understanding

7    of your suspicious order monitoring program, that that had a

8    dramatic effect on the need to report?

9    A    Yes, it did.

10           MR. SPRUIELL:  Again, Your Honor, may I approach the

11   witness?

12           THE COURT:  Yes.

13   BY MR. SPRUIELL:

14   Q    Mr. Dickson, I've laid in front of you a, what I'll

15   characterize is a spreadsheet.  Can you identify that document

16   for the Court?

17   A    Yes.  I asked for it to be developed.

18   Q    All right.  And what does it purport to show or reflect?

19   A    It shows everything, all controls by dosage unit that we

20   sold from 2014 to the present, and then specifically that for

21   hydrocodone and for oxycodone.  And that's by dosage unit.  The

22   dosage unit in common parlance is a pill.

23   Q    One pill is one dosage unit?

24   A    Yes.

25           THE COURT:  But this applies not just to the

1    scheduled or the controlled drugs; this applies to everything?

2              THE WITNESS:  The 1,321,000,000 number is all

3    controlled substances.

4              THE COURT:  Okay.  Perhaps I need more explanation,

5    Mr. Spruiell, of the whole chart.

6              MR. SPRUIELL:  Yes, ma'am.

7    BY MR. SPRUIELL:

8    Q    Go ahead and take the Court through the columns and --

9    A    Since 2014, Morris & Dickson has distributed to its

10   customers 1.3 billion dosage units of controlled substances and

11   5.1 billion dosage units of non-controlled substances, for a

12   20 percent percentage.

13       So by dosage units, 20 percent of the dosage units that go

14   out our door are controlled drugs.  And has earlier been said,

15   there are many controlled drugs who are not what you would call

16   narcotics.  Some that treat seizures, ADD in children; there's

17   a wide variety of other controlled drugs that are not the

18   opiates that are the focus of the attention today.

19       The lower box shows the two principal drugs that were

20   identified by the DEA in this ISO and are the ones that are

21   most discussed in the public spectrum today.  That's

22   hydrocodone and oxycodone, and those are opioids.  And the

23   numbers there totaling 378 million are 5 percent.  5.8 percent

24   is what we have distributed since 2014 of those drugs.

25   Q    Approximately three and a half year time frame?

1   A    That's correct.

2   Q    All right.  Included in the pleadings that have been filed

3   which you have authenticated, can you tell the Court the

4   percentage reduction in hydrocodone and oxycodone dosage units

5   sent out over the past twelve months?

6   A    I believe the number was 27 percent, if I remember right.

7   Q    Okay.  So it's actually gone down over the past twelve

8   months?

9   A    It's gone down every year since 2014.

10  Q    Was that in any way reflected or included in the ISO?

11  A    No.  It was included in this 2016 slide presentation.  We

12  have a chart that shows that, that shows that decline.  And

13  it's continued.  Since 2016, it's continued today, the decline.

14        THE COURT:  That 27 percent decline refers to what

15  drugs?

16        THE WITNESS:  All controlled drugs.  But it also --

17  both.  All controlled drugs and hydrocodone.

18        THE COURT:  All controlled drugs and --

19        THE WITNESS:  Everything's declined since 2014.

20  Well, excuse me.  I couldn't say "everything"; we have a lot of

21  controlled drugs.  I'm sorry.

22        Opioids have declined and the total controlled drugs have

23  declined.  I can't speak to the epilepsy medicines.

24        THE COURT:  What does the 27 percent refer to?

25        THE WITNESS:  All controlled drugs.  And this is to

1    the best of my knowledge.  Y'all are asking me statistics and

2    I'm remembering -- I'm doing my best to do that by memory.

3    BY MR. SPRUIELL:

4    Q    Now, Mr. Dickson, has the service of the ISO on Morris &

5    Dickson had an impact on your customers since Thursday,

6    May 3rd?

7    A    It's tragic and cataclysmic beyond my ability to explain

8    that in words, on multi levels, for multiple reasons.

9    Q    As a result of the disruption of your deliveries, have you

10   received communications from your customers wherein they

11   detailed the problems because they could not get their

12   scheduled narcotics?

13   A    Hundreds, representing, as I recall from my looking at the

14   numbers this morning --

15           MS. VINCENT:  Your Honor, it's hearsay.

16           MR. SPRUIELL:  Your Honor, this is a TRO hearing.

17   The rules of evidence are relaxed.  We had two business days to

18   get prepared for this and we could not get hospital directors

19   and pharmacists in from seventeen states to testify.

20           THE COURT:  So, Mr. Spruiell, you're not complaining

21   about the Court's prompt scheduling of the hearing on your TRO,

22   are you?

23           MR. SPRUIELL:  No way, Your Honor.  I understand the

24   need to have it promptly.

25           THE WITNESS:  They were emailed to me.

1           THE COURT:  Yes.  And the Court is concerned about

2      whether or not the Government was going to object to the

3      letters that have been submitted in support of the reply.  Does

4      the Government object to those or can the Court give them the

5      weight appropriate because they are just in fact hearsay

6      letters that are unauthenticated?

7           MS. VINCENT:  Your Honor, they're not just a little

8      hearsay; they are totally un -- a lot of them are just

9      completely unreliable, which is the whole reason for the

10     hearsay rule.

11       I mean, for instance, in one of them, it's allegedly from

12     the director of one of the hospitals in Texas and he says:

13     Please get in touch, contact me; but there's no letterhead;

14     there's no contact information.  One of them has a big blank in

15     it.  I can't tell if something has been copied and taken out.

16     They're just totally unreliable.

17       Now, I'm not saying they're not -- that a lot of those

18     people weren't well-intended.  But if the Government had the

19     opportunity to cross-examine those folks, there's probably a

20     lot more to the story than what's presented in those emails.

21     So, yes, we object on the basis of hearsay.  And it's bad

22     hearsay.  And it's offered for the truth what's in the email;

23     it's not offered for another purpose.

24           THE COURT:  Mr. Spruiell, your reply?

25           MR. SPRUIELL:  Your Honor, again, this is a TRO

1   hearing.  The rules of evidence are relaxed due to the

2   accelerated period of time to have this type of hearing.

3        We offer these so simply the Court will have an

4   understanding in the consideration of one of the components,

5   the four components that we must look at for the consideration

6   of the TRO, and that's the public interest and the harm that

7   will exist to the public, including the hospitals, pharmacies,

8   nursing homes, hospice centers, who, because of the action of

9   the DEA, the draconian action of serving an ISO with no prior

10   notice and cutting off the ability of Morris & Dickson to ship

11   these important medications to these facilities, the only way

12   we can develop that is through these letters, which were

13   voluntarily submitted.  No one in counsel or Mr. Dickson has

14   had contact with these people.  They supplied these voluntarily

15   to us.

16        And we'd respectfully submit that the Court certainly can

17   look at them, review them, consider them and give them the

18   weight they deserve.  But to suggest that the information in

19   these letters is fabricated or somehow not real or fake or just

20   done to help Morris & Dickson in this case is I think far

21   afield.

22             MS. VINCENT:  Your Honor, may I respond?

23             THE COURT:  Yes, ma'am.

24             MS. VINCENT:  I didn't -- first of all, the

25   Government did not suggest that the information was fabricated,

 1   that there's just more to the story possibly is what I --

 2             THE COURT:  Right.  And I appreciate that.

 3        The Court is going to allow their introduction into

 4   evidence.  They were attached to the pleadings, so they're not

 5   technically in evidence.  And the Court is aware of the hearsay

 6   nature, the lack of the ability of the Government to

 7   cross-examine them, and will assign the appropriate weight to

 8   them based with that in mind.

 9             MS. VINCENT:  Your Honor, may I make one more point,

10   one quick point?  Just that there are some facilities that are

11   local and those folks could have been here today (inaudible).

12             (The Reporter asks Ms. Vincent to repeat.)

13             MS. VINCENT:  There are some of those customers who

14   are local, by the witness' own testimony, and there's no reason

15   that those folks could not have been here today, that I know

16   of.

17             THE COURT:  Thank you.

18        Please continue.

19   BY MR. SPRUIELL:

20   Q    Mr. Dickson, let's move to the harm experienced and to be

21   experienced in the future by Morris & Dickson as a result of

22   the ISO.

23        What impact has the service of the ISO had on Morris &

24   Dickson?

25   A    It will extinguish our business completely within a matter

1   of weeks if it continues in place.

2   Q    Can you explain your answer to the Court.

3   A    I previously described that a store must be primary with

4   the wholesaler to buy controlled substances.  So the only way

5   my customers can buy controlled substances if I can't sell them

6   is to become primary with another wholesaler.  That means they

7   don't buy from me anymore.  That's already begun.  Last night

8   our sales dropped 14 percent.  So it's already begun.

9           THE COURT:  And this is across the board or only as

10  to the controlled substances?

11          THE WITNESS:  This is across the board.

12          THE COURT:  What is the effect of the limiting on

13  your sales of controlled substances to the non-controlled

14  substances?

15          THE WITNESS:  By dollar, it's about 10 percent, so

16  you could extrapolate 14 percent -- I mean, 4 percent out of

17  the 14.

18          THE COURT:  No --

19          THE WITNESS:  But we don't know that that's accurate.

20  But it's more than the controlled substance loss.

21          THE COURT:  Right.  My point is:  What is the

22  likelihood of your losing the non-controlled drug business if

23  you are unable to supply the controlled substances?

24          THE WITNESS:  It's absolutely certain that we would

25  lose as a primary that 90, 80 to 90 percent I talked about, and

```
 1   we could only be secondary because our customers have to buy
 2   controlled drugs.  And if they can't buy them from us, they
 3   must become primary with one of "the big three" because "the
 4   big three" require that.
 5                THE COURT:  Okay.
 6                THE WITNESS:  So at best, they could buy 20 percent
 7   from us.  In fact, a lot of them will buy nothing from us.
 8        We were contacted yesterday by our largest single
 9   alternate care customer.  MCAP is the acronym.  But this is
10   GPO, group purchasing organization, for state dispensaries.
11   That would be everything owned by a state from the college
12   infirmary to a mental health clinic to a prison.  Anything
13   except a big hospital owned by a state.  And we have nine
14   states.  That's $400 million a year.  That's 10 percent of our
15   business.  They told us yesterday they were seeking another
16   primary wholesaler.
17                THE COURT:  I'm sorry, sir.  So how much --
18                THE WITNESS:  That's 10 percent of our business.
19   They told us they were moving, they were beginning the move.
20                THE COURT:  And is it your testimony, sir, that
21   Morris & Dickson did nothing to solicit those emails?
22                THE WITNESS:  No, that's not true.  We did -- in
23   fact, we asked our customers to speak out.  We asked them to
24   let their voice be heard both in Congress -- we didn't ask them
25   to send them to the Court; they did that on their own.  I asked
```

1   them -- I gave them my personal email address, which quickly

2   became overwhelmed since I couldn't keep track of them and the

3   other emails and so I created another address called

4   needmeds@morrisdickson.com.  I had that one created expressly

5   for this purpose.  Our sales reps were allowing people to

6   express themselves.  But the only solicitation we made was an

7   initial one.  This has been a ground swell generated by the

8   people that are experiencing these tragic situations.

9       I might say, Your Honor, I had a rough weekend.  I read

10  every last one them and I prayed for every one those pages.

11  You got the worst of them.  I called one pharmacist, one that

12  related the patient dying of cancer that he used the code name

13  Janice for, who was crying in pain.  And I talked to him, the

14  pharmacist; I prayed with him over the phone.  I had a rough

15  weekend.  I had a really -- that had absolutely to do with the

16  question you just asked me and that's:  Will my business

17  survive?  Because all I was worried about all weekend was

18  people.

19      But, no, our business will be extinguished.  It will be

20  knocked out.  We'll lose 80 percent of our business.  We cannot

21  survive on 20 percent.  We have this massive 500,000 square

22  foot facility.  We've got trucks that travel tens of thousands

23  of miles a day all over the country.  This is a massive

24  organization.  You can't downsize it; it doesn't work that way.

25      But probably the most salient point is:  We'll lose all

1    our discounts with our manufacturers.  We make two-tenths of

2    one percent.  That's our net profit.  It will be this year

3    probably.  Last year, we actually lost money.  We were slightly

4    below breakeven.  The loss of discount is 3 percent.  Multiply

5    3 percent times our volume, which this year will be

6    4.8 billion.  So 3 percent of 4.8 billion, if I got it right,

7    is 150 million we'd lose, if I got it right, just in lost

8    discount alone.

9        And so this is untenable within weeks, because if we don't

10   get this TRO today, the ISO stays in place, then we have to

11   tell our customers exactly what's going on and they will leave

12   us immediately.  We won't be here for that July 9th hearing;

13   we'll be long gone.  We -- you can't just stay there and lose

14   money like that; it doesn't work.  And the customers will be

15   gone.  And even if we got it back on July 9th, it's too late;

16   the customers are gone.  And furthermore, why would they come

17   back?  They don't know that it won't happen again.  So it is

18   absolutely true that if we don't get this TSO (sic) today, a

19   177-year business is killed in five days.

20            THE COURT:  Mr. Spruiell, the Court, in accordance

21   with the precedent in *Cardinal*, is interested in the numbers as

22   to the percentage of the overall profits, the overall sales,

23   and the percentage of hydrocodone and oxycodone in terms of

24   dollars that those drugs represent.

25            THE WITNESS:  May I speak to profit?

1          THE COURT:  Yes, sir.  And the Court is interested --

2    and, Mr. Spruiell, you would of course have read *Cardinal* and

3    would be guided by what is discussed by the Court in the

4    analysis of that case for the substantial harm.  Because the

5    harm must not just be harm, but substantial.  And the Court in

6    the -- for the preliminary injunction in that case decided that

7    the ISO in that case did not represent a substantial amount.

8          Am I categorizing this wrong?  You rise.

9          MS. AVERGUN:  No, Your Honor.  I am prepared to

10   address the questions about *Cardinal Health*, though, other than

11   Mr. Spruiell, if that would be okay with the Court.

12         THE COURT:  But I need some numbers and so that's

13   what I'm looking for.  And I'm asking you for the type of

14   numbers, if you would ask the questions that would solicit the

15   type of numbers that would give me the information that is

16   discussed by the Court in *Cardinal*, to rephrase the problem.

17         MR. SPRUIELL:  Your Honor, just to bring the Court --

18   give notice of the prior testimony.  We understand, and

19   *Cardinal* very clearly addresses the number of distribution

20   points, by *Cardinal*.

21      When the ISO in *Cardinal* was served on the Lakeland,

22   Florida facility, the Court granted a TRO but denied the

23   preliminary injunction.  And one of the principal reasons the

24   preliminary injunction was denied is because Cardinal could

25   service all of the customers of Cardinal out of the Lakeland

 1    facility from another distribution point.

 2         So at the hearing, when the judge realized what had

 3    happened and the stated circumstances at that time, there was

 4    no loss in business for Cardinal at that time because all of

 5    the needs of Cardinal's customers could be served by another

 6    distribution facility.

 7         We do not have that opportunity.  We have one distribution

 8    point.  If the registration for that one distribution point is

 9    suspended, we cannot service.  So we don't have the ability,

10    like Cardinal did, to take up the slack somewhere else.  So

11    that is one very critical, and I think it was the predominant

12    reason the Court declined the preliminary injunction in that

13    circumstance.

14              THE COURT:  All right.  Registration, then, is not

15    per company but per distribution site?

16              MR. SPRUIELL:  Yes, ma'am.  And we have two.  And

17    they suspended both, and we don't know why they suspended the

18    New Orleans because there's absolutely no evidence in the ISO

19    that anything happened in that particular facility that related

20    to diversion or possible suspicious orders because there is no

21    distribution from that particular facility.

22              THE COURT:  It goes from New Orleans to Shreveport.

23              THE WITNESS:  On returns.  May I speak to that

24    purpose of that New Orleans facility?  I missed one part; I

25    forgot.

1     The New Orleans facility serves as a backup.  We served

2   Katrina.  We served -- the most recent one, Houston floods.

3   Okay.  We have that there for backup in case of emergency.

4   Now, we never expected that we'd need it for this.  But we had

5   that there for emergency backup.  So if Shreveport ever got

6   hit, because we've been hit by a tornado.  Our facility was hit

7   by a tornado once.  So that was there as a backup facility and

8   we could use it as a backup Schedule II, except they placed the

9   ISO on it, too.

10  BY MR. SPRUIELL:

11  Q    And I think one other thing, Mr. Dickson, the Court wanted

12  to hear from you were numbers regarding total sales and

13  Schedule II, particularly hydrocodone and oxycodone and the

14  profits that may be related and what would happen if the ISO

15  stays in place.

16        THE COURT:  And if I may go back up.  So when we see

17  in the ISO that notice is hereby given, and it's the

18  certificate of registration, it lists two certificates of

19  registration and they apply to the New Orleans facility and the

20  Shreveport facility.  Those numbers correspond to those

21  facilities?

22        MR. SPRUIELL:  Yes, ma'am, that's correct.

23        THE COURT:  All right.

24     Now, yes, I'd like to hear about the numbers.

25        THE WITNESS:  We've been going a lot of places.  I

1    think the question is:  Tell me about the profitability of

2    Schedule II's, which includes hydrocodone and oxycodone.  We

3    lose money on Schedule II's.  Every time we sell a bottle,

4    every additional bottle of a Schedule II drug, every additional

5    oxycodone, every additional hydrocodone is additional loss.

6    And this is why.

7         The vault that we had to just build when they uplisted

8    hydrocodone recently, cost us a million dollars alone just to

9    build that vault.  The Form 222, CSOS, the SOM programs, these

10   are all very labor-intensive, very expensive things.  So, but

11   we make exactly the same margin on a controlled drug as we do

12   on a non-controlled drug; the margin is the same.  The absolute

13   profit, because margins are percentages, right?  These are

14   cheap.  They're mostly generics, so they're low dollar, so the

15   margin is often just less than a dollar or less, or pennies.

16   So there isn't any margin there; we've got all these costs.

17        The only reason -- I would love not to sell controlled

18   drugs.  That would be great if it was possible.  But that's not

19   how the industry works.  The industry works where you sell

20   everything if you are a full-line wholesaler.  Now, there are

21   other companies that are in a different class of trade.  But

22   that's not who we are.  We're a full-line wholesaler.  It is a

23   class of trade and it's the business we're in; can't be in any

24   other.  And so we have to carry Schedule II's because our

25   customers need them.  And so what money we lose on Schedule

 1   II's has to be made up on the other things that we don't have

 2   those additional costs involved.

 3       So when the statement is made that there is profiteering

 4   going on, that's just ignorant of facts, because there is no

 5   profiteering in selling hydrocodone.  We lose money in selling

 6   hydrocodone.  It's a service to the industries; that's what it

 7   is.

 8           MR. SPRUIELL:  And back to, I guess my final question

 9   if the Court does not have any additional information that need

10   on that issue?  Have we answered your questions, Your Honor?

11           THE COURT:  Well, I thought I heard Mr. Dickson say

12   that the overall income on the business was 4.8 billion a year

13   but that the profit was 150 million.  Is that correct?

14           THE WITNESS:  No, ma'am.  I'm sorry.  There was a lot

15   of numbers thrown there.  Let me give you those.

16           THE COURT:  Okay.  That's what the Court's looking

17   for.

18           THE WITNESS:  Our total sales, that's the total sales

19   figure for our company is, this year will probably be

20   4.8 billion.  We might make 3 million this year.  We've still

21   got have a month and a half to -- excuse me, we're going to

22   lose money this year, period.  Okay.  It's a matter how much.

23   Had this not happened, we would have been, in June 30th, we

24   would have been somewhere between 3 and 8 million in net

25   profit, which is, as I said, just a few basis points or a few

1    tenths of percents of that 4.8 --

2              THE COURT:  Overall sales?

3              THE WITNESS:  Right.  That would be a tenth of a

4    percent would be the 4.8.

5    BY MR. SPRUIELL:

6    Q    Final question.  The TRO is not entered and you don't have

7    the ability to get back into the market of distributing

8    controlled drugs, what's going to happen to your employees?

9    A    They will all lose their jobs.

10             MR. SPRUIELL:  Your Honor, that's all the questions I

11   have for the witness.

12             THE COURT:  All right.  This might be a good time,

13   then, to take a break.  Before we do that, the Court would ask

14   counsel to address the issue of sovereign immunity.

15       Ms. Vincent, does the Government contend that the

16   economic -- any economic loss is recoverable if it turns out

17   that you are wrong in the imposition of this ISO?

18             MS. VINCENT:  Well, Your Honor, I'm not really

19   prepared to speak with regard to -- I don't know what type of

20   claim would be made.  But if it's a tort claim, for instance, I

21   don't believe sovereign immunity -- I think there are

22   exceptions to the FTCA -- like the discretionary function

23   exception, maybe some others.

24             THE COURT:  The case law seems to uniformly

25   acknowledge that the sovereign immunity applies.

1          MS. VINCENT:  I think that's probably the case.  But

2   I'm prepared to say that.  Without knowing what type of claim

3   would be made, I can't definitively say, but I am prepared to

4   say I think that it would be difficult to get beyond the

5   sovereign immunity bar.

6          THE COURT:  Mr. Spruiell, would you address that

7   issue for the Court?

8          MR. SPRUIELL:  It is my understanding that sovereign

9   immunity would block any claim on the part of Morris & Dickson

10  for any relief financial related particularly dealing with an

11  improperly served ISO.

12         THE COURT:  Thank you.  All right --

13         MR. SPRUIELL:  Your Honor, at this time, with the

14  Court's permission, I'd like to offer Exhibits 1, 2, 3, and 4.

15      And just for the record, Number 1 is the spreadsheet

16  reflecting the employment information and related.

17      Number 2 is the wholesaler's perspective, which is the

18  PowerPoint slide presentation.

19      Number 3 is the financial information that reflects the

20  relative percentages.

21      And Number 4 is Mr. Dickson's affidavit that was attached

22  to the reply brief filed yesterday that had the 15 or 16, I

23  believe, letters or email responses which the Court has agreed

24  to allow and give whatever weight it deems appropriate.

25         THE COURT:  Subject to the Court's prior rulings,

```
 1   they are admitted.
 2        At this time, then, we're going to take a break and we're
 3   going to come back at 12:15.  That's like 25 minutes.  I would
 4   suggest that everyone obtain some cheese crackers or something
 5   to kind of keep you going because we have some more ground to
 6   in fact cover in this hearing and that we hope to finish it
 7   today.
 8             MR. SPRUIELL:  Yes, ma'am.  Thank you.
 9             THE COURT:  All right?  Good.  Well, we are in
10   recess, then, until 12:15.  Thank you.
11                          (Recess)
12             THE COURT:  Please be seated.  Yes, Mr. Dickson, if
13   you will just take the stand.  One minute, sir.
14        You may proceed.
15             MS. VINCENT:  Have you tendered the witness?
16             MR. SPRUIELL:  I'm sorry.  Yes, Your Honor, we tender
17   the witness.
18                       CROSS-EXAMINATION
19   BY MS. VINCENT:
20   Q    Good afternoon, Mr. Dickson.
21   A    Good afternoon.
22   Q    Mr. Dickson, you mentioned that you have your own --
23   Morris & Dickson has its own information on its customers; is
24   that correct?
25   A    That's correct.
```

1   Q     And I assume that means their purchasing patterns and some

2   things of that nature -- of controlled and non-controlled?

3   A     We have also our own sales data, yes.

4   Q     Okay.  In addition to the other things, which I'll get to

5   in a minute.  But you have your own information on the

6   customers.

7         What is the number of dosage units an average customer

8   would buy of oxycodone or hydrocodone in a month?

9   A     Average doesn't have -- I don't know your question in

10  terms of the meaning of "average," considering the term of

11  variability I have previously described.

12  Q     Well, you would have -- at least, you would know average

13  per customer, would you not?

14  A     I would not the way you ask "average," because it varies

15  by customer.  I mean, an arithmetic average is not useful; so,

16  no, I don't know the arithmetic average because it's not

17  useful.  I guess that's the --

18  Q     You would have the information for each specific customer

19  though; is that correct?

20  A     That's correct.

21  Q     Have you read the order to show cause immediate suspension

22  of registration completely?

23  A     I have.

24         MS. VINCENT:  Your Honor, I'd like to offer the order

25  to show cause and immediate suspension of registration.  I

1   could have him identify it, but --

2            THE COURT:  Oh no.  It is -- I don't think there is

3   any objection to that being admitted into the record.  That is

4   in the record.

5            MS. VINCENT:  Government Exhibit 1, Your Honor.

6            THE COURT:  And that's consists of 16 pages; is that

7   correct?

8            MS. VINCENT:  That's correct.

9       I've already provided one, an extra one to Mr. Spruiell.

10           THE COURT:  Ms. Keifer, I have that.  You have a copy

11   for the Court?

12           MS. VINCENT:  I do, Your Honor.

13       May I approach the witness, your Honor?

14           THE COURT:  Yes.

15           (Ms. Vincent hands document to the witness.)

16   BY MS. VINCENT:

17   Q   Mr. Dickson, I have handed you a complete copy of the

18   order to show cause and immediate registration.  I'd like to go

19   over some of the statements in that document.

20       Do you dispute -- and I don't think we need to go to the

21   specific page for this; but if we do, please let me know.

22       Do you dispute that between 2014 and 2018, that Morris &

23   Dickson submitted only two, possibly three, suspicious order

24   reports?

25   A   I don't dispute that.  That's correct.

```
 1    Q    And there's some -- there's been some discrepancy with
 2    regard to whether it was two or three.  As I understand it,
 3    Morris & Dickson actually found two.  Does that sound right?
 4    A    That's not correct.  There's three.
 5    Q    Well, there were three ultimately found.  Is that --
 6    initially, they only found two.
 7    A    I don't know what you mean by "initially."  There are
 8    three.
 9    Q    Okay; there were three.
10         Of the third report, was Morris & Dickson even able to
11    determine who the pharmacy was?
12    A    Excuse me.  Which one is the third report?
13    Q    Oh, okay.  Let's go over the customers.  Was Plaza
14    Pharmacy one of the customers?
15    A    It was.
16    Q    For one of the suspicious order reports; is that correct?
17    A    To my recollection, it is.
18    Q    Was Hedrick Pharmacy one of the pharmacies for the
19    suspicious --
20    A    To my recollection, that's correct.  I don't have -- can I
21    be provided with the letters?
22    Q    You sure -- well, you sure can.
23    A    Okay.
24              MS. VINCENT:  May I approach, your Honor?
25              THE COURT:  Yes.
```

```
 1              (Ms. Vincent hands document to the witness.)

 2              THE WITNESS:  Thank you.

 3    BY MS. VINCENT:

 4    Q    Have you had an opportunity to review that email?

 5    A    I did.

 6              MS. VINCENT:  And just for counsel's purposes, this

 7    is the email from Clara Guinn to Jacob Dickson.

 8              THE COURT:  And do you have a copy for the Court?

 9              MS. VINCENT:  I do, Your Honor.  I didn't have it in

10    yet, but I -- he hasn't identified it, but I'd be happy to

11    introduce it at this point.

12         I'd like to introduce it as Government's Exhibit 2.

13    BY MS. VINCENT:

14    Q    Sir, this document, does this look familiar to you at all?

15    A    My name is not on here.  I do remember the letter, but

16    this isn't the letter.  This is emails between different

17    employees at our company and the DEA.  This is not the letter.

18    I had asked you for the letter.  This is something else.

19         But the subject matter is familiar.

20    Q    Okay.  Who is Jacob?  Jacob Dickson is --

21    A    -- my son.

22    Q    Okay.  And he -- what is his position in the company?

23    A    He is vice-president of marketing.

24              THE COURT:  I don't know what I'm looking at.  So I

25    need some help there, Ms. Vincent.
```

1              MS. VINCENT:  Okay.  Okay.

2   BY MS. VINCENT:

3   Q    Does this refresh your memory with regard to the

4   suspicious order reports and who the pharmacies were?

5   A    I'm familiar with the situation.  As president of the

6   company, I didn't handle this situation.

7              THE COURT:  This does not appear to be a

8   suspicious --

9              MS. VINCENT:  No.  And, Your Honor, and I really

10  just -- if he didn't remember, I wanted -- I thought this might

11  help him recall the pharmacies and the nature of the three

12  suspicious order reports that were actually submitted to the

13  DEA.

14             THE COURT:  And what the Court would like is:  Could

15  you just please tell me the dates of those, who the pharmacies

16  were and the dates and perhaps Mr. Spruiell would be in a

17  position to stipulate.

18             MS. VINCENT:  Well, that's part of the problem, Your

19  Honor.  I think that Plaza Pharmacy was one, as identified by

20  the witness.  Hedrick Pharmacy was the second.  And I am asking

21  about the third.

22             THE WITNESS:  This is Plaza Pharmacy you put in front

23  of me.

24             THE COURT:  It says Plaza and then it says -- I don't

25  know what I'm looking at.

1        MS. VINCENT:  And then it says Hedrick down below for

2   a second one.

3        So I'm asking the witness who the third was, who the third

4   suspicious order was.  I'm not sure if it's Hedrick again for

5   compliance --

6        THE WITNESS:  I was asking for the letters because,

7   off the top of my head, I can't recall the name right now.  I

8   do remember a third one.  And I've seen the letters.  But I

9   don't -- I can't recall off the top of my head, no.

10  Q    Do you recall that --

11       MS. VINCENT:  And I -- again, Your Honor, I didn't

12  intend to -- intended this document to help him remember the

13  incident more than I did to introduce it into evidence.

14       THE WITNESS:  I'm sorry; I'm not understanding what

15  incident you're referring to.

16  BY MS. VINCENT:

17  Q    The three reports.  But --

18  A    That's not an incident.  Those are three separate actions.

19  Q    Okay.  Well, why don't you tell me -- and you don't recall

20  who the third suspicious --

21  A    I can't call the name off the top of my head, no.

22  Q    Do you recall the dates?

23  A    No.

24       THE COURT:  All right.  Is there any way we could

25  just say what this is?  It looks like Plaza.  The suspicious

```
 1   report was 4/26/17 and involved pseudoephedrine.

 2            MS. VINCENT:  Yes, pseudoephedrine.

 3            THE COURT:  Ephedrine.

 4            MS. VINCENT:  Yes, Your Honor.  That was one of

 5   the -- this is from Plaza Pharmacy.  That was one of the

 6   suspicious order reports.  And I assume counsel will correct me

 7   if --

 8            THE COURT:  Does everybody agree to that?

 9            MR. SPRUIELL:  Yes, Your Honor, although

10   pseudoephedrine is not Schedule II controlled drug.

11            THE COURT:  What is it?

12            MS. AVERGUN:  It's a listed chemical, Your Honor.

13            THE COURT:  It's a what?

14            MS. AVERGUN:  A listed chemical.  So there's

15   controlled substances and then there's listed chemicals.

16            THE COURT:  Are the listed chemicals something that

17   is subject to the ISO?

18            MS. VINCENT:  Well, all controlled substances and

19   it's a controlled substances, so yeah.  The answer is --

20            THE COURT:  That's the Court's question.  All right.

21            MS. VINCENT:  It is a controlled substance.

22            THE COURT:  Do we not know?  No one knows.  So that

23   it's not relevant, if it's not a controlled substances.

24            MS. VINCENT:  Well, then, a suspicious order would

25   not have been required?
```

 1              THE WITNESS:  May I answer?

 2              THE COURT:  Yes, sir.  Do you have a --

 3              THE WITNESS:  The state has a separate listing than

 4      the federals.  And if this is in Louisiana, pseudoephedrine is

 5      a listed state.  It's not listed federal.

 6              MS. AVERGUN:  And in addition, your Honor, the Code

 7      of Federal Regulations that govern all the regulations has a

 8      separate suspicious order reporting requirement for listed

 9      chemicals.  So there is the 1301.74 which applies to controlled

10      substances, and then there is a section, I believe it's in 1310

11      of the C.F.R. that has reporting requirements for extraordinary

12      orders of pseudoephedrine and other listed chemicals.

13              THE COURT:  But under the ISO, there is no ban on him

14      selling the pseudoephedrine?

15              MS. AVERGUN:  I think it's subject to the

16      Government's interpretation, Your Honor.

17                  (Counsel simultaneously talking.)

18              THE REPORTER:  Excuse me; one at a time, please.

19              THE COURT:  That's not a good answer to my question.

20      The Court is struggling to understand regulations with which it

21      is not familiar, and it needs your honest answer on that.

22          Is it your interpretation that that is subject to the ISO?

23              MS. VINCENT:  If it is not a controlled substances,

24      then it is not subject to the ISO.

25              THE COURT:  So what is our relevance here today to

 1   this?

 2           MS. VINCENT:  Well, I'm really just trying to get

 3   some background on three suspicious order reports that were

 4   submitted.

 5           THE COURT:  So one we think may not be relevant.  The

 6   second the Hedrick Pharmacy, do we know the date of that and

 7   what was the chemical or the drug?

 8           MS. VINCENT:  Well, the date of the email is December

 9   4, 2017.  It looks like the date -- it says I still need the

10   DEA number which he reported on April 26, 2017.  So I assume

11   that's the date.

12           THE COURT:  But you have -- you say you have three

13   suspicious order reports.  What is the date of the suspicious

14   order report for Hedrick?

15           MS. VINCENT:  On or about April 26, 2017.

16           THE COURT:  And that is for?  What was the suspicious

17   activity?

18           MS. VINCENT:  What I have does not -- well, what I

19   have does not definitively identify what drug.

20           THE COURT:  Okay.  And then it's the third one now

21   that we're talking about?

22           MS. VINCENT:  Yes.

23           THE COURT:  Do you remember what pharmacy the third

24   one is in reference to?  Surely somebody has these in their

25   possession.

 1          MS. VINCENT:  Well, that's part of the problem.  The

 2     third one was ambiguous.  The DEA actually found three, and the

 3     ISO says this.  The Morris & Dickson provided two.  The DEA

 4     found a third vague one.  And I don't think we've ever gotten

 5     to the bottom of it.

 6          THE COURT:  Okay.

 7          MS. VINCENT:  That was the point I was trying to

 8     make.

 9          THE COURT:  All right.  So the question for this

10     witness, then, is:  Do you know anything about the third one?

11          MS. VINCENT:  Correct.

12          THE COURT:  Not Plaza, not Hedrick but a third one.

13          THE WITNESS:  I could, if I can be reminded of that

14     third one.  If there was a third letter and I saw it, there is

15     one, it was mailed to the DEA and they had a question, they

16     could have, as it is in this email, inquired until they got an

17     answer.  But I can't, just off the top of my head reel off the

18     number.  I remember now the pseudoephedrine one, and I remember

19     why we reported it, even though it wasn't a controlled

20     substances.  But I, just off the top of my head, can't recall.

21     If somebody can refresh my memory, I probably could.

22          MS. VINCENT:  Okay.  I think we've made enough of --

23     BY MS. VINCENT:

24     Q    You don't remember.  That is your answer and that --

25     A    I don't recall the name.

1  Q    Okay; that's fine.  Hedrick and Plaza, are they current

2  customers of Morris & Dickson?

3  A    I believe so.

4  Q    Mr. Dickson, I am going to turn -- I would like for you to

5  turn your attention to the ISO, which has been marked as

6  Government Exhibit 1, page 6, starting with paragraph 25 where

7  Wallace Drug Company is discussed.

8      Do you dispute that there was an initial risk evaluation

9  report by your third-party vendor Pro Compliance, and it

10  revealed that this particular pharmacy, Wallace Pharmacy,

11  dispensed a higher quantity of hydrocodone and oxycodone

12  tablets than the national average and engaged in cash

13  transactions hire than the national average?

14  A    Yes.

15  Q    You dispute that your -- that that --

16  A    No, I'm aware of that.  I'm aware of that.  I'm sorry; I

17  don't dispute that.

18  Q    You actually have a report to that effect?

19  A    That's correct.

20  Q    And what did you do with that report?

21  A    We have that report on file.

22  Q    You have it on file?  Okay.

23  A    (Nods head up and down.)

24  Q    As a result of that report, did Morris & Dickson review

25  the orders from Wallace Pharmacy any differently than other

1    customers?

2    A    Yes, we did.

3    Q    And who specifically would have been involved in reviewing

4    those orders?

5    A    Clara Guinn.

6    Q    Now, Clara Guinn is -- is she the chief compliance officer

7    for Morris & Dickson?

8    A    She is the only compliance officer --

9    Q    Okay.  Do you deny that in January of 2018, Wallace Drug

10   Company ordered 24 bottles of a thousand dosage units of

11   hydrocodone in two days and 12 more bottles of 1,000 on the

12   following day?

13   A    Was it January?  I thought it was -- excuse me, but I

14   didn't think it was January.  Give me just a second and I'll

15   review this record, please.

16   Q    Okay.

17   A    I'm sorry.  Yes, it was -- okay, yes, that was January,

18   that's correct.  There were some other orders that we also

19   noted that were not January; but, yes, there was an order in

20   January.

21   Q    And the first two orders for the 24,000 dosage units were

22   actually shipped; is that correct?

23   A    That's correct.

24   Q    As a result of those two orders that were shipped, or the

25   third order, was there any report made to the DEA of a

1   suspicious order?

2   A    No, it was not because it wasn't suspicious of wrongdoing.

3   Suspicious of wrongdoing as opposed to suspicious of the

4   purpose of the purchases.  Mr. Wallace was afraid this item was

5   in short supply and he didn't want to run out and so he stocked

6   up.  And we don't allow customers to do that, and we called him

7   and he sent it back.

8   Q    But the shipments were actually shipped, the first two,

9   not the third, but the first two, is that correct --

10  A    That's right.

11  Q    -- that 24,000 dosage units?

12  A    That's right.

13  Q    And it was shipped and it was ordered and it was still a

14  suspicious order; isn't that correct?

15  A    It was an order of unusual size.  It was deemed suspicious

16  after the fact, based on reviewing his records.  It was

17  determined that he was not -- it was for an explainable reason

18  and then we told him to send it back and so he did.  I mean, he

19  sent it back in good faith.  We did our due diligence and

20  corrected the problem.

21  Q    So the order of unusual size, that included the 24,000

22  dosage units, did it not?  The first two orders.

23  A    The first two orders was 24,000, yes.  And that was an

24  unusual size, yes.

25  Q    And it was not reported to the DEA?

1    A    Yes.

2    Q    The order?

3    A    That's right.

4    Q    Even after the fact?

5    A    That's correct.

6    Q    Is Wallace Drug Company a current customer?

7    A    I believe so.

8    Q    Okay.  I'll turn your attention now to paragraph 33

9    through 40 dealing with Bordelon's Super-Save Pharmacy.  Do you

10   dispute that your -- that the report provided to Morris &

11   Dickson showed that this particular pharmacy, Bordelon's,

12   dispensed a higher quantity of oxycodone and hydrocodone than

13   the national average?

14   A    That's correct.

15   Q    And what did you do with that report?

16   A    Well, I have been in Bordelon's Pharmacy.  I'm aware of

17   the customer.  It's in a working class neighborhood in Baton

18   Rouge near the refinery, and -- I'm sorry.  It's in a working

19   class neighborhood.  Having to go beyond my -- it's in a

20   working class neighborhood.

21        The patients are those that -- the profile of the customer

22   is one that tends to use more of those drugs than average

23   because of the clientele.

24   Q    What did you do with the report?

25   A    We have it on file.

 1   Q     Do you dispute that Morris & Dickson shipped an order for

 2   2,000 dosage units of oxycodone to Bordelon's in January of

 3   2017?

 4   A     I do not dispute that.

 5   Q     And that would also be considered an order of unusual

 6   size, would it not?

 7   A     Not necessarily.  It depends on their ordering pattern.

 8   Q     Well, if the ordering pattern shows that that's a spike --

 9   and I think your testimony earlier was 10 times -- would that

10   be correct that it would be of --

11   A     Excuse me; you're misinterpreting.  Our flag is 10 times.

12   That's to flag it.  If he's bought very little before, then it

13   just means he's irregularly purchasing, so it's not necessarily

14   suspicious; it's just flagged.

15   Q     But it might be unusually large; is that correct?

16   A     Correct.  And it -- therefore it should be looked at.  But

17   not necessarily suspicious.  It's looked at.  And if he hadn't

18   bought much before that, his stock was empty, and he was

19   ordering -- remember, I said they order Schedule II's

20   irregularly because it's time consuming for them and they have

21   a pattern of one to seven times a month usually.  Sometimes

22   it's irregular.  So just because it's high and 10 times is

23   median -- and of course median isn't of any value in this type

24   of analysis -- what is important is his pattern; and if it did

25   not constitute an excessive order in terms of his overall

1    purchasing of the drug, then it would be shipped.

2    Q    Well, certainly 42 times the median order for Bordelon's

3    would constitute an unusually large order; is that correct?

4    A    Yes, it would.

5    Q    And was that reported to the DEA?

6    A    Because it wasn't suspicious.  In September of 2014,

7    hydrocodone was rescheduled from III to II.  The price was also

8    increased dramatically.  Mr. Bordelon was arbitraging the price

9    as well as trying to avoid a shortage, so he stocked up ahead

10   of the reschedule and ahead of the price increase in order to

11   make more money on it and in order to not run out.

12   Q    So is it your testimony that unusually large orders aren't

13   necessarily suspicious, regardless of what the regulation

14   requires?

15   A    You asked two things.

16   Q    Okay.  Is it your testimony that an unusually large order

17   would not require reporting to the DEA?

18   A    It's not necessarily suspicious, but maybe we should have

19   sent the letter.  We probably should have sent the letter.  But

20   it wasn't suspicious to us because we knew what he was doing.

21   Q    In your opinion, it wasn't suspicious but it was unusually

22   large; is that correct?

23   A    It was unusually large, yes, ma'am.

24   Q    Is Bordelon's a current customer?

25   A    That is correct.

1   Q    I'll now turn your attention to Folse Pharmacy -- or

2   Folse; I'm not sure how they pronounce it -- on page 8.

3        Do you agree that the initial evaluation report from your

4   third-party vendor revealed that Pharmacy Specialties Group had

5   a higher percentage than average of prescriptions for

6   controlled substances and a higher percentage of controlled

7   substances paid in cash?

8   A    Ma'am, you started with Folse and then you jumped to

9   Pharmacy Services.

10  Q    Oh, I'm sorry; you are correct.

11       Do you agree that the initial evaluation report from your

12  third-party vendor on Folse, classified Folse as high risk?

13  A    Yes.  As I've said before, Pro Compliance has three

14  levels.  They use the term "risk" to mean "deviation."  It's

15  high deviation; in other words, it deviates from the norm.

16  Q    And what did you do with the report on Folse?

17  A    We have it on file.

18  Q    And when you say "we have it on file," is this a -- how do

19  you maintain the file?

20  A    Every customer has a file, and in that file is all the

21  suspicious ordering monitoring information I described earlier

22  such that when we want to review a customer's order or a

23  customer's order pattern, it's all there with the customer.

24  This is in a computer file, obviously.  This is all electronic.

25  Q    Correct.  But you maintain all of that?

1   A   Yes.

2   Q   So you would know the customer's ordering pattern?

3   A   We would be able to look it up and investigate it.

4   Q   Which brings us to the market basket analysis, which is

5   something that Morris & Dickson uses also; is that correct?

6   A   That's correct.

7   Q   The market basket analysis with Folse Pharmacy showed that

8   51 percent of the total purchase volume in January of 2016, was

9   controlled substances?

10   A   Excuse me.

11   Q   That's a high percentage, is it not?

12   A   Would you state the number you're reading from.

13   Q   I'm reading from paragraph 43.

14   A   43?  Okay, thank you.  Yes, that is high.

15   Q   And as a result of that market basket analysis, were any

16   of Folse's orders, both as a result of the analysis and their

17   ordering patterns, were any of those orders reported to the DEA

18   as suspicious?

19   A   I don't believe so.

20   Q   Do you dispute that Folse placed, and Morris & Dickson

21   shipped, two orders for 6,000 dosage units of oxycodone for a

22   total of 12,000 in September of 2017?

23   A   I don't dispute.

24   Q   And do you dispute that in August of 2017, just the month

25   before, that Folse placed two orders of 12,000 dosage units for

1   a total of 24,000 of hydrocodone, and Morris & Dickson shipped

2   them?

3   A      I don't dispute that.

4   Q      And also in September of 2015, do you dispute that Folse

5   placed two orders of 7,000 dosage units of 14,000 total, of

6   oxycodone, and it was shipped by Morris & Dickson?

7   A      I don't dispute that.

8   Q      And none of those orders were reported as unusually large

9   or suspicious to the DEA; is that correct?

10  A      That is correct.

11  Q      Is Folse Pharmacy a current customer?

12  A      Yes.  I think so.

13  Q      I'll turn your attention to Pharmacy Specialties Group

14  paragraphs 50 through 60, on page 9.

15         Did the risk evaluation report from the third-party vendor

16  show that this particular pharmacy had a higher percentage of

17  average prescriptions for controlled substances and a higher

18  percentage of controlled substances paid in cash?

19  A      I haven't looked at it --

20  Q      Did the --

21  A      -- just prior to this hearing, therefore I can't

22  remember those -- you're getting down in some weeds now.  I'd

23  have to look at the document.

24  Q      If the DEA went through your records and found that, do

25  you have any reason to disagree with that?

```
 1   A     If I don't have the document in front of me, I couldn't
 2   answer.
 3   Q     And if you had that risk evaluation report, what -- let's
 4   assume that Morris & Dickson received it.  What would have
 5   happened to it?
 6   A     Well, they're going to look at that in the context of the
 7   store.  This particular store is a very unusual pharmacy.  He
 8   went in to become a specialty pharmacy.  This guy buys 6 and
 9   $7,000 seizure, specialty seizure medications that are
10   non-controlled, which is very unusual for a pharmacy.
11   Obviously, he has epilepsy patients; he serves an epilepsy
12   clinic.  He has a number of other very narrow niche practices
13   unrelated to controlled substances, which makes him unusual.
14   So when we look at his controlled drugs, we have to take that
15   in context that this is a niche supplying pharmacy.  I'm also
16   aware that he is -- and, again, I mentioned these working class
17   neighborhoods, not to the slight that, but he is in a working
18   class neighborhood and he does have a lot of people who come in
19   for pain.
20   Q     What would have happened to the initial report, evaluation
21   report?  It would placed in the file; is that correct?
22   A     It would have been reviewed and investigated to understand
23   and know the customer and then retained, yes, as was everything
24   else in the customer's file.
25   Q     And this is a current --
```

1   A    I looked at this one before -- I mean, I've looked all of

2   these, but I looked at this one and I talked about it so I'm

3   familiar with this guy.

4   Q    And he's a current customer?  I say "he."  The pharmacy is

5   a current customer?

6   A    Mr. Salid is a customer.  I believe his name is Salid,

7   yeah.

8   Q    Let's talk about the control, the oxycodone and the

9   hydrocodone that was distributed to this pharmacy.  Do you

10  dispute that 2400 dosage units of oxycodone was distributed to

11  this pharmacy?

12  A    I don't dispute it.

13  Q    And then 12,000 in -- and that was in October of 2016.

14  And then in January of 2016, do you dispute that 12,000 dosage

15  units of hydrocodone was distributed to this pharmacy?

16  A    You're losing me.  Where are you?

17  Q    Paragraph --

18          THE COURT:  54.

19          THE WITNESS:  Thank you, Your Honor.

20  A    Okay.  I don't dispute that data.

21  Q    Then again in September of 2015, 12,000 dosage units of

22  oxycodone was distributed to the pharmacy.  Is that correct?

23  And that is the same paragraph C.

24  A    Says September.  You just said December, I think.

25  Q    Well, September of 2015.

1    A    Yes, it's true that it's September.  You said December.

2    I'm sorry; I was making sure I'm in the right place.

3    Q    And none of these orders or shipments were reported to the

4    DEA as unusually larger or suspicious?

5    A    No.

6    Q    Now, let's turn to Dave's Pharmacy, the bottom of page 10.

7    Do you agree that Dave's was identified as relatively high risk

8    and there was a note that Dave's dispensed a significantly

9    higher quantity of hydrocodone and had a high cash payments for

10   controlled substances?

11   A    I don't dispute.

12   Q    And that was reported to Morris & Dickson by the

13   third-party vendor; is that correct?

14   A    That's correct.

15   Q    And can I assume that this report was placed in this

16   customer's file also?

17   A    Yes.

18   Q    Do you deny that in April of 2017, 6,000 dosage units of

19   oxycodone was ordered and shipped to Dave's by Morris &

20   Dickson?

21   A    I don't dispute.

22   Q    And in June of 2015, 18,000 dosage units of oxycodone in

23   three orders was shipped to Dave's.  Is that correct?

24   A    I don't dispute that.

25   Q    In March of 2014, Morris & Dickson shipped 24,000 dosage

1    units of hydrocodone to Dave's.  Do you dispute that?

2    A    I don't dispute that.

3    Q    And none of these orders were reported to the DEA as

4    unusually large or suspicious; is that correct?

5    A    I don't remember on this one.

6    Q    Do you think that may have been one of the three

7    suspicious orders?

8    A    I didn't say that; I just don't remember the letter or the

9    absence of one.

10   Q    Okay.  Is Dave's a current customer?

11   A    Oh, I'm sorry.  I thought you were saying that

12   affirmatively.

13   Q    Is Dave's Pharmacy a current customer?

14   A    I don't recall if Dave's is.

15   Q    I'll turn your attention to paragraph 68 through 78 on the

16   bottom of page 11.  And I'm not sure I've saying this right.

17   But Hephzibah Pharmacy, they're no longer a customer of Morris

18   & Dickson, are they?

19   A    I believe that is correct.

20   Q    In fact, they went to another competitor; isn't that

21   correct?

22   A    I think so.

23   Q    Would you agree that your third-party vendor report showed

24   this pharmacy with a higher percentage of prescriptions for

25   controlled substances and the pharmacy dispensed large

```
 1   quantities of hydrocodone and oxycodone and had a high
 2   percentage of cash payments for controlled substances?
 3   A    I don't dispute.
 4   Q    Do you maintain -- do you continue to maintain those
 5   reports on prior customers?
 6   A    Yes, we do.
 7   Q    Okay.
 8   A    I should say it's our policy to.  It's our policy to
 9   retain them.  Obviously, I'm not looking at the file.  So it's
10   our policy to retain them.
11   Q    And if your records showed that your third-party vendor,
12   Pro Compliance, raised some issues regarding the high cash
13   payments and high quantities of hydrocodone and oxycodone,
14   you'd have no reason to dispute that either, would you?
15   A    Not without the data in front of me, no.
16   Q    In spite of those issues being raised by Pro Compliance,
17   if your records or the ARCOS records show that Morris & Dickson
18   shipped eight orders for oxycodone totaling 4,000 dosage units
19   in May of 2017, do you have any reason to disagree with that?
20   A    I don't dispute it.
21           THE COURT:  Ms. Vincent, I have a question.  Is it
22   the DEA's position that Morris & Dickson would have been
23   required to report to the DEA anytime Pro Compliance rated a
24   transaction as high?
25           MS. VINCENT:  Well, I don't think the regulation says
```

1    that if you are a third-party vendor, if you've got somebody

2    else -- it just says report unusually large shipments, orders.

3              THE COURT:  So what does that mean to Morris &

4    Dickson?  What does that mean when they look at that?

5              MS. VINCENT:  Well, Mr. Dickson has stated, has

6    testified that that's one of the methods they use.  And if

7    they're not -- if they're putting it in a file and they're not

8    using -- if it's doing nothing, it's not an effective -- it's

9    not effectively allowing them to report the orders they should

10   be reporting.

11             THE COURT:  Do you have evidence they did that on a

12   regular basis?

13             MS. VINCENT:  Well, it's on the ISO.  I mean, these

14   are large orders.  Now, I understand there may be some dispute

15   at some point in time, but these are large orders.  They're

16   flagged by their compliance folks, and they're doing nothing

17   with them.  That's the problem.

18             THE COURT:  As to these five?

19             MS. VINCENT:  Or eight.  But these are

20   representative.  These are eight various pharmacies.  We don't

21   have the entire -- as the Court noted, we don't have the entire

22   record here, administrative record.

23             THE COURT:  How many were examined in the entire

24   administrative record?

25             MS. VINCENT:  I can't speak to that.  One of the

1    attorneys that's involved in the administrative process could

2    do that.  But I know there were more.

3           THE COURT:  Well, the Court understands that this is

4    examples or a representative sample.  But the Court would need

5    information from you, and perhaps not right this moment while

6    you're in the middle of cross-examination, as to the length and

7    extent of the administrative record, how many days was it, how

8    long is it, has it been reduced to a transcript, and how many

9    pharmacies were actually looked at.

10          MS. VINCENT:  Well, I do have some questions for

11   Mr. Dickson with regard to some of that, that will touch on

12   some of that.  But with regard to the actual administrative

13   record, I mean, we've got documents that support the

14   administrator's decision, which I think what the Court is

15   asking for.

16          THE COURT:  Isn't there a record?

17          MS. VINCENT:  Well, that would be those documents

18   that support the administrator's decision; that is correct.

19          THE COURT:  Were these submitted just in some written

20   format to the administrator?  How was it submitted?

21          MS. VINCENT:  I don't know how it -- I know it

22   contains Excel sheets and all kinds of documents.  But to tell

23   you precisely, I can't.

24          THE COURT:  Is there any like testimony that goes

25   along with that to the administrate -- at the administrative

1   hearing level before the ISO?

2         MS. VINCENT:  Well, we haven't had the hearing.  The

3   actual hearing will be in July, but it would be the documents

4   that support the decision.

5         THE COURT:  Okay.  So what happens in order for this

6   ISO to be issued?

7         MS. VINCENT:  The acting administrator, in this

8   instance, finds under the statute, not just regulation, but

9   under the statute and regulation, in his discretion, that an

10  imminent harm to the public exists.

11        THE COURT:  That's not my question.

12        MS. VINCENT:  Okay.

13        THE COURT:  My question was a more practical one.

14        MS. VINCENT:  Oh.

15        THE COURT:  So what does he have in front of him?

16  Does someone present to him, like you-all are presenting to me

17  today, evidence and say we are requesting this ISO based on

18  this information?

19        MS. VINCENT:  I could defer to my -- my counsel from

20  DEA would know that better than me.  But I do know this:  There

21  are a lot of documents that are provided to the administrator.

22        THE COURT:  I need to know before -- and as I said,

23  not right this minute, but I'll need to know the information

24  from you as to how this occurs.  Does someone approach the

25  person who signs the ISO and says:  This is the evidence that

 1  we have?  Or does Mr. Patterson, the Acting Administrator of

 2  the DEA, does he compile these?

 3          MS. VINCENT:  Well, the DEA diversion units do -- I

 4  mean, diversion investigators do.

 5          THE COURT:  How -- how -- yes.  So what the Court

 6  needs information is:  What is this presented?  Are these

 7  things identified?  If this Court were to review that

 8  administrative record, what would the Court be looking at?

 9          MS. VINCENT:  Okay.

10          THE COURT:  So that's what the Court wants to know.

11          MS. VINCENT:  Okay.

12          THE COURT:  But you don't have to answer that right

13  now, but I am going to need that information from you.

14      You may continue with your cross.

15          MS. VINCENT:  Okay.

16  BY MS. VINCENT:

17  Q   Okay.  Let's go to Wellness Pharmacy -- wait, wait.  Let

18  me back up.

19      With Hephzibah Pharmacy, was this pharmacy included on a

20  list of customer accounts closed due to the due diligence

21  efforts?  Is that what Morris & Dickson indicated?

22  A   I don't recall.

23  Q   But as far as you know, they are continuing to do business

24  with a competitor?

25  A   I would have no way of knowing that.  Only that they

```
 1   weren't doing business with us.
 2   Q     And let me just clarify.  None of the shipments, orders or
 3   shipments to this pharmacy were reported to the DEA as
 4   unusually large or suspicious, that you can recall?
 5   A     Because they weren't.  They would be suspicious by
 6   numerical standards; but after our investigation, they were
 7   deemed not to be suspicious.  And throughout all of this -- and
 8   you mentioned the filing.  Well, we don't leave it in a file.
 9   It's an electronic -- that just means an electronic record.
10   That is a very active exercise document.  And in the context of
11   these pharmacies' practices, we did not consider these numbers
12   to be unusually large or excessive in the context as we
13   understand them, not in some numerical formula that the DEA
14   might have applied.
15        If we had had the chance to go over these and if we get
16   the chance in the future, we would love to be able to go over
17   these with the DEA and explain every one of them.
18   Q     But your own third-party vendor flagged some of these; is
19   that correct?
20   A     They flagged them as being above the norm, not in the
21   context of --
22             THE COURT:  For the nation --
23   A     -- of the store.
24             THE COURT:  Is that right?  It's for the nation?
25             MS. VINCENT:  Correct.
```

1              THE COURT:  Not for the store.  Okay.

2              MS. VINCENT:  That's my understanding.

3    Q    Is that correct?

4    A    It is his pool of data.  It's not necessarily national.

5    It is greater pool of data.  It is proprietary to him.  I can't

6    speak to exactly what his universe is.  We may have it

7    somewhere and I just don't know it off the top of my head in

8    this --

9              THE COURT:  Is his universe -- if I may -- is his

10   universe the purchases by this store or is it compared -- I

11   thought I understood you to say earlier --

12             THE WITNESS:  Yes.

13             THE COURT:  -- that it was other stores.

14             THE WITNESS:  Yes, ma'am.  It is compared to an

15   average.

16             THE COURT:  The average of what?

17             THE WITNESS:  I don't have that information right

18   here.  I have seen it.  I do understand it and I believe it's

19   valid, but you're in deep into his algorithms now and I don't

20   have that information in front of me.

21             THE COURT:  But this differs from your market basket

22   approach in that the market basket is looking at what that

23   pharmacy buys?

24             THE WITNESS:  Correct.  And it's comparing it to my

25   stores, or just to the customers of Morris & Dickson.

1           THE COURT:  Okay.

2           THE WITNESS:  His is described.  When I said "his

3    universe," I meant it is described as a national figure.  I

4    don't know exactly who -- whether he uses CVS or doesn't or

5    what his source of data is.

6           THE COURT:  I see.

7           THE WITNESS:  I don't know that, sitting here.  But I

8    have seen it and I believe it's valid.

9    BY MS. VINCENT:

10   Q    But your market basket for this pharmacy, or any others,

11   would just compare a particular pharmacy with its -- in its

12   median, right?

13   A    The market basket compares his controlled drug purchases

14   to his purchases or their purchases, excuse me.  I know this

15   person; it happens to be a man.  Anyway.  It compares the

16   controlled drug purchases to their market basket purchases.

17   And we use our own set of customers as the norm for that.

18   Q    And it tracks each customer monthly; is that correct?

19   A    We review it monthly.  We can review actually as often as

20   we want.  And if there is -- this is back to the exercising

21   these files.  If there is an order that raises our -- if it's

22   flagged, we might go look at all of these entities to make a

23   determination of whether we believe they are suspicious.

24   Q    But that market basket analysis, in the vary least, would

25   compare controls and non-controls percentages, would it not?

1    A     The market basket items are non-controlled.

2    Q     All non-controlled?

3    A     The market basket comparison items, as I said before, are

4    things completely unrelated to the things that controlled drugs

5    are for.  We initially, we intentionally picked hypertension,

6    statins, antibiotics, things that have nothing to do with the

7    drugs that --

8    Q     But it compares the percentage of controlled to

9    non-controlled; is that correct?

10   A     No, ma'am.  It's not correct.

11   Q     It only gives you -- then why do you use it as part of

12   your --

13   A     Ma'am, you're misunderstanding.  You said non-controls.

14   It's a select set of non-controls.  It compares a particular

15   purchase and their control purchases to the market basket,

16   which is a select set of non-controls that are also unrelated

17   to pain or any of these other conditions that the opioid crisis

18   is concerned with.

19   Q     So it would really have no effect, it wouldn't help in

20   determining when a suspicious order or unusually large order --

21   A     It's very effective determining that.

22   Q     How does it do that?

23   A     It compares the store's controlled drug purchases to its

24   other drug business, its other patients.

25   Q     And if there is a high percentage of controls, then it

1   shows you something, does it not?

2   A    It does indicate that they have a high percentage of

3   controls.

4   Q    And there are customers that Morris & Dickson, that this

5   market basket analysis, it did show there was -- like the

6   51 percent we just discussed, that is an indicator, that's a

7   high percentage of controls.  Yet none of those orders were

8   reported as suspicious or unusually large.  Is that correct?

9   A    Because the market basket is not used in isolation.  It's

10  used in combination with our "Know Your Customer," which the

11  DEA requires us to know our customer.  And so to use any one

12  item in isolation would not -- or to use a mathematical formula

13  would be against our instructions from the DEA to know our

14  customer.

15  Q    Unusually -- you have to use a mathematical formula to

16  determine unusually large, would you not?

17  A    As set of pure mathemat -- as the DEA has used.  We have

18  to use these things in combination, right along with the

19  visiting with the pharmacy and having the photograph on the

20  screen.  All these, and our field reps and all of that in

21  combination is what we did to know our customer.

22  Q    Okay.  Well let's keep going through this.  The Wellness

23  Pharmacy.  The Wellness Pharmacy is page 12.  Did the initial

24  risk evaluation report provide that this pharmacy dispensed

25  high quantities of oxycodone and hydrocodone and note that

```
 1   controlled substances accounted for a significantly higher

 2   percentage of total prescriptions than the national average?

 3   A    That may be true.

 4   Q    You don't dispute that, do you, if that's what your

 5   report --

 6   A    I don't have any reason to dispute it.

 7   Q    And this would have also been placed in the file for

 8   Wellness Pharmacy; is that correct?

 9   A    All the reports are placed in each individual pharmacy's,

10   yes.

11   Q    Do you know whether or not you conducted any additional

12   due diligence on this pharmacy and its orders?

13   A    That's a broad question, but --

14   Q    Additional due diligence.

15   A    And that's a broad question.  My -- I would have -- I have

16   some data if I could have it in front of me.

17          THE WITNESS:  Is that possible for my counsel to

18   bring some data that we have --

19          THE COURT:  With regard to Wellness?

20          THE WITNESS:  She is asking for unspecified

21   information, general information, and I don't --

22   Q    Let's just, let me ask you this.  No, we can go on.  If

23   you don't know the answer, you don't know the answer.

24   A    Okay.

25   Q    Okay.  Do you dispute that Morris & Dickson shipped 6,000
```

1   dosage units of oxycodone in June 2017 to this pharmacy?

2   A    I don't dispute.

3   Q    And then in April of 2017, shipped another order for 6,000

4   dosage units and 5 -- of oxycodone and then 5,000 dosage units

5   of oxycodone in April of 2017.  Was that shipped?

6   A    I don't dispute.

7   Q    Okay.  And then again, two orders of 6,000 dosage units

8   for a total of 12,000 of hydrocodone in October of 2014 to this

9   pharmacy?

10  A    I don't dispute.

11  Q    And were these orders reported to the DEA as unusually

12  large or suspicious?

13  A    I don't recall.

14  Q    Let's -- Wellness Pharmacy, is it out of business today?

15  A    I believe so.

16  Q    Wilkinson Family Pharmacy.  What is the current operating

17  status of Wilkinson?

18  A    I know that he voluntarily relinquished his controlled

19  drug license.  I know that.

20  Q    So he's no longer in the business of dispensing controlled

21  substances, as he surrendered his license to the DEA; is that

22  correct?

23  A    That's correct.

24  Q    If I told you that that occurred in April of -- April 19

25  of 2017, would you have any reason to dispute that?

1    A     No.

2    Q     And do you have any reason to dispute that Morris &

3    Dickson shipped an order of 6,000 dosage units of oxycodone to

4    Wilkinson's in April of 2017 --

5    A     I don't dispute.

6    Q     -- which would have been just before Wilkinson's

7    surrendered controlled substances license to the DEA?

8    A     Okay.

9    Q     Is that correct?  You have no reason to dispute that?

10   A     No, I don't dispute that.

11   Q     Were any orders shipped to Wilkinson identified as

12   suspicious or unusually large?

13   A     Not after our investigation.  Initially, they were flagged

14   and he was very closely monitored and closely investigated.

15   Q     But no order was reported to the DEA; is that correct?

16   A     No.  Because we did not suspect him of diversion.

17   Q     So all shipment -- Morris & Dickson placed, shipped all

18   product on all orders; is that correct?

19   A     Well, I don't know that.  That's a broad, vague question.

20   I couldn't possibly know the answer to that.

21   Q     Well, it's not broad, but if you don't know the answer --

22   A     All orders, ma'am, would be thousands of orders over the

23   long, the period of time that he bought from us.  I don't know

24   all of those.

25   Q     Okay.  Let's discuss the ARCOS system.  It's actually

1    regulated.  It's in the Code of Federal Regulations.  Were you

2    aware of that?

3    A    I don't dispute that.

4    Q    And if the Code of Federal Regulations requires it to -- I

5    think you had mentioned that it had to be, that the data has to

6    be reported monthly?

7    A    I honestly got stuck on that point.  It's done

8    automatically out of our mainframe computer by actually a

9    different set of people, information technology people.  And

10   I'm the president of the company.  I do a lot of things.  And

11   that one particular schedule, since it's automated, I just

12   simply don't recall.

13   Q    If the Code of Federal Regulations says quarterly, you

14   have no reason to dispute that, do you?

15   A    We send it out on time.

16   Q    And so it's not realtime; there's a lag on it?

17   A    It's after the fact, yes.

18   Q    Yeah.  There's quarterly and then there's some lag, so it

19   takes a while to get up to the DEA.  You have no reason to

20   dispute that, do you?

21   A    Oh, no, I don't dispute that.

22          THE COURT:  Do we agree that Morris & Dickson was

23   submitting it quarterly and not monthly?

24          THE WITNESS:  I know we are meeting the regulations.

25   We're not -- ARCOS is a long-term regular thing.  We receive

1    replies from the DEA when there's clerical errors or numbers

2    that don't match up and we have to make those adjustments.  And

3    those are regular.  And so I know that it's regular and that

4    we're on time; I do know that.  I just don't know exactly when

5    we send it in, off the top of my head.

6          THE COURT:  Does the DEA ever notify you when they

7    suspect that a pharmacy is over-dispensing?

8          THE WITNESS:  No, ma'am.  On ARCOS, the only thing

9    we've ever gotten back are, from the DEA, is numbers that are

10   maybe clerical or errors in keystrokes and we have to go back

11   and repair.  We get that frequently.  We've never gotten what

12   you asked for.

13         THE COURT:  I wondered, because like with these

14   people that are surrendering their licenses, obviously the DEA

15   has suspicions about them, or there's a reason for that.  But

16   you never get any notice of any pharmacies that are under

17   investigation by the DEA?

18         THE WITNESS:  Yes, we do at times, because they ask

19   us for data.  Historically, the DEA has come to us without a

20   subpoena voluntarily and asked us for sales data when they're

21   doing research.  They've told us that's because the ARCOS data

22   is useless to them.  One of them used the term "arcane."  And

23   so they come to us and we give them the information they're

24   looking for.

25         And one thing, if I may correct the record in the case of

```
 1    Mr. Wilkinson.  You said "these pharmacies who give up

 2    their" -- that's the only one.  And I'm very, very familiar.

 3    Mr. Wilkinson gave that up voluntarily because he was very

 4    afraid and the Louisiana State Board of Pharmacy inspector told

 5    him:  You should do this.  And he was very afraid and so he

 6    said he gave it up.  To this date, Mr. Wilkinson has, to my

 7    knowledge, has not been charged with anything.

 8              THE COURT:  But sometimes they do come to you with

 9    suspicions about pharmacies and to get records?

10              THE WITNESS:  I don't know why they're doing it, but

11    they come to me and ask for data.  And so does the Board of

12    Pharmacy.  And we send it to them voluntarily.  It's routine.

13    It's routine.  My assistant, Susie Irelan, has done it for

14    years.  It comes from the State Boards of Pharmacy from all

15    over, and occasionally from the DEA.  It might come in the form

16    of phone call; it might come in an email.  And it's all

17    voluntary.  Would you send us everything you have on

18    such-and-such?  And so we do it.

19              THE COURT:  Do they ever notify you that they -- to

20    be wary of a certain pharmacy based on the records that they

21    have?

22              THE WITNESS:  No.  They never tell us why they're

23    asking for the data, nor do they ever give us any kind of

24    warning.

25              THE COURT:  Okay.  Please continue.
```

 1          MS. VINCENT:   Your Honor, I know I'm not a witness,

 2   but I don't know that they could comment on investigation, if

 3   it's an investigation.   I know we couldn't.

 4   BY MS. VINCENT:

 5   Q    You mentioned in response to counsel's questions that

 6   there was a Schedule I, which the example was marijuana --

 7   A    I don't even know what they are.   We don't deal with them.

 8   Q    Right, right.   But you said Schedules II through VI were

 9   the ones that you deal with.   Schedule VI, I'm not familiar

10   with?

11   A    Schedules III through VI are a classification that doesn't

12   really have practical application to us.   Our only concern is

13   the recordkeeping requirements and particular delivery

14   requirements and storage requirements of Schedule II, and the

15   different storage, recordkeeping, and delivery requirements of

16   III through VI, which is the same.   So there's no

17   differentiation for us in III through VI.   And I believe it is

18   at other levels, but for us, it's a vault item or a cage item.

19   Q    But oxycodone and hydrocodone are Schedule II; is that

20   correct?

21   A    Currently.   Prior to September of 2014, hydrocodone was a

22   Schedule III.

23   Q    They are controlled substances?

24   A    All Schedule drugs are controlled substances.

25   Q    And you wouldn't disagree that oxycodone and hydrocodone

1   are two of the most abused?

2   A    That's what I've heard through the media.  We don't deal

3   specifically with that kind of clinical aspect of the drug.  We

4   just deliver it.

5   Q    Okay.  And the ARCOS system, it's only going to pick up

6   the Schedule II's; isn't that right?

7   A    I believe that's right.

8   Q    That's all the data you put in it, are the Schedule II's?

9   A    I believe that's right.

10  Q    So the DEA would only have the shipment data from Morris &

11  Dickson on the Schedule II's; is that correct?

12  A    No, it's not correct.  In ARCOS, as I said to the Judge,

13  they ask us all the time for III through VI's and we send it to

14  them.

15  Q    Okay.  Based on the ARCOS data, is what my question is.

16  A    Based on the ARCOS data, yes.

17  Q    Okay.  Do you agree that DEA registrants are required to

18  take efforts to control diversion?

19  A    Yes.

20  Q    How does Morris & Dickson store their Schedule II drugs

21  and their other drugs?  You mentioned earlier there's a vault

22  and there's a cage.  Can you explain that in a little more

23  detail?

24  A    It's in the C.F.R. very specifically.  It gives

25  specifications for the vault.  It has to be a class five door,

```
 1   has to be so many man-minutes to entry.  It's very specific for
 2   the vault and the cage.  And you can exceed those.  And then
 3   after you've built your vault and cage, the DEA comes and it
 4   inspects your vault and cage and it certifies that it meets the
 5   CFR.  And then after you receive that inspection, then they
 6   give you the authorization to place product in that enclosure.
 7   Q    Okay.  So, if I am envisioning a large, I think you said
 8   30,000 square feet --
 9   A    I believe it's 20, I think.  20 or 25.  It's huge.
10   Q    Vault.  We're talking about the vault now, as opposed to
11   the cage.
12   A    Yeah.
13   Q    A large vault.  How many entries and exits are there into
14   that?
15   A    Just one.
16   Q    Just one.  So, and right now, that vault contains all your
17   Schedule II's; is that correct?
18   A    Well, we actually have two vaults.  We have the old one
19   and the new one.  We had one for many years, 10 years.  And
20   when they rescheduled hydrocodone -- hydrocodone is -- there's
21   a lot of hydrocodone used.  We needed more room and our volume
22   increased.  When we first built that vault, we were a much
23   smaller company; and as we grew, it was getting really tight in
24   there.  And then they rescheduled hydrocodone, so we had to go
25   build a new vault.  So we went and built a new one but we left
```

1    the old one and both were still authorized and inspected.  And

2    again, that was a sort of that fallback in case of emergency,

3    you know, any kind of emergency or any problem in the

4    warehouse, for instance, a fire in one area.  These were in

5    different areas of the warehouse, so the redundancy of having

6    two vaults added a level of safeguard, so we kept them both

7    active.

8    Q    And they're both taped -- both entries are taped up, as we

9    stand here today?

10   A    The two vaults are both sealed, yes, as well as the vault

11   in New Orleans.

12   Q    And the access key or common code, or whatever it is, to

13   the vault, who maintains that?

14   A    The employees that use the vaults.

15   Q    Would DEA know that, have that information?

16   A    No.

17   Q    So if you create access to the Schedule II, the vaults

18   that contain Schedule II drugs -- I mean, that's access to

19   whoever normally has access.  You can't -- you couldn't -- you

20   can't distinguish in that Schedule II --

21   A    Oh, yes, ma'am, we certainly can.

22   Q    Well, you can because you have to place order -- I mean,

23   you have to fill orders.  But if you're allowing someone access

24   to the vault for oxycodone or for a non-oxycodone/hydrocodone

25   product, they're going to have access to the oxycodone and the

1  hydrocodone also?

2  A     No, ma'am.  You don't understand how it's done.  The

3  Schedule II's are kept in the vault.  Every authorized vault

4  employee has an electronic identification.  Prior to the vault

5  doors, there's electronic controls that they have to pass

6  through.  Then they have to again pass through electronic

7  controls to enter the vault, and it's a very limited number of

8  people.  So the number of people who are limited and have

9  access in the vault is very small and they are specifically

10 vault Schedule II employees.  They're very carefully vetted and

11 very carefully chosen.

12 Q     Oh, I understand that.  But what I'm asking is:  Once you

13 have access, you have access to all the drugs?

14 A     Well, you have access to the Schedule II vault and

15 everything inside in it, yes.

16 Q     Correct.  That's my point.

17        THE COURT:  Ms. Vincent, the Court does not

18 understand the relevance, and maybe help me here.  There is no

19 allegation in the ISO, either that the employees were diverting

20 drugs or that those were improperly stored.

21        MS. VINCENT:  No.  This goes to the Morris &

22 Dickson's position that we can -- the Court should let us

23 distribute controlled substances besides oxycodone and

24 hydrocodone to these specific pharmacies.  I mean, once you

25 lose control, you lose control.  Access is access.  I don't

1    think that's possible is what I'm -- he just said that once

2    you're in the vault --

3              THE COURT:  Now.  But that doesn't mean that steps

4    couldn't be taken.  So that's the question.  Can steps be taken

5    to isolate the oxycodone and the hydrocodone?

6              THE WITNESS:  Okay, yeah.  Easily.  Every item has --

7    again, it's all very sophisticated and electronically

8    controlled.  Every item has a bar code.  Every item we pick is

9    scanned.  That item is scanned, as well as the code of the

10   person who picked the order.  So we have record of the person

11   picked it, the moment they picked it, verification they picked

12   the right item, and verification that it went in the box.  It's

13   then checked by a second person in an outside room that

14   verifies that that's correct.  So we have double checks.  And

15   that person scans every item and then it's packed.

16        So we have electronic verification of everything that goes

17   in the box.  So that would answer the question that I think she

18   was saying of:  How would you know what people were picking?

19   Well, people have to verify everything they pick and it's

20   double-checked.

21             MS. VINCENT:  No, my position is:  Once you have

22   access, you have access to a vault.

23             THE COURT:  I got your point.  I don't think we ever

24   got an answer to the question, sir, of what percentages of the

25   controlled substances are OxyContin (sic) and hydrocodone.

```
 1              THE WITNESS:  5.81 percent.

 2              THE COURT:  All right.  And that is on that sheet?

 3    Yes.

 4              THE WITNESS:  It is 5.81 percent, yes.

 5         And that was based on an analysis we did from 2014 to the

 6    present, adding up by dosage units.  That was empirical data.

 7    So that's all the dosage units divided by all the dosage units

 8    of everything else.

 9         But I might add that -- well, I'm just going to answer

10    your question.  I'm sorry.

11              THE COURT:  Well, then the next question is:  What

12    effect does it have on your business as a multi-line pharmacy

13    if in fact you are precluded from selling hydrocodone and

14    OxyContin but other Schedule II --

15              THE WITNESS:  It has the exact same effect as all

16    Schedule II's.  These are critical drugs.  The patients that I

17    was referring to when I got a little upset before, they need

18    these drugs, too.  The drugstore has to carry everything.  If

19    it doesn't carry everything, its patients leave it.  The

20    hospital can't be without oxycodone and hydrocodone, even

21    though they don't buy very much.  It's not used much.  They

22    still need some.

23         So, we don't have the option of hand selecting things in

24    or out.  If we don't sell oxycodone and hydrocodone, we also go

25    out of business immediately.  Our customers leave us and get a
```

1    primary account with another wholesaler who can then sell them

2    those two products.

3              THE COURT:  All right.  Thank you.

4    BY MS. VINCENT:

5    Q    And along the lines of the storage of the controlled

6    substances, the Schedule II's in particular, the regulation --

7    it's your understanding of the regulation that requires the

8    suspicious order reports applies to all controlled substances,

9    does it not?

10   A    That's correct.

11   Q    Does Morrison Dickson require customers to order minimum

12   amounts of controlled and non-controlled substances?

13   A    Ma'am, we are Morris and Dickson.  There's no "son" on the

14   end of our name.

15   Q    Oh, Dicks, okay.

16   A    We do not require -- no, ma'am, we don't require of them

17   any -- there is no minimum, no.

18   Q    So it's your testimony that you don't have any agreements

19   with your customers that require them to --

20   A    To buy a minimum amount of --

21   Q    -- buy a certain minimum --

22   A    -- of controlled substances?

23   Q    Or non-controlled.

24   A    No, we don't.  I'm sorry; I thought you asked controlled

25   substances.

1  Q    I said both.   Noncontrolled or controlled.

2  A    We don't keep somebody secondary for very long.   We will

3  give them an opportunity to introduce ourselves to them.   And

4  that might be a small amount of purchases and hopefully we get

5  to become their primary wholesaler.   But eventually, if we

6  don't become their primary wholesaler, then we would not allow

7  them to do that anymore.

8       The exception with that would be some very large hospitals

9  where we are selling them secondary under contract with our

10 GPOs that require us to service all the hospitals within that

11 group.   But that's a very different situation and I don't

12 believe it has anything to do with your ISO.   You didn't

13 mention hospitals anywhere in there.

14 Q    Well, you testified earlier about selling controlled and

15 non-controlled and what effect the ISO would have on your

16 business.   So that's what I'm asking you.

17 A    Okay.   I don't understand your question; I'm sorry.

18 Q    Do you have agreements with your customers that require a

19 minimum amount purchase of controls and/or non-controls?

20 A    No.

21 Q    You have no agreements to that effect?

22 A    No.

23          THE COURT:   I didn't hear what the question was.

24          MS. VINCENT:   He has -- Morris & Dickson has no

25 agreements with their customers to purchase certain minimum

1    quantities of controlled or non-controlled.

2              THE COURT:  Okay.

3    BY MS. VINCENT:

4    Q    In your -- in your -- in the court -- in your -- in Morris

5    & Dickson's response or reply filed in court, the pleading that

6    had your affidavit attached to it, did you read that?

7    A    I did.

8    Q    Okay.  And do you recall the statement that it said

9    something to the effect that you voluntarily turned 140

10   customers away?

11   A    That's correct.

12   Q    It's not true that those were customers who didn't

13   purchase the required minimum?

14   A    That is not why we did that, no.  No, ma'am.  We did that

15   solely because we did not trust them.

16   Q    But Wilkinson was not in that group, was it?

17   A    No, ma'am.

18   Q    Also, you have mentioned that the percentage of controlled

19   substances has declined, the sales for Morris & Dickson; is

20   that correct?

21   A    That is correct.

22   Q    Over the years.

23   A    Since 2014, specifically.

24   Q    Wouldn't you say that that's basically nationally we've

25   seen the same decline for other distributors?

1    A    I don't have the specific data on the big three, so I

2    can't answer that question.

3    Q    And at one time, although you have no current customers

4    that are internet pharmacies, there was a time when Morris &

5    Dickson did distribute to internet customers, is that correct,

6    pharmacies?

7    A    It wasn't -- we didn't know it.  When we determined that

8    they were, we quit using them -- excuse me, we quit servicing

9    them.  And it was a maybe one or two a decade.  It was a long

10   time ago.

11   Q    That business has basically gone out of business?

12   A    It was a long time ago and it was a couple of instances.

13   When we discovered it, we cut them off.

14   Q    Has Morris & Dickson urged their customers not to turn to

15   other wholesalers at this point?

16   A    No.  We're hoping this ISO would be lifted.

17   Q    And on Friday, did you send some sort of notification to

18   your customers that you could not supply controlled substances

19   for that day only?

20   A    We told them that we didn't know how much longer it would

21   be.  And that was before this hearing was scheduled.  Once this

22   hearing was scheduled, then we told them we had the hearing

23   scheduled.

24   Q    Are you familiar with Louisiana Wholesale?

25   A    I am.

```
1   Q    And what is Louisiana Wholesale?

2   A    They are a co-op.  They're owned by a select set of their

3   members?

4   Q    And they're a drug distributor also located in Louisiana;

5   is that correct?

6   A    Yeah.  They're not a full line.  They're just some retail

7   stores and they buy a lot of -- they are a secondary

8   wholesaler.  They buy a lot of -- to my understanding, they buy

9   a lot of things from AmerisourceBergen and then they distribute

10  those on to their members and they keep some in stock, so.

11  Q    And they are located around Lafayette; is that correct?

12  A    Sunset.

13  Q    In fact, would you disagree that there are over 700

14  wholesale distributors, drug distributors?

15  A    (Shakes head from side to side.)

16  Q    Some of them vary in size, no question about it, but there

17  are over 700?  Is that --

18  A    Your definition of "wholesalers" is overly broad.  We are

19  full line.  There is no comparison.  That's like saying apples

20  and oranges.  So your 700 are -- I mean, yeah, they may be

21  wholesalers, yes, but they're not what we are.

22  Q    And they distribute drugs.  Some of the same --

23  A    Some drugs to some accounts to some classes of trade.

24  Q    And of course, there's the big three that you testified

25  about?
```

```
1   A     Correct.  We're the only other --

2            THE COURT:  You testified that you're the only other

3   multi-line distributor in the United States?

4            THE WITNESS:  Yes, ma'am.  When I came in the

5   business in 1984, there were approximately 125.  When my

6   brother Skipper came in the '70s, there was over 200.  And it

7   slowly, slowly became absorbed through all this consolidation.

8   And little by little, we were left simply because we were still

9   doing a good job and still enjoyed the business.  But this has

10  only recently been the case that we're the only one.

11  BY MS. VINCENT:

12  Q     In addition to the big three, though?

13  A     In addition to -- oh, no, they're not privately held.

14  They're publicly held.

15  Q     I understand that.

16        The timeline here, Mr. Dickson, there were actually three

17  administrative subpoenas that were propounded to you and your

18  company, is that correct, by the DEA?

19  A     There was Wilkinson alone.  There was this general one

20  maybe in a follow-up.  I can't remember the third.

21            THE COURT:  Okay.  The Court needs that information.

22  It's not contained anywhere in anything.

23  BY MS. VINCENT:

24  Q     Let's go back.  Okay.  The DEA conducted a routine audit

25  in the fall of 2017.  October, November of 2017.
```

1    A    Correct.

2    Q    And they asked Morris & Dickson for the information on

3    suspicious orders; is that correct?

4    A    It --

5    Q    That was the first request for the information.

6    A    My memory -- that may be so.  I remember the Wilkinson one

7    and I remember this broad one that said send us

8    everything you've ever done.  I don't remember.  Maybe so.  I

9    just don't remember right at the moment.

10   Q    I'm asking when they asked generally for all of the

11   suspicious order reports that you had, when they asked you to

12   provide that?

13   A    It wasn't -- okay.  I remember it being:  Send us all the

14   documentation for all the investigations you've done.  Which

15   would have included all the ones that we investigated where

16   there was nothing wrong and it wasn't suspicious.  So which was

17   unprecedented.  We had never seen one of these before.  And,

18   you know, so that's why I remember that one, because it was

19   unprecedented.

20            THE COURT:  The Court's lost.  I need to know when

21   the subpoenas were issued and what was the nature of the

22   information that was sought.  I was under the impression it was

23   one subpoena issued; it was in October or November of 2017.

24            MR. SPRUIELL:  (Shakes head from side to side).

25            THE COURT:  Perhaps Mr. Spruiell and Ms. Vincent, you

1     can --

2              MS. VINCENT:  And I'm trying to get those copies of

3     the subpoenas, Your Honor.

4              MR. SPRUIELL:  I can offer a little bit in that

5     regard, Your Honor.

6              THE COURT:  I'm listening.

7              MR. SPRUIELL:  The subpoena, first subpoena was

8     February.  It involved Wilkinson.

9              MS. VINCENT:  No.  No, no.  It was in January, I

10    believe.

11             THE COURT:  Oh, come on, y'all.

12             MR. SPRUIELL:  I'm going to tell you what I know.

13             THE COURT:  Okay.

14             MR. SPRUIELL:  February of 2017, the first of two

15    subpoenas, one was Wilkinson Pharmacy.  And the second was as

16    Mr. Dickson -- it was a much broader subpoena:  Provide us all

17    documents in your possession that deal with your investigation

18    of possible suspicious orders and your due diligence of those.

19    Very broad.

20             MS. VINCENT:  And this was 2018?

21             MR. SPRUIELL:  Absolutely.  2018.  We responded to

22    that --

23             THE COURT:  I'm sorry.  The subpoena for Wilkinson

24    was -- I put, wrote February of 2017.

25             MR. SPRUIELL:  '18, Your Honor.

1            THE COURT:  Okay.  All right.

2            MR. SPRUIELL:  That was the first subpoena.

3        Along at the same time, we got the very broad subpoena

4    that I just described, February of 2018.  We timely responded

5    on behalf of Morris & Dickson to that subpoena.

6        We then got a follow-up subpoena and asked for additional

7    information, primarily related to the broader subpoena of

8    records in our possession regarding due diligence, possible

9    suspicious order, and the like.

10            THE COURT:  And when did you get that?

11            MR. SPRUIELL:  March.  And I apologize; I don't have

12    specific dates.

13            THE COURT:  Records re what?

14            MR. SPRUIELL:  Suspicious orders.

15            THE COURT:  I thought that -- okay, go ahead.

16            MR. SPRUIELL:  It was just a follow-up for additional

17    types of records related to what we had already submitted in

18    reply to the first subpoena.  So it was just kind of:  They

19    were starting out here and they were trying to narrow it down

20    (indicating) and to get a commitment from Morris & Dickson

21    about we had supplied everything.  And we had to point out to

22    them that we couldn't because it was so broad.

23        They then hit with a third subpoena which was in April,

24    late March or early April where they again narrowed the

25    subpoena down and asked for some additional information as part

 1   of their presumed investigation.  We responded to that timely.

 2          THE COURT:  What information did you give them in

 3   late March or early April that they did not have previously?

 4          MR. SPRUIELL:  It was primarily, Your Honor, we

 5   probably didn't supply them additional information, because at

 6   that point they were really focusing on the lack of records.

 7   Because as we've pointed out, we don't keep records documenting

 8   orders that are investigated that turn out to be not of an

 9   unusually high volume or suspicious.  And so we had to continue

10   to explain to them we don't have those records.  And we

11   supplied them a couple of different responses to try to explain

12   that.  And I would have to literally give you those to be more

13   specific than that.

14          THE COURT:  Are the subpoenas and the responses to

15   the subpoenas part of the administrative record?

16          MS. VINCENT:  It's my understanding that they are.

17          THE COURT:  Okay.  Thank you.

18   BY MS. VINCENT:

19   Q    The last response to the last administrative record,

20   subpoena, Morris & Dickson provided that on or about

21   April 27th; is that correct?  Does that sound right, that date?

22   A    I don't dispute what my counsel said.

23          MS. VINCENT:  And, Your Honor, I don't if -- we are

24   obtaining the subpoenas.  I don't -- I'm sure we're not going

25   to have everything, the response.  And that would for a later

 1  date for the administrative record, but I can at least get the

 2  subpoenas today and offer them into evidence.

 3  BY MS. VINCENT:

 4  Q    Morris & Dickson has communicated with DEA on occasion

 5  with regard to their recordkeeping.  Is that correct?  I think

 6  the last time was in June, May or June of 2017.  Does that

 7  sound correct to you?

 8  A    I don't believe that was my communication.

 9  Q    Well, would it -- maybe it would have been with your

10  compliance officer?

11  A    I don't know.  That's a vague question.  I don't know that

12  right now.  I don't know.

13  Q    Now, Mr. Dickson, I understand what you're saying, that it

14  may have been with the compliance officer, which would be

15  natural to assume.  However, you testified earlier that you're

16  the go-to person on compliance, on the suspicious order?

17  A    Excuse me.  No, I didn't.  I said I'm the president of the

18  company.  The president of the company ultimately -- the buck

19  stops there.  But, no, the compliance officer is the go-to

20  person at the level of -- I'm not sure what you're asking.

21  Go-to person for what?

22  Q    Well, what I'm trying to clarify for the Court is that on

23  occasion you have communicated with the D -- Morris & Dickson

24  has communicated with the DEA about recordkeeping and maybe

25  things that needed to be improved.  Is that correct?

1   A    I don't know what you're talking about.  I testified

2   earlier that I did this for 25 years.  I also testified that in

3   the last six years, my duties have been that of a senior

4   executive and the CEO, although we don't use that title.

5   That's what I've done.  And other people were doing some of

6   this communication.  I did sign those letters, but it doesn't

7   mean that I did all the communication.  And, no, I don't recall

8   off the top of my head the DEA having a communication like that

9   except what I already testified to about Mr. Milione coming on

10  August of '16.  I don't recall, unless you can be more

11  specific.

12          MS. VINCENT:  May I approach the witness?

13          THE COURT:  Yes.

14  BY MS. VINCENT:

15  Q    I am going to hand you this (handing document to the

16  witness).

17  A    (Witness examines document.)

18          THE COURT:  The next question should be to ask the

19  witness if he can identify the document.

20          THE WITNESS:  Oh, yeah.  Okay.

21          THE COURT:  Can you identify that --

22          THE WITNESS:  Yes.  It's a clerical thing.  I'm

23  sorry.  But this is a clerical matter.  That's why I didn't

24  remember it.

25      Yes, this was in recordkeeping.  This was -- somebody left

1    a date off one Form 222.  It's a minor, a minor, mundane

2    clerical matter.  But yes, I do -- I remember when Susie showed

3    this to me, right, yes.

4    Q    And the letter responding to the DEA is actually from you,

5    is it not?

6    A    Yeah, I remember it now.  I remember it now.

7            THE COURT:  When is this?  What are we talking about?

8            MS. VINCENT:  In May and June of 2017.

9    A    But you said January; you didn't ask me May.

10       But anyway, it doesn't matter.  This is of such minor

11   significance, I just didn't remember it.  It's the date off a

12   222.

13           MS. VINCENT:  I would offer --

14   BY MS. VINCENT:

15   Q    You identified the correspondence as a communication

16   between the DEA and you, and your response to some sort of

17   recordkeeping issue, regardless of what it is.

18   A    Yes, ma'am.  I'm sorry; I didn't remember it.

19           THE COURT:  Come on, Ms. Vincent.  I mean, come on.

20           MS. VINCENT:  Well, Your Honor, I am not going to

21   stand here and say it had something to do with reporting a

22   suspicious order.  But it's not as if the DEA doesn't

23   communicate with its registrants on occasion.

24           THE COURT:  So does that fact work for you or against

25   you that that's what you can produce as to lack of reporting?

1          MS. VINCENT:  Well, that, in addition to -- this

2    didn't come out of left field.  It started back in the fall and

3    then there were three subpoenas giving Morris & Dickson every

4    opportunity to produce what they could to show that they were

5    in compliance.  And it just shows that the DEA is not absent,

6    as if Mr. Dickson would like for us to believe.

7          THE COURT:  But is there -- do you have any letters

8    that you can show me where the DEA contacted him prior to the

9    subpoenas with regard to the recordkeeping as to the suspicious

10   order monitoring?

11         MS. VINCENT:  I don't have letters, Your Honor, but

12   there are agents -- there were agents on, you know, on the site

13   from when they first -- from the fall and then with the ARCOS

14   data and providing --

15         THE COURT:  Nothing before that?

16         MS. VINCENT:  But no letters.

17         THE COURT:  But nothing before that?  Nothing before

18   the fall?

19         MS. VINCENT:  That is correct.

20         THE COURT:  All right.  Thank you.

21         MS. VINCENT:  I'm not going to put this into

22   evidence.

23         THE COURT:  Well --

24         MS. VINCENT:  Do you want it?  I'll be happy to, Your

25   Honor.

1          THE COURT:  I mean, you talked about it, and the

2    Court needs to see it.

3          MS. VINCENT:  Okay.

4          MR. SPRUIELL:  And we would have no objection to the

5    Court looking at that document.

6          THE COURT:  Did you introduce -- you marked this as

7    Number 3; is that right?

8          MS. VINCENT:  That's correct.  Don't we have Number

9    2?

10          THE COURT:  Number 2 was never offered.  And I still

11   don't know what Number 2 is.  I don't know where it came from.

12   It's three different emails on three different sources.  I

13   don't -- as I said, the Court does not know what it's looking

14   at.

15          MR. SPRUIELL:  And, Your Honor, really, since I don't

16   have the suspicious activity or order of reports in front of

17   me, I was really trying to get to the bottom of that third

18   order, that third suspicious order report.  And Mr. Dickson

19   couldn't remember the specifics either.

20          THE COURT:  So you're not offering Number 2?

21          MS. VINCENT:  No.  So I guess we need to change the

22   other one to Number 2.

23          THE COURT:  Well, that's all right.  We can just say

24   it's not offered.  This one is Number 3.  Number 2 is not

25   offered, and Number 1 is in evidence.

1        Will the marshals approach?  I know you're wondering about

2    my schedule.  We will go ahead and take a break in a few

3    minutes and take care of our 2:00 sentencing, yes.

4            MS. VINCENT:  Are we going to take a break right now?

5            THE COURT:  No.

6            MS. VINCENT:  Oh, I'm sorry, Your Honor.  I

7    misunderstood you.

8            THE COURT:  Do you have any further questions?

9            MS. VINCENT:  Yes, I do.  Just a few.  I

10   misunderstood you.  I apologize.

11   BY MS. VINCENT:

12   Q    As of -- today is Tuesday.  As of yesterday, Monday, there

13   were shipments of some sort leaving Morris & Dickson; is that

14   correct?

15   A    That's correct.

16   Q    In fact, large truckloads of shipments; is that correct?

17   A    We are a very large company.  We have a dozen

18   tractor-trailers that leave daily, nightly.

19           THE COURT:  But you're not implying he was shipping

20   Schedule II?

21           MS. VINCENT:  Oh, no, Your Honor.  It's just they're

22   still in business.  I mean, there is product of some sort being

23   shipped.

24           THE WITNESS:  As I testified earlier, our business

25   last night dropped 14 percent, which means we still, as of that

1   one day, had retained 86 percent.

2   BY MS. VINCENT:

3   Q    And the letters that were put into evidence that were sent

4   to the email address, you actually solicited those letters, did

5   you not?

6   A    I sent out an email to our sales force because I was

7   already beginning to get a lot of feedback from customers.  And

8   I encouraged them to make their voices heard.  And I told them

9   in there that I would help them make their voices heard.

10  Q    And some of those, some of those folks that were, that you

11  wanted to let them know that their voices needed to be heard,

12  some of them were actually contemplating going to other

13  distributors to obtain controlled substances; is that correct?

14  A    There's a lot of things described in those letters.  The

15  difficulty of doing that is described in those letters.  And

16  the impossibility for some of doing that is described in those

17  letters.

18  Q    Well, let's talk about nursing homes and hospices, for

19  instance.  Those types of facilities actually obtain their

20  drugs from a pharmacy; is that correct?

21  A    That is correct.

22  Q    They're not DEA registrants and you don't actually supply

23  directly to them?

24  A    No, that's way overly broad.

25       There are pharmacies who are separate in ownership from

```
 1    the hospices and other alternate care entities, nursing homes.

 2    There are nursing homes who own their own pharmacy.  There's

 3    all combinations.  There are hospices which own their own

 4    pharmacies.  We have over 3,000 different accounts and there's

 5    a wide range of permutations there.  So to answer your

 6    question, all of those things are possible.

 7    Q    But you actually distribute to the pharmacy.  You can't

 8    distribute -- Morris & Dickson can't distribute to, directly to

 9    a nursing home unless it's a DEA registrant; is that correct?

10    A    We distribute to the pharmacy, the DEA registrant.

11    Schedule II's actually, by law, must be delivered to the

12    address that's on the Form 222, which is the registered

13    address, yes, of the pharmacy.  That might be inside a nursing

14    home; it might be outside a nursing home.

15            THE COURT:  That was my question.  When you say that

16    the hospital or the alternate care facility is your customer,

17    you are referring to an in-house pharmacy?

18            THE WITNESS:  Or they're contracted.  Like I said --

19            THE COURT:  The pharmacy that is supplying --

20            THE WITNESS:  It's the supplier.  There's all kinds

21    of them.  There's both.  All of these things are true.  It's

22    all of the above.

23            THE COURT:  So -- but the point that's important is

24    that the prescription for that drug would come from the

25    hospital or the alternate care facility?
```

1          THE WITNESS:  Now, I don't fill prescriptions.  A

2    prescription comes from a physician to a pharmacy.  I'm just a

3    merchant with a delivery truck.  Okay.  So I deliver to a

4    registrant, which is a pharmacy, what they ordered.

5          THE COURT:  But then how does that pharmacy, even if

6    it is either wholly-owned by the hospital or some variant where

7    they have a contract with that hospital, how do those drugs get

8    from the pharmacy to the patient?

9          THE WITNESS:  Well, that's the process of filling the

10   prescription.  So I would sell say a bottle of 100.  And

11   patient's prescription in the nursing home might be a dose at a

12   time.  Or they might be a contract pharmacy.  It might be

13   what's called a unit dose packaging, where the package is in

14   units.  And they might tear -- but I can't sell a dose.  We've

15   described doses here to help with the understanding.  But we

16   can't sell the doses.  The FDA has a labeling requirement, and

17   it says the manufacturer has a label and that label says, say

18   there's a bottle of 100 or a bottle of 40 and it's this drug

19   and et cetera.  I can only sell a FDA label.  I can't open the

20   bottle and count it out.  I'm not allowed to do that, so we

21   don't.  So we sell that unit to the pharmacy; they then break

22   it up and fill the prescription.  So whether the pharmacy is

23   located in the nursing home or outside, they are going to

24   deliver it to the patient.

25          THE COURT:  So, but my point is that that's why it's

1    less room for abuse, because the end user is in a hospital or

2    an alternate care facility?

3              THE WITNESS:  Yeah, it's kind of like what you were

4    saying a minute ago.  It's still a closed world and so you've

5    got employees of the pharmacy walking to wherever the hospice

6    and then maybe hospice or hospital has nurses or maybe the

7    pharmacist goes there directly to the patient.  It varies.

8              THE COURT:  But the intended end user is a patient?

9              THE WITNESS:  That's correct.

10             THE COURT:  In a facility.

11             THE WITNESS:  And sometimes the pharmacist goes to

12   patients; sometimes a pharmacy tech goes to the patient;

13   sometimes a nurse goes to the patient.  Again, wide range of

14   permutations there.

15             THE COURT:  But I'm glad she asked that question

16   because I wanted to know.

17             THE WITNESS:  Excuse me.  I should also say that

18   there is also stock-keeping units within a hospital or a

19   hospice in the nursing station, because nurses are authorized

20   to give a med.  So the pharmacy might bring a certain amount to

21   the nurses' station and it might be kept there at the nurses'

22   station and then the nurses -- but that's not our game.  We

23   quit at the back door of the pharmacy; that's as far as we go.

24             THE COURT:  All right.  Ms. Vincent, anything else?

25             MS. VINCENT:  I have nothing further of this witness,

1   Your Honor.  I do have the administrative subpoenas.  I don't

2   have copies right now, but at the break, I can make them.

3          THE COURT:  Please do.  We will let you do that.

4      We are going to take a break at this time.  The Court has

5   an another matter.  The court is an open court.  We will switch

6   out.

7          THE COURT:  We'd ask the marshals to bring the

8   prisoner out.  Do we have counsel?

9                 (The Court heard another matter.)

10                        (Recess)

11         THE COURT:  Please be seated.

12      We are continuing with our hearing.  Ms. Vincent had

13  finished her cross-examination but I think has some

14  documentation she wants to put into the record.

15         MS. VINCENT:  Yes, Your Honor.  I've already provided

16  a copy to Mr. Spruiell.  These are the administrative subpoenas

17  that were served on Morris & Dickson.

18         THE COURT:  May I see them, please.

19         MR. SPRUIELL:  And we have no objection.

20          (The Clerk hands documents to the Court.)

21         THE COURT:  So we don't have the responses?

22         MS. VINCENT:  No, Your Honor, we don't have the

23  responses.  That would be part of the administrative record.

24         THE COURT:  Okay.  Well, the Court will allow these

25  to be filed.

1    At this time I would ask you to please address for the

2    Court:  What is the administrative record?  What does that

3    entail, both physically and as a matter of procedure, how is it

4    compiled?

5        MS. VINCENT:  If the Court would indulge me to allow

6    counsel from the DEA to respond to that I think -- I think that

7    DEA counsel can probably respond more accurately --

8        THE COURT:  All right.

9        MS. VINCENT:  -- and completely than I can.

10       THE COURT:  Mr. Dean?

11       MR. DEAN:  Good afternoon, Your Honor.  May it please

12   the Court.  In terms of explaining how the administrative

13   process in these types of proceedings are a little bit

14   different than your standard administrative process.

15       The ISO is developed through the investigative file.  The

16   administrator looks at the investigative file.  What he ends

17   up -- what is the ISO itself are his conclusions, and that's

18   what's required to be in the documents.  So those are the

19   conclusions.

20       So there's other documents; for example, the response,

21   subpoena responses, our requests for clarification to the

22   target; all that sort of information.  DEA's own statistical

23   analysis would all be part of the record, but the only actual

24   part at issue would be the administrator bases his -- reaches

25   his conclusion, writes the conclusion in the ISO.  And that's

1   the basis for his action.

2            THE COURT:  But like the statistical method, is there

3   like a report from the expert or something that's in that

4   record?

5            MR. DEAN:  Yeah.  There has been -- yes, DEA has

6   their own statisticians who did create a report, and that's how

7   they developed the statistical analysis, which allowed the

8   administrator to reach his conclusions.

9            THE COURT:  Mr. Spruiell, have you been party to see

10  that?

11           MR. SPRUIELL:  No, ma'am.  It has not been provided.

12           THE COURT:  So, is this a -- is there anyone who ever

13  raises their right hand and says:  This is the evidence that

14  constitutes the administrative record?

15           MR. DEAN:  No, ma'am.  Not until right -- all this

16  stuff would come into play during the administrative process

17  after a hearing has been requested and then a hearing is set

18  before the administrative law judge.  At that point, any

19  information that we relied upon in bringing our charges would

20  be shared with the other side at that point in time.  And

21  that's when we would proceed with the administrative process.

22           THE COURT:  In this particular case, could you give

23  me an estimate of the number of pages that comprise the

24  administrative record?

25           MR. DEAN:  That would be difficult, Your Honor,

1    solely for the reason that Morris & Dickson provided a hard

2    drive with thousands of pages on it.  It's eventually part of

3    the response to our second subpoena.  It was like late March, I

4    think.

5              THE COURT:  Well, the second subpoena is pretty

6    broad.

7              MR. DEAN:  Right.  And we had a dialogue with them

8    requesting more specific information.  Those letters are not

9    before you.  However, eventually what I'm trying to get at,

10   it's a fairly broad record.  It's a result of the responses

11   that we received in response to our questions.  If I had to

12   guess, I'd say maybe 8,000 pages.  But that is purely off the

13   top of my head.  Most of that is going to be the information we

14   received from the respondent.

15             THE COURT:  Is there any delineation by the

16   Department as to what among, say, the response from Morris &

17   Dickson that they deemed to be relevant in compiling the ISO?

18             MR. DEAN:  Yes.  Yes.  So, I think, if I am

19   understanding your question correctly, yes.  We did not -- the

20   ISO did not necessarily rely upon all of the data we received

21   from them.  Parts of the data were what was used, yes.

22             THE COURT:  And is that part that was relied upon in

23   compiling the ISO as relevant, is that what comprises about

24   8,000 pages or would that --

25             MR. DEAN:  No.  That would be significantly less,

1    Your Honor.

2          THE COURT:  All right.  And how -- what is the

3    process that assures the Court that this is what this person

4    considered in formulating the ISO?

5          MR. DEAN:  The ISO itself.  I think the document

6    speaks for itself.  I mean, I -- those are just -- I'm sorry.

7          THE COURT:  What would preclude -- are there any

8    safeguards in place that would preclude the DEA from going out

9    and getting additional documents that have not been used to

10   compile the ISO but would support the positions of the ISO?  I

11   mean, is there anywhere where it's like saying:  This is what

12   is the record?  Is there a file?  Are there --

13         MR. DEAN:  Well, the record itself doesn't occur

14   until we actually get into the administrative process after

15   they request a hearing, which hasn't happened yet.  But in

16   terms of the stuff that was used for -- the information that

17   was used to compile the ISO, yes, we're aware of what that is

18   and we can provide that.  But that's not something that would

19   normally be part of the process.  The process would be:  We

20   have the ISO that sets forth the administrator's conclusions

21   and it's a question whether those conclusions are rationally

22   related to his actions.

23         THE COURT:  In the *Cardinal* case, when the Court

24   requested to look at the administrative record, is that what

25   you are talking about now, is that it is the ISO supporting

1    documentation?

2              MR. DEAN:  Yes.  For the purposes of the TRO, we

3    would say it's the ISO.  When we get to -- if and when we get

4    to a preliminary injunction process, if we're talking about a

5    broader scope, the administrative record, yeah, could include

6    these other items along with the ISO.  Am I making myself

7    clear?

8              THE COURT:  Yes.  Yes.  But -- and how quickly could

9    the DEA get those documents together?

10             MR. DEAN:  May I confer with my colleague?

11             THE COURT:  Yes.  And what the Court would be

12   interested in would be the documents that were relevant to the

13   compilation of the ISO.

14             MR. DEAN:  Okay.

15                       (Counsel confer.)

16             MR. DEAN:  Thank you, Your Honor.  Sorry for the

17   slight delay.

18        Just the documents, we could do in a couple of days.  With

19   respect to like having the administrator certify -- the Acting

20   Administrator certify something, that may be a bit longer

21   because I don't know his schedule, if he's traveling or

22   something like that.  So that would be the, sort of the wild

23   card.

24             THE COURT:  All right.

25        And, Mr. Spruiell, is this your understanding of what the

1   administrative record reflects at this time?

2          MR. SPRUIELL:  Your Honor, obviously we know what we

3   provided.  Beyond that, we don't know what is in the file of

4   the DEA.  We obviously see references to statistical analysis,

5   but we have had no access and are not privy to any of the

6   background information, the range, who did it, how they did it,

7   and that sort of thing.

8       And so all we can tell the Court today is:  We know what

9   we gave them, which was a substantial amount of documents in

10   response to the subpoena.

11          THE COURT:  All right.  Thank you.

12      All right.  Is there anything further from you?

13          MS. VINCENT:  No, Your Honor.

14          THE COURT:  All right.  Do we have redirect?

15          MR. SPRUIELL:  No, Your Honor.  And the Plaintiff

16   would rest.

17          THE COURT:  All right.  So at this time, then, the

18   Court would invite your argument.

19          MR. SPRUIELL:  May it please the Court, Your Honor.

20      The issue before the Court is obviously a TRO.  And there

21   are four elements that apply to a TRO in terms of the burden of

22   proof on Morris & Dickson.  We respectfully submit that two of

23   those are not seriously disputed.

24          THE COURT:  And that would be the substantial risk of

25   harm, or --

1          MR. SPRUIELL:  No.  I was talking more about the

2     public interest and not being disputed.  Very clearly, there is

3     no evidence that has been presented by the DEA that the public

4     interest weighs in favor of the DEA as opposed to Morris &

5     Dickson in this particular instance primarily based upon the

6     medical information that was submitted and also the dramatic

7     effect that the failure of the TRO being granted would have on

8     the business primarily as it relates to the employees.

9          THE COURT:  And that's what I was referring to:

10    Substantial threat of irreparable injury.

11         MR. SPRUIELL:  Yes, ma'am.  And on that particular

12    issue, I don't believe that the DEA offered any evidence to

13    challenge irreparable harm.  Mr. Dickson --

14         THE COURT:  I agree.

15      Let me make one clarification, and I would invite you to

16    the other podium, Ms. Vincent, to comment.

17      When you talk about the public interest, you are referring

18    to, of course, the last two factors, and that is that the

19    threatened injury outweighs the threatened harm to the party

20    whom he seeks to enjoin; and, four, granting the preliminary

21    injunction will not disserve the public interest.

22      Because, Ms. Vincent, this is in fact the DEA who is

23    seeking this action and/or they are the party who has been

24    seeking to be enjoined, what do you see as the relationship

25    between numbers 3 and 4?

1           MS. VINCENT:  The irreparable harm -- I'm sorry, your

2     Honor.  The public interest or the --

3           THE COURT:  Okay.  This is the question.  There are

4     four elements:  Substantial likelihood the plaintiff will

5     prevail, a substantial threat that the plaintiff will suffer

6     irreparable injury.  Okay.  Those are the first two.

7           The last two are that the threatened injury outweighs the

8     threatened harm to the party whom he seeks to enjoin.  And in

9     this case, the party who is sought to be enjoined, is the DEA.

10    The DEA, of course, doesn't suffer any harm.  It is the DEA's

11    acting on behalf of the public.  And I say that, not as a

12    statement, but as a question to you as to what your position

13    is.

14          Then with regard to number 4, granting the preliminary

15    injunction will not disserve the public interest, that is,

16    the public interest.  It does appear to me, since the DEA is

17    acting on behalf of the public, that those two overlap in this

18    particular case.  And I invite your comment on that conclusion

19    of the Court.

20          MS. VINCENT:  To some degree, they may overlap.

21          THE COURT:  Distinguish it, then.  To what degree do

22    they not?

23          MS. VINCENT:  Well, for instance, the threatened

24    injury to DEA, I see as a threatened injury to the agency who

25    has this discretion provided by the statute.  It's not one of

1    those where we have to determine how much discretion.  But the

2    Administrator had discretion; therefore, an adverse ruling, to

3    some effect, you know, says that the agency didn't do something

4    right with that discretion.  They were arbitrary and capricious

5    or something to that effect.  So I know that goes to the

6    likelihood of success on the merits, but it also goes -- I see

7    it also as injuring the DEA in some respect.  But to a degree,

8    I agree with you that it's the disservice to the public.  They

9    are kind of related.  They overlap at least to some degree.

10            THE COURT:  All right.

11            MS. VINCENT:  But going to that issue, you know --

12   and this goes to the specifics of the requirement for the

13   suspicious order reports -- we don't know the information that

14   the DEA had.  You know, it's not incumbent upon a distributor

15   to use his discretion.  The regulation is very clear that

16   reports are to be made.  And they weren't made.  That's very,

17   very clear.  It's clear in the ISO and it's clear with the

18   testimony.

19            THE COURT:  All right.  Is there any objective

20   standard given, though, as to, when you look at the language of

21   the C.F.R. 21:1301.74(b), where it says:  Suspicious orders

22   include orders of unusual size, orders deviating substantially

23   from a normal pattern, and others of unusual frequency.

24            MS. VINCENT:  There is none that appear in the

25   regulation; however, I would argue that there's great deference

```
 1    to the agency, especially in light of the discretionary aspect

 2    of the action.

 3              THE COURT:  Okay.  Thank you.

 4        All right.  So that, then, Mr. -- may I ask you then to

 5    speak to Mr. Spruiell's point that there was no contrary

 6    evidence on the issue of irreparable harm.

 7              MS. VINCENT:  Well, I mean, to the extent his company

 8    is going to be harmed and he doesn't have, probably doesn't

 9    have an action against the United States should he prevail

10    ultimately in the administrative action, I don't disagree with

11    that.

12              THE COURT:  Okay.  Thank you, ma'am.

13              MR. SPRUIELL:  Your Honor, as I appreciate the

14    Court's comments and Counsel's acknowledgment, it would appear

15    that we're really talking about the first element, and that is

16    the substantial likelihood of success on the merits.

17              THE COURT:  Well, I think we need to talk about --

18    well, go ahead.

19              MR. SPRUIELL:  And just so that the Court is aware,

20    obviously what that means in terms of substantial likelihood of

21    success on the merits, there have been Fifth Circuit cases that

22    have dealt with that standard specifically.  A recent case,

23    *Def. Distributed versus United States Department of State*, 838

24    F3d 451, 2016, Fifth Circuit case.

25        And I'll read this as a quote.
```

1        None of the four prerequisites has a fixed quantitative

2   value --

3                THE COURT:  You're referring to a sliding scale?

4                MR. SPRUIELL:  Yes, ma'am.

5                THE COURT:  Do you agree, Ms. Vincent, that the

6   sliding scale applies?

7                MS. VINCENT:  No, Your Honor, I don't.

8                THE COURT:  All right.  Well, we'll hear -- I was

9   going to try to short circuit the --

10               MS. VINCENT:  Well, at least I will say I think it's

11  in doubt.  I'm not going to say it's -- I think that there is

12  some question as to whether it's still valid.

13               THE COURT:  Well, I look forward to hearing from you

14  on that.  I was trying to preclude that issue from having to be

15  discussed.

16       Mr. Spruiell, the Court will hear your argument.

17               MR. SPRUIELL:  Yes, ma'am.

18       And in that particular case that I gave you the citation

19  on, it refers back to the decision of the Fifth Circuit from

20  1975 in the *State of Texas versus Seatrain*.  And in that

21  particular -- and I know the Court doesn't want me to spend

22  time reading a quote, but I think it's a quote that's very

23  important for the Court's analysis.

24       "However, one appealing to the conscience of the

25  chancellor to maintain the status quo pending final decision,

1    although he carries the burden, is not required to prove to a

2    moral certainty that his is the only correct position.  The

3    prerequisite as an absolute is more negative than positive.

4    One cannot obtain a preliminary injunction --"

5        We know the standard is same for both TRO and preliminary

6    injunction.  And continuing:

7        "-- if he clearly will not prevail on the merits.

8    However, that he is unable in an abbreviated proceeding to

9    prove to a certainty eventual success does not foreclose the

10   possibility that temporary restraint may be appropriate.  In

11   its negative sense, the factor is critical; but viewed

12   positively, the importance and nature of the requirement can

13   vary significantly, depending upon the magnitude of the injury

14   which would be suffered by the movant in the absence of

15   interlocutory relief and the relative balance of the threatened

16   hardship faced by each of the parties.  This is so because, as

17   we have noted, none of the four prerequisites has a fixed

18   quantitative value.  Rather, a sliding scale is utilized, which

19   takes into account the intensity of each in a given calculus."

20       Your Honor, in this particular case for a immediate

21   suspension order to issue, it is unquestioned that the DEA has

22   to show that the Plaintiff has a substantial likelihood of

23   success and that Plaintiff would suffer irreparable injury --

24   I'm sorry.

25       The DEA must show imminent danger to the public health or

1    safety under 824(d).  And the Fifth Circuit has defined that to

2    mean that in the absence of imminent danger to the public

3    safety, there can be no suspension and no seizure without

4    notice and an opportunity to be heard.  And that's the *Norman*

5    *Bridge* decision quoted in our reply brief.

6         We respectfully submit that the ISO does not contain any

7    evidence; it is devoid of any evidence of imminent threat or

8    danger to the public health and safety.

9         The information relied upon by the DEA is stale.  It goes

10   back as far as 2014.  They have had that information in their

11   possession for three and a half years and they have never acted

12   upon it.  In fact, most of the information in the ISO relates

13   back to 2015, '16, and the middle of the 2017.  They don't

14   address anything that's current and would deal with where we

15   were on May 3rd of 2018.  And we believe that as a result of

16   that and the mere conclusory allegations contained in the ISO,

17   they cannot prevail in that respect to show imminent danger to

18   the public health or safety.

19        They have not quoted and cited any evidence in the ISO

20   that any particular individual will be harmed by Morris &

21   Dickson continuing to ship and distribute controlled

22   substances.  They have cited no evidence specifically as to any

23   individual who has been hurt by any controlled substances

24   distributed by Morris & Dickson.  As such, they have not come

25   close to even establishing any threat of imminent harm at the

1    time of the ISO service on May 3, 2018.

2         Your Honor, we also believe that the ISO is overly broad

3    and overreaching for a number of other reasons.  The ISO does

4    not differentiate between --

5              THE COURT:  I'm sorry; before you move on to that, I

6    have a question to ask you and I was looking for the quote.

7         And again, this is from *Cardinal Health* on the preliminary

8    injunction.  And in that case, the Court held that the DEA

9    could reasonably rely on sales trends from the past five years

10   to show a pattern of inadequate anti-diversion efforts which

11   ultimately culminated in the need for immediate suspension.  So

12   in other words, *Cardinal* blesses the use of a pattern, even if

13   it goes back as long as five years.

14        Can you distinguish the facts in your case from that?

15             MR. SPRUIELL:  Your Honor, *Cardinal*, we also need to

16   remember that it involved issues related to recidivism.  They

17   had had issues in the past where they had not complied with

18   issues related to prior memorandum agreements where they had

19   entered into settlements, if you will, with the DEA and agreed

20   to do certain things.  On a moving-forward basis, they did not

21   comply with that memorandum of understanding, which ultimately

22   led to, I believe, the decision that is in front of you.

23        The distinguishing characteristic in this case is:  The

24   DEA has had access to Morris & Dickson's sales information and

25   distributions forever.  And while there may have been some

1   disagreement is it monthly or quarterly, the fact is they have

2   had this information in their possession for the past five

3   years.  And not once did they ever suggest to Morris & Dickson

4   in that five-year period that anything they were doing in their

5   suspicious order monitoring program was deficient, inadequate,

6   or improper.  No one ever suggested that Morris & Dickson was

7   inadequate or improper in its record keeping.  And it's

8   acknowledged there is no requirement or rule in place about

9   recordkeeping.  We acknowledge that we could have been better

10  with that, and we will be better with that.  But the fact of

11  the matter is they have --

12          THE COURT:  Your position is:  You're shutting down a

13  business for lack of adequate recordkeeping?

14          MR. SPRUIELL:  Yes, Your Honor.  And in that same

15  five-year period of time, Morris & Dickson has never been

16  penalized, never had any type of action brought against it

17  regarding compliance.  The only thing the DEA could bring to

18  this hearing today to show failure to comply on the part of

19  Morris & Dickson was a 222 report that didn't have a date on

20  it.  That's the worst thing that Morris & Dickson did in the

21  past five years.

22          We have never been accused or had it suggested to us that

23  we were doing anything improper, yet we get hit out of the blue

24  with an ISO without having any opportunity to be heard, without

25  having the opportunity to proceed through the administrative

1    process so that we would have time to address these issues, to

2    have an administrative record prepared, have discovery, and

3    then ultimately have potentially a corrective action plan put

4    in place.  Instead, we believe for political purposes, we're

5    the sacrificial lamb for the DEA.

6         THE COURT:  Why -- do you have any information as to

7    how often this procedure of suspending a registration without

8    the benefit of a hearing is utilized by the DEA?

9         MR. SPRUIELL:  Your Honor, as a matter of fact, as we

10   know today, there are congressional hearings going on regarding

11   the opioid crisis.  Four presidents or CEOs of the big three,

12   plus one more, are testifying in front of Congress:  McKesson,

13   AmerisourceBergen, Cardinal, and Miami-Luken.

14       In that particular proceeding, the committee issued a

15   report that looked at the history of the DEA and the

16   enforcement proceedings that have taken place as far as back as

17   2007.  The last time the ISO was ever utilized was 2012 and

18   that was the *Cardinal* case.  Prior --

19        THE COURT:  Ms. Vincent, do you dispute that, that

20   this is the first time that an ISO has been used in that many

21   years to shut down somebody without a hearing?

22        MS. VINCENT:  Your Honor, may I again defer to my

23   colleague?

24        THE COURT:  Yes.  Mr. Dean, if you will get to the

25   microphone.  I know Ms. Avergun has been trying to say

1    something with regard to *Cardinal* and the staleness issue.  So

2    we'll go back to that.

3         Yes, sir, Mr. Dean?

4              MR. DEAN:  Your Honor, with respect to ISOs that

5    we've done so far this year --

6                   (Reporter asks Counsel to speak slower.)

7              MR. DEAN:  With respect to ISOs, I believe so far

8    this year, DEA has issued about ten.

9              THE COURT:  To whom?

10             MR. DEAN:  Mostly, I believe, doctors and pharmacies.

11   And this is the first distributor at least this fiscal year

12   that I'm aware of.

13             THE COURT:  Have there been any distributors who have

14   been issued ISOs in the last five years?

15             MR. DEAN:  If I may confer?  I believe -- there have

16   been show causes; I'm not sure there have been ISOs, but I will

17   check.

18             THE COURT:  Right.  But that's a hearing.

19             MR. DEAN:  Yes.

20             THE COURT:  Right.

21             MR. DEAN:  No.

22             THE COURT:  Thank you.

23        All right.  Let's address, go back to the staleness issue.

24   In other words, I'm saying that there is precedent that sales

25   trends over a period of time can, in fact, be used to show a

 1   pattern of inadequate anti-diversion efforts.  And that's what

 2   the Court said in *Cardinal*.  And one of your arguments is:

 3   Well, they're using old figures.

 4       So can you distinguish your argument from what the Court

 5   relied upon in *Cardinal*.  And I understand that there were

 6   recidivism issues.  Okay.

 7           MR. SPRUIELL:  With the Court's permission, could my

 8   co-counsel respond?

 9           THE COURT:  Yes.

10           MS. AVERGUN:  Your Honor --

11           THE COURT:  Yes, ma'am.

12           MS. AVERGUN:  Thank you, Your Honor.  I don't think

13   that the Court relied alone on the fact that there were trends

14   of diversion in *Cardinal* and said that that's sufficient.  I

15   think that what the Court looked at in *Cardinal* was the fact

16   that the trends in Lakeland, given the fact that there was a

17   compliance agreement in place, was problematic.  That's -- I

18   think that's what the Court was focusing on.

19       And our position here, and what we think is distinct -- of

20   course aside from the fact that Morris & Dickson has not been

21   the subject of any compliance addendum settlement agreement --

22   is that the information that the DEA is relying on all happened

23   in the past.  The sales of controlled substances have gone down

24   at Morris & Dickson, which was also an opposing factor in

25   *Cardinal*.  I think that the judge in *Cardinal* noted that even

1    while the ISO was in place in *Cardinal* for three distribution

2    centers in 2008, their sales and revenue went up.

3         So the trend information in *Cardinal* was really different

4    of a kind and in degree to what we have here.

5         I also think that the trend analysis that's present here

6    is not really a trend analysis.  There is a lot of assumption

7    about excessive orders.  And Mr. Dickson told us that, in fact,

8    they were not excessive, that the company looked at them and

9    determined that they weren't suspicious, they merely were

10   large.

11              THE COURT:  He made the comment that they were

12   unusually large orders that were not reported because he

13   followed up.

14        I am perplexed by the use of the term "unusually large" in

15   that C.F.R.  Are we talking about a legal term, or are we

16   talking about what we would say in common parlance:  Well, this

17   is unusually large?  I mean, how are we defining that term?

18              MS. AVERGUN:  I think that it's clear from the four

19   corners of the ISO that they are talking purely in terms of

20   quantitative analysis:  Wow; it's a big number compared to a

21   national average.  But the national average is not the same for

22   every customer.  It's not a good reference point because every

23   customer is different.

24        So, is 22,000 a lot of pills to get in a three-day period?

25   Yes.  Is that unusual in the circumstances of a particular

1   customer?  Perhaps not.  And the problem we see in the ISO is

2   that they talk about some statistical analysis that we don't

3   know what it is, but they just say:  That's a big number; these

4   are unusually large.  Which does not mean that the order is

5   suspicious, per se.  It means it's large, it's flagged, it's

6   reviewed; but if it's not suspicious, it doesn't get reported.

7           THE COURT:  What would you have the Court do today?

8   What do you think the resolution of this should be today, where

9   the Court only has the ISO in front of it and not the entire

10  administrative record?

11          MS. AVERGUN:  Well, I think that because we're in a

12  temporary restraining order situation, Your Honor, all we're

13  doing is preserving the status quo until there can be a hearing

14  and there can be evidence presented.  I think because of really

15  the abject failure of the government to rebut the evidence, it

16  was our burden, that there is certainly irreparable harm, the

17  business will shut down, 500 people will lose their jobs and

18  the fact that there is no evidence other than the generalized

19  statement about the opioid crisis, there is no evidence that

20  anything that Mr. Dickson and his company sent anywhere was

21  actually diverted.  There is no chance that they meet the

22  standards necessary to prevent the TRO from being in place.

23      So our request that the ISO be completely rejected, that

24  the Court issue the TRO and restrain the DEA from enforcing it

25  until such time that there is a preliminary hearing.  Given the

1  amount of time that the DEA took to understand Morris &

2  Dickson's business, given the fact that they had evidence in

3  front of them, the fact that they chose May 2 of 2018, to issue

4  an ISO is really of no moment.  So 10 days additional, in the

5  absence of any specific evidence of harm, is really not any

6  damage to the Drug Enforcement Administration or the United

7  States public.  It gives time to gather evidence and present a

8  case to the Court.

9      So our request is:  Issue the TRO and have the ISO

10  completely voided.

11          THE COURT:  But, let's talk.  Can the Court -- even

12  if the Court issued the TRO, isn't the Court obligated to look

13  at the entire administrative record in this matter?

14          MS. AVERGUN:  When we have a preliminary hearing, I

15  think that that's the case, Your Honor.

16          THE COURT:  And by "preliminary hearing," you mean a

17  hearing on a preliminary injunction?

18          MS. AVERGUN:  Correct.  Preliminary injunction

19  hearing, correct.

20          THE COURT:  You are not referring to the

21  administrative hearing?

22          MS. AVERGUN:  I am not.

23          THE COURT:  Okay.

24          MS. AVERGUN:  That's in July when the company doesn't

25  exist anymore.

 1          THE COURT:  So then the issue there would be the

 2   issues of due process and arbitrary and capriciousness in

 3   issuing the ISO, and not the ultimate merits of whether or not

 4   Morris & Dickson didn't comply with the statutes?

 5          MS. AVERGUN:  Exactly right, Your Honor.  That issue,

 6   whether it ultimately gets to keep its license because of

 7   failure to comply with 1301:74, that's for a July

 8   administrative hearing.

 9      What is for a hearing on the preliminary injunction is:

10   Was it appropriate for this immediate suspension order to

11   issue?

12          THE COURT:  If the Court were to have some -- the

13   Court has inquired as to the availability of the administrative

14   record.

15      It doesn't seem possible, Ms. Vincent, just arguing with

16   you for a second.  If the Court would issue the TRO, it doesn't

17   seem possible that we would have a review of that -- we would

18   have the record, have all parties get to review the record and

19   have a hearing on that within 10 days.  Would you say that that

20   was a possibility to occur?

21          MS. VINCENT:  Well, you know, I think what Mr. Dean

22   said --

23          THE COURT:  14 days.  I'm sorry; it's 14 days.

24          MS. VINCENT:  -- that we could get the record; it may

25   not be certified, though --

1           THE COURT:  You need to certify that --

2           MS. VINCENT:  I agree with you; I agree.  That's part

3    of the administrative record generally, attesting to its

4    accuracy.

5       But I would agree we might -- I mean, it's hard to say

6    without knowing when the Administrator could sign the

7    certification.

8           THE COURT:  All right.  I mean, are you talking about

9    one week, two weeks, or a month for the Administrator?

10          MS. VINCENT:  We thought one week to 10 days.  10

11   days?

12          THE COURT:  So if the -- and the Court has not -- is

13   proposing this question to you, assuming that the Court would

14   issue the TRO.  Would the Government agree to an extension

15   beyond the 14 days in order to allow the submission of the

16   record, the review of the record by the parties and a review of

17   the record and the briefing by the Court?

18          MS. VINCENT:  Your Honor, I don't think the

19   Government can.  It's our position that the Acting

20   Administrator has properly exercised his discretion in issuing

21   the ISO, which was based on imminent harm.  As a result, I

22   don't think we can agree.

23      Now, I know we may respectfully disagree with the Court on

24   that issue; but in the sense that that is our position, I don't

25   think we can.  I mean, if we truly believe, which we do, that

 1    there is imminent harm to the public --

 2             THE COURT:  And we'll hear your argument on that in

 3    just a second.  Thank you.

 4        Yes, ma'am?

 5             MS. AVERGUN:  I don't have anything else, Your Honor.

 6             THE COURT:  All right.

 7             MS. AVERGUN:  Thank you.

 8             THE COURT:  Mr. Spruiell, you want to continue?

 9             MR. SPRUIELL:  With respect, Your Honor, I think we

10    were pretty close to the end.  I think co-counsel adequately

11    summarized our position and our belief that the issuance of the

12    ISO was in fact arbitrary and capricious under the

13    circumstances presented.  While subject to some deference, it

14    is not subject to deference in this particular circumstance.

15             THE COURT:  Thank you.

16        All right.  Ms. Vincent?

17             MS. VINCENT:  Your Honor, if I may indulge the Court

18    and ask that Mr. Beerbower explain the statistical analysis of

19    the ISO to the extent it appears in the ISO.

20             THE COURT:  All right.  Let's talk about that.  There

21    is no explanation of that statistical analysis in the ISO.  Can

22    I entertain an explanation of that?  Is he going to testify

23    about that?  Is it -- how can I take that into consideration?

24             MS. VINCENT:  No.  I think it's simply argument, Your

25    Honor.  It's not testimony.

1          THE COURT:  All right.

2      Mr. Spruiell, you took position earlier that it's a

3  four-corners issue.  I am not sure it's a four-corners issue,

4  so I need some law on that from you.

5          MR. SPRUIELL:  I think both sides stipulated on that,

6  Your Honor, that both of us agreed that the ISO was limited to

7  the four corners.  That was proposed by the DEA's counsel.  We

8  concurrently believe that is the law.  And now I hear the DEA

9  saying:  I want to go outside those four corners despite their

10  stipulation.

11          MS. VINCENT:  No, I don't think that's what we're

12  saying.  I think we're saying we want to argue that it is the

13  four corners.

14          THE COURT:  But you want to explain to me how the

15  statistics were --

16          MS. VINCENT:  No, I can -- I mean, I can explain one

17  thing.  It was going to be part of my argument.  I'm not sure

18  Mr. Beerbower is going to expound on this.  But it's part of

19  the four corners of the ISO.

20      When Counsel says that these numbers were taken from

21  national averages, that is not correct.  The ISO itself says

22  that it references specific orders that were for each

23  representative pharmacy.  It references that particular

24  pharmacy's order, how much they had ordered.

25          THE COURT:  I understand.

 1          MS. VINCENT:  And then it goes on to say:  These are

 2     considered unusually large after -- so that's not an national

 3     average; that's a customer average.

 4          That's looking at those -- and for each pharmacy it does

 5     that.

 6          THE COURT:  I was going to note also that paragraph

 7     18 summarizes the statistical analysis by saying that the DEA

 8     conducted a statistical analysis of orders for oxycodone and

 9     hydrocodone placed between January of 2014 and September of

10     2017, to identify extremely large individual pharmacy

11     transactions, et cetera, et cetera, and that they did that

12     based on, not just those other figures, but the customer's

13     historical order and quantities.

14          MS. VINCENT:  Correct.

15          THE COURT:  So I was aware of that.  But there's not

16     much other explanation in the ISO as to what any other

17     statistical analysis was.

18          MS. VINCENT:  Well, I think what Mr. Beerbower

19     probably wanted to do, and I can do it, Your Honor.  If you

20     look to the regulation and you look to the statute, it doesn't

21     require anything further.  It requires a statement.  And that's

22     a statement.  In fact --

23          THE COURT:  A statement that it's unusually large.

24     You get to say it's unusually large and you get to shut him

25     down.  Is it as simple as that?

1          MS. VINCENT:  No.  But that's the reason that the

2     Administrator has discretion to determine.  I mean, this is

3     not -- again, this is not a statute where we're trying to

4     determine whether it's a discretionary matter.  I mean, it's

5     clearly discretionary.

6          THE COURT:  And isn't it after giving due deference

7     to that discretion that it's my job to decide whether or not

8     that decision is arbitrary and capricious?

9          MS. VINCENT:  Not only due deference to the decision

10    but the method in determining the basis for the decision.  And

11    the deference goes to, also goes to looking at these numbers

12    and then determining what orders were unusually large.  And

13    we're not talking about just -- we're talking about, you know,

14    22,000.

15         THE COURT:  Let's talk about the harm to the public.

16    If you truly wanted to change their behavior, why wouldn't

17    you have either given them a hearing or sat down with them and

18    said:  This is what we need you to do better?  Enter into a

19    compliance order as was done in *Cardinal*.  Why would you not do

20    that?  Why would you simply just shut them down?

21         MS. VINCENT:  I can't answer that on behalf of the

22    DEA.  What I can say is that it's not like this came out of

23    left field.  You know, it started in the fall of 2017, and the

24    DEA was requesting information through the three subpoenas, you

25    know, through the informal process.  And you know, maybe it was

1    when the numbers -- I don't know.  I don't know.  But they get

2    the spreadsheets and they see the numbers and --

3            THE COURT:  So what is the imminent harm?  Enunciate

4    for me the imminent harm.

5            MS. VINCENT:  Well, the imminent harm is to the

6    public and it's the Acting Administrator's authority to

7    determine whether or not the failure -- it's not -- the

8    imminent harm is not for me to decide or the Court to decide or

9    for DEA -- well, the issue is whether or not the Administrator

10   abused his discretion in determining that.  Not whether or not

11   the Court agrees with it.

12           THE COURT:  But there have to be facts on which he

13   made that determination.  So other than these unusually large

14   orders, do we have anything to point to that the public was

15   being harmed?

16           MS. VINCENT:  Unusually large orders that were not

17   only not reported but also shipped.  Also shipped.

18           THE COURT:  All right.  Do we have anything to point

19   to of harm, the imminence of the harm?

20           MS. VINCENT:  Well, again, that goes back to, if

21   you're asking about investigations on pharmacies, if that's

22   your question, I can't -- I'm not privy to that.  However,

23   that's the reason, that's part of the reason you have these

24   requirements on DEA registrants so that they notify the DEA of

25   suspicious activities so the DEA can take appropriate action.

1    The DEA may know something that I don't know.  I'm sure they

2    do.

3         But the harm, the harm is in the 22,000 that weren't

4    reported and the shipments that were made, even without being

5    reported.  It's not just the failure to report, but it's the

6    shipments that were made.

7         Your Honor, may I confer with my colleagues?

8              THE COURT:  Yes.  And you were going to address the

9    sliding scale.

10             MS. VINCENT:  Your Honor, I read in one of the cases

11   this weekend when I was just reading, that there had been doubt

12   cast whether or not that was still -- I can't find the case.  I

13   can't even swear to this Court that it was a Fifth Circuit

14   case.

15        But I will say this.  All along I've thought that it would

16   be very, very difficult for the Plaintiff.  The Plaintiff seems

17   to put the burden on the DEA, and the burden is not on the DEA.

18             THE COURT:  No.  Well, that wasn't the question.

19        The question is:  When the Court is analyzing the four

20   factors, may the Court do that with what is referred to in the

21   jurisprudence as a sliding scale, that is, that the factors are

22   not weighed equally but where one factor would weigh so heavily

23   that another factor could weigh less heavily.

24        Do you have an opinion about that?  And your answer is no?

25             MS. VINCENT:  No.  I don't, Your Honor.  But I do --

1    I mean, the Court's well aware, you know, when you're reading

2    the cases, if you can't show success, likelihood of success on

3    the merits, then in spite of the sliding scale, then that's a

4    tremendous factor.

5            THE COURT:  All right.  Mr. Spruiell, I sidetracked

6    you when you were going to address the overly broad nature of

7    the ISO.

8            MR. SPRUIELL:  Your Honor, yes, it is overly broad in

9    several respects.

10       Number one, it does not differentiate between the two

11   registrations: Shreveport and the Jefferson-New Orleans area

12   facility.  There's nothing in the ISO that addresses the

13   Jefferson, Louisiana facility.

14       The other aspect of it is:  The only information orders

15   addressed in the ISO relate to pharmacies.  It does not relate

16   to hospitals and the other alternate care facilities that we do

17   service.  And there's absolutely no evidence in the record

18   whatsoever that there is any risk or threat of diversion at

19   those.  Now, can diversion occur?  Yes.  Theft.  And the Court

20   noted that during the course of the hearing.  It is certainly

21   possible to have it, but it is far, far less likely in that

22   context.

23       So we believe in that context, the DEA's ISO is overly

24   broad.

25           THE COURT:  All right.  Thank you.

1        MS. VINCENT:  Your Honor, my response would be the

2   regulation requires -- I don't know, I don't have the

3   spreadsheet in front of me, but -- and I would agree, I think

4   we would all agree that it's probably less -- distribution to

5   hospitals is susceptible less -- diversion is susceptible less

6   there than to pharmacies.  But the regulation applies to any

7   shipment.

8        THE COURT:  Any other argument?

9        MS. VINCENT:  Well, your Honor, I have just a couple

10  of things, but I -- Oh, do you have anything further?

11       MR. SPRUIELL:  Go ahead.

12       THE COURT:  I thought you were finished.  I'm sorry.

13  Please.

14       MS. VINCENT:  Well, you know, with regard to

15  irreparable harm, I'm not going to dispute that it will cause

16  Morris & Dickson issues.  I mean, that's obvious.  And all

17  along we knew that would be obvious.  But they do have -- it

18  may not put the entire business out of business.  If you heard

19  Mr. Dickson, they have other products.  Now, I understand the

20  difficulties.  But some of those products are software

21  products.  They can continue selling those software products

22  and the non-controlled substances.  You know, again, I get the

23  difficulty, but the ISO does not address those.

24       You know, it's not just the 22,000 unusually large orders

25  here that were not reported; it's 45 million dosage units that

1  made it out of that warehouse, that distribution warehouse

2  and --

3          THE COURT:  And I think it's really 32.  You say

4  42 --

5          MS. VINCENT:  45.  45.8, I believe --

6          THE COURT:  It's 22.  Isn't it 22?

7          MS. VINCENT:  Well, millions of dosages.

8          THE COURT:  It was 22,000 --

9          MS. VINCENT:  22,000 orders.

10         THE COURT:  Orders.  Okay.

11         MS. VINCENT:  And the delay in issuing -- first of

12  all, I don't believe there is a delay.  I think the DEA worked

13  diligently.  They started -- you know, the Government, it

14  doesn't happen overnight.  This reached the very highest level

15  of DEA, the administrator, the Acting Administrator signed it.

16  But they started, they were working and in spite of this came

17  out of the blue, they go to the company, they're working with

18  the company and trying to obtain -- they're thinking that

19  surely we're going to get more information here.  So they issue

20  a subpoena, they issue another subpoena, they issue another

21  subpoena.  It didn't happen overnight, as it seems to be

22  portrayed.

23      Promises to discontinue shipping to specific pharmacies,

24  that shouldn't -- the Court -- that should not even be

25  considered by the Court.  It's laudable.  I agree with that.

1    It's laudable.  But that is not what the Administrator -- those

2    promises weren't before the Administrator.  All of this is in

3    our brief, Your Honor.  I can continue to go through it, but --

4              THE COURT:  Well, the Court, of course, is familiar

5    with all the briefs, but the Court would like any edification

6    you can give the Court on the legal points in light of the

7    evidence produced.

8              MS. VINCENT:  Well, I will say this.  I think that

9    what was made clear here today is that there were no reports

10   being made and that there are large shipments.

11             THE COURT:  Certainly there are -- this is the next

12   question.  Certainly there are problems that the DEA should

13   address.  How does the DEA decide when they are going to give

14   somebody a hearing and when they are going to shut that person

15   down?

16             MS. VINCENT:  Well, they give them a hearing either

17   way, but the ISO is the part that you're referring to.

18             THE COURT:  Yes.

19             MS. VINCENT:  I mean, obviously there's an order to

20   show cause.  It's part of the ISO that was going to go forward.

21             THE COURT:  Right.  But how do you decide that you're

22   going to issue the ISO or you're going to go ahead and just do

23   the order to show cause?

24             MS. VINCENT:  Well, both the statute and the

25   regulation refer to that:  When the Acting Administrator or the

1    Administrator determines there is an imminent harm to the

2    public.

3              THE COURT:  Imminent harm to the public.  That is

4    the -- that would be the difference, wouldn't it?  That's the

5    deciding factor in whether or not we shut these people down or

6    whether we allow them to have a hearing first, and then you

7    decide whether or not they have violated.

8              MS. VINCENT:  Well, you know, it's business as usual.

9    These large orders continued to go out as late as January of

10   2018, after the suspicious order report forms were requested.

11   They went out to Wilkinson until they were almost -- large

12   orders until they were almost closed.

13                  (Ms. Vincent and Mr. Dean confer.)

14             MS. VINCENT:  That's all we have, Your Honor.  Thank

15   you.

16             THE COURT:  Thank you.

17        Mr. Spruiell?

18             MR. SPRUIELL:  Counsel for the DEA continually used

19   the term "large orders."  Large orders are not at issue in this

20   case.  They made the determination that an order was unusually

21   large without any offering or suggestion to us as to what that

22   is.  The ISO certainly doesn't define it.  We don't know what

23   an unusually large order is to this day.

24        Now, we do our very best to try to identify suspicious

25   orders that raise concerns about the issue of product going

1    into illicit means.  But how are we supposed to, based on the

2    DEA's definition, which they don't disclose, make that

3    determination?  We do our very best.  And Mr. Dickson very

4    clearly explained and he made determinations through due

5    diligence to look at orders that were flagged.  And he did his

6    best and the company does its best.  Is it perfect?  No.  There

7    is no perfect system.  So I believe in that context, they have

8    not established there's an imminent threat.

9         Any prescription that was issued by a physician to a

10   patient to get oxycodone or hydrocodone will get filled between

11   now and a hearing.  They're just going to take it to a

12   competitor.  So that obviously means, as I think the DEA said

13   in its own brief, there can't be imminent threat if the order

14   itself, the prescription from the physician to the patient, is

15   filled in the meantime.  The drugs are going to go out.

16        Yes, we are a large company.  There are a lot of dosage

17   units of these two drugs that go out.  But you have to

18   understand:  We're less than 2 percent of the entire U.S.

19   market.

20        So, Your Honor, I just respectfully submit they have not

21   established imminent threat of harm to the public.  Thank you.

22             THE COURT:  Thank you.

23        Yes, ma'am?

24             MS. VINCENT:  Your Honor, just briefly.  We don't

25   know if those orders are going to be, those prescriptions are

1    going to be filled.  That's entirely speculative, not if

2    another distributor is following the regulation.

3              THE COURT:  You didn't shut down Cardinal.  You

4    didn't shut down the other two big ones.

5              MS. VINCENT:  Well, they can distribute; I'm not

6    denying that.

7         What I'm saying is:  If they distribute to these

8    particular pharmacies, all of them that were considered, not

9    just the eight, it's possible -- I mean, we don't know, we

10   don't know whether they'll be filled or not is what I'm saying,

11   if the regulations are complied with.

12             THE COURT:  If I forged a prescription and I go to my

13   usual pharmacy and they don't have any OxyContin that day, what

14   keeps me from just walking down the street to another pharmacy

15   and another pharmacy?

16             MS. VINCENT:  Nothing.  But if that pharmacy is

17   ordering large shipments or unusually large shipments, then at

18   least if they then report that to the DEA, the DEA can maybe

19   say:  We've got a lot of diversion in that area and maybe we

20   need to go check out that pharmacy and see if that's where the

21   diversion is occurring.  You know, people going to sell it in

22   the parking lot.  Maybe they could check that out.

23             THE COURT:  He uses exemplars and I think I asked you

24   this question already.  But these eight specific instances, but

25   you do not know how many are contained in the administrative

1    record?

2              MS. VINCENT:  No, I would have to see the Excel

3    spreadsheet.  There is a spreadsheet.

4              THE COURT:  But you've never seen it?

5              MS. VINCENT:  No.

6              THE COURT:  Okay.  Thank you, ma'am.

7         All right.  Is that it?

8              MR. SPRUIELL:  Yes, ma'am.

9              THE COURT:  All right.  The Court would ask everyone

10   to come back, the Parties and Counsel, to come back -- let's

11   give the Court about 40 minutes.  Let's say at 25 to five, and

12   the Court will render oral reasons at that time.

13                          (Recess)

14             THE COURT:  Please be seated.

15        At the outset, the Court notes that in dictating reasons

16   into the record, the Court is faced with the challenge of

17   extemporaneously analyzing a very complex matter.

18        And of course any written opinion is preferable as far as

19   organization and clarity.  But because of the exigent nature of

20   the relief sought, the Court is going to go ahead and dictate

21   its reasons into the record, knowing they will not be as

22   perfect as they would be if in fact the Court had written

23   something out.

24        The Court notes that the Plaintiff, Morris & Dickson

25   Company, is a multi-line, family-owned wholesale pharmaceutical

1   distributor.  We learned today what it means for it to be a

2   multi-line distributor.  They provide medications to

3   pharmacies, hospitals, and nursing homes.  They operate out of

4   a main distribution center in Shreveport and a satellite center

5   in Jefferson Parish.  Part of M&D's business consists of

6   distribution of controlled substances such as oxycodone and

7   hydrocodone under two DEA registrations, one for each of the

8   distribution centers.

9       On May 2, 2018, the Acting Administrator of the Drug

10  Enforcement Agency issued an Immediate Suspension Order

11  suspending these registrations due to M&D's failure to

12  adequately identify and report suspicious orders of these

13  controlled substances pending a show cause hearing before an

14  A.L.J.  In response, M&D filed the instant suit and moved for a

15  TRO enjoining enforcement of the ISO.

16      Morris & Dickson brings four claims under the

17  Administrative Procedures Act:  One, that the ISO exceeded the

18  DEA's statutory authority under 5 U.S.C. Section 706(2)(c);

19  and, two, the ISO violated procedural due process; three, that

20  the Acting Administrator's decision-making was arbitrary and

21  capricious; and, four, that the ISO did not contain factual

22  findings required by DEA regulators.

23      The complaint seeks the declaration that the ISO was

24  unlawful, vacatur of the ISO, and a TRO and preliminary

25  injunction cost, and attorney's fees.

1    The Court notes at the outset that there are two processes

2  by which the DEA can suspend a registration.  Under the

3  Controlled Substances Act, the DEA can revoke, restrict, or

4  suspend a registration upon one of five findings, only one of

5  which is relevant here:  That the registrant has committed acts

6  that rendered the registration inconsistent with public

7  interests under 21 U.S.C. Section 824(a)(4).

8    Prior to revoking or restricting a DEA registration, the

9  DEA must generally follow procedures designed to provide a

10  registrant with notice and an opportunity to be heard.  It must

11  issue an order to show cause setting forth the agency's

12  proposed action and providing the registrant with the

13  opportunity to request a hearing.  That is contained in 21

14  U.S.C., Section 824(c).  At such a hearing, the Government has

15  the burden of proving by a preponderance of the evidence that

16  registration is inconsistent with the public interest.  And

17  that's contained in 21 C.F.R., Section 1301.44(d).

18    The DEA may issue a license suspension order without

19  providing a registrant with prior notice or an opportunity to

20  respond to the allegations against it only if the continued

21  registration poses an imminent danger to the public health and

22  safety.  The relevant statutory provision states:  The Attorney

23  General may, in his discretion, suspend any registration

24  simultaneously with the institution of proceedings under this

25  section in cases where he finds there is an imminent danger to

1    the public health or safety.  A suspension under this

2    subsection shall continue in effect until the conclusion of

3    such proceedings, including judicial review thereof, unless

4    sooner withdrawn by the Attorney General or dissolved by a

5    court of competent jurisdiction.

6         21 U.S.C. -- that's 21 U.S.C. Section 824(d).

7         The governing regulation specifies:  The Administrator may

8    suspend any registration simultaneously with or at any time

9    subsequent to the service upon the registrant of an order to

10   show cause why such registration should not be revoked or

11   suspended in any case where he/she finds there is an imminent

12   danger to the public health or safety.  If the Administrator so

13   suspends, he or she shall serve with the order to show cause,

14   pursuant to Section 1301.37, an order of immediate suspension,

15   what we've been referring to today as an ISO, which shall

16   contain a statement of his findings regarding the danger to

17   public health or safety.

18        So as everyone agrees, the difference between a due

19   process hearing in which Morris & Dickson would not have the

20   burden of proof and the Attorney General's discretionary power

21   to issue the ISO without these procedural safeguards, is

22   whether or not there is an imminent danger to the public health

23   or safety.

24        In the course of an investigation into certain pharmacies,

25   the DEA became aware that Morris & Dickson was supplying many

1   of the top purchasing pharmacies with oxycodone and

2   hydrocodone, including six pharmacies in Louisiana, purchasing

3   between seven and thirteen times the state average of

4   oxycodone, and nine pharmacies in five other states purchasing

5   more than five times their respective state averages.

6        In 2017, the DEA conducted a routine audit of M&D where it

7   asked for copies of suspicious order reports that distributors

8   are required to file with the DEA.  Morris & Dickson provided

9   two, and the DEA later identified a third for the relevant

10  period of January 2014 through September 2017.  Concerned by

11  the low number of reports, the DEA served an administrative

12  subpoena in February of 2018, to which M&D responded.

13       The Court learned today that there were two other

14  subpoenas that had also been issued prior to that, or around

15  the same time.  M&D described its approach for detecting

16  suspicious orders, utilizing a third-party vendor to analyze

17  its customers' dispensing patterns and requesting more frequent

18  reports for pharmacies identified by the vendor as suspicious;

19  two, conducting a monthly "market basket" analysis of the ratio

20  of controlled to non-controlled substances purchased by each

21  customer; and, three, installing software to flag orders that

22  are more than ten times the rolling 90-day average of orders of

23  a particular substance by a particular pharmacy; and, four,

24  using its warehouse employees to identify unusual patterns.

25       Morris & Dickson also indicated it did not retain records

1   of any investigations of potentially suspicious orders unless

2   the investigation resulted in a suspicious order report to the

3   DEA.  As part of its investigation of Morris & Dickson, the DEA

4   conducted a statistical analysis to identified "unusually large

5   orders."  The ISO describes the analysis as "using a standard

6   statistical method for identifying improbable events" to allow

7   the DEA to identify orders that were unusual in light of a

8   customer's historical ordering quantities.

9        The ISO does not enumerate for the Court that standard

10  statistical method.  And it refers to two different references:

11  The customer's historical ordering quantities, as well as the

12  overall pattern in relation to other pharmacies in the area.

13  The Court, therefore, does not have the advantage of being able

14  to describe or to evaluate the methodology used by the DEA for

15  the conclusions that it contains in the ISO.  But we know from

16  the ISO that the analysis identified 16,596 what they refer to

17  as unusually large orders of oxycodone and 6,382 unusually

18  large orders of hydrocodone between January of 2014 and 2017.

19       Likewise, the Court notes that no criteria is laid out in

20  the ISO for what the cutting-off point in its opinion was of an

21  unusually large order of these that they identified and indeed

22  have reported three as suspicious.  As a result, the

23  Administrator concluded that M&D has failed to maintain

24  effective controls against the diversion of controlled

25  substances into other than legitimate channels.

1          M&D has further failed to identify and report suspicious

2     orders to the DEA.  That's paragraph 21 of the ISO.

3          In paragraph 22 they state:  In fact, M&D has routinely

4     shipped, and at least as recently as February 28, 2018,

5     continues to ship controlled substances to customers without

6     conducting adequate due diligence and despite the fact that

7     those customers have been identified by M&D's third-party

8     vendor as raising red flags consistent with diversion, have

9     been identified by M&D's own employees as suspicious and have

10    placed orders identified by DEA's statistical analysis as being

11    of an unusually large relative to historical ordering

12    quantities.

13         Paragraph 23.  Indeed, despite being aware of information

14    suggesting that controlled substances that M&D shipped to

15    certain customers were being diverted, M&D failed to perform

16    reasonable follow-up investigation into these red flags, let

17    alone an investigation that was able to dispel these concerns,

18    continued to fill the orders and did not report them to the

19    DEA.

20         So we see in those paragraphs that the methodology is to

21    identify the unusually large orders; and, secondly then, the

22    conclusion from these unusually large orders that the DEA makes

23    is that the customers were -- that the shipments to these

24    customers were being diverted.

25         The Court has no ability to assess that methodology or

1    these conclusions without further information.

2         The Administrator makes specific preliminary conclusions

3    necessary to issue the show cause order and the ISO.  One, that

4    M&D's continued registration is inconsistent with the public

5    interest; two, that M&D failed to maintain effective controls

6    against diversion of controlled substances; and, three, M&D's

7    continued registration during the pendency of revocation

8    proceedings would constitute an imminent danger to public

9    health or safety.

10        The Court notes that the ISO set a show cause hearing

11   before an A.L.J. on July 9 of 2018, if M&D opts to request it.

12        At the outset, the Court would be remiss if it did not

13   state the standard for the temporary restraining order.  Under

14   the Federal Rule of Civil Procedure 65(b), a temporary

15   restraining order may be issued *ex parte*, subject to the

16   special procedural requirements of that rule.  However, when

17   the opposing party actually receives notice of the application

18   for a restraining order, the procedure that is followed does

19   not differ functionally from that on an application for a

20   preliminary injunction and the proceeding is not subject to any

21   special requirements.

22        In our case the defendants have responded to M&D's motion

23   and the Court has set the hearing that was held today.

24        The standard, then, is as follows, the four elements to

25   which we have all referred today and upon which everyone agrees

1    are the elements necessary.

2         One, a substantially likely -- first of all, the Plaintiff

3    has the burden and must clearly show, one, a substantial

4    likelihood that he will prevail on the merits.

5         Two, a substantial threat that he will suffer irreparable

6    injury if the injunction is not granted.

7         Three, his threatened injury outweighs the threatened harm

8    to the party who he seeks to enjoin.

9         And, four, granting the preliminary injunction will not

10   disserve the public interest.

11        The Fifth Circuit has cautioned that a preliminary

12   injunction -- and of course the same standard applies -- is an

13   extraordinary remedy which should not be granted unless the

14   party seeking it has clearly carried the burden of persuasion

15   on all four elements.

16        The Court would likewise be remiss if it did not address

17   the standard by which the Court must evaluate the Acting

18   Administrator's order.  The correctness of the Acting

19   Administrator's determination that Morris & Dickson continued

20   registration poses an imminent danger to public health must be

21   viewed in light of the deferential standard with which this

22   Court will ultimately review his findings.  Although M&D

23   presents its allegations in terms of the Acting Administrator's

24   statutory authority, the arbitrary and capricious standard

25   still applies to its factual findings.  To evaluate whether an

1    agency's determination is arbitrary and capricious, the Court

2    must ask whether the agency articulated a rational connection

3    between the facts found and the decision made.  That was the

4    holding of *Exxon Mobil Pipeline versus The United States*

5    *Department of Transportation*, Fifth Circuit, 2017.

6         However, review is limited to the agency's stated

7    rationale at the time of its decision.  There is a presumption

8    that the agency's decision is valid.  The Plaintiff has the

9    burden to overcome that presumption by showing that the

10   decision was erroneous.  And that's the holding in *Texas*

11   *Clinical Labs, Inc. versus Sebelius*, Fifth Circuit, 2010.

12   Under this highly deferential standard, the mere fact that an

13   agency's initial findings of fact may turn out to be incorrect

14   after completion of a thorough investigation and review of

15   evidence at the administrative hearing does not justify court

16   interference.  That was the holding in *Novelty Distributors*.

17   Thus, Morris & Dickson must establish that the acting

18   administrator irrationally concluded that M&D posed an imminent

19   threat to public safety on the basis of the facts before them.

20        Stated another way, the ultimate decision of whether or

21   not there is an imminent danger to the public, must be

22   evaluated by this Court in the following manner, because that's

23   the conclusion and that's the issue that we have here today as

24   to whether or not the ISO should have been issued; that is,

25   whether or not Morris & Dickson was entitled to a due process

1    hearing.

2         The thought process or the methodology by which the Acting

3    Administrator comes to that conclusion, that there is an

4    imminent danger, is that they come to the conclusion -- working

5    backwards, is that there is diversion.  His conclusion that

6    there is diversion is based on the unreasonably large orders

7    that he says were ordered, and then he uses a statistical

8    methodology for identifying the unusually large orders.

9         So in order to decide whether or not the decision of the

10   Administrator is arbitrary and capricious, the Court must look

11   at the evidence and methodology of the DEA administrator in

12   issuing the ISO.  What was the methodology for identifying the

13   unusually large orders within the meaning of that statute?  And

14   did that methodology employ or use reasonable information by

15   which to assess whether or not there were unreasonably large

16   orders?  And then lastly, is it a reasonable conclusion that

17   these unreasonably large orders pose an imminent threat to the

18   public harm?

19        This Court does acknowledge that there are cases which do

20   say that a pattern of unusually large sales can in fact be

21   evidence of diversion.  But I do not have all of the record in

22   front of me to determine whether the above facts and the

23   methodology used to assess that facts lead to the conclusion

24   that there is a threat to the public sufficient to justify the

25   issuance of this ISO without a hearing.

1        The ISO, the Court acknowledges, is a summary document.

2   It does provides no information in this case as to the

3   statistical methodology.  It contains conclusions for which

4   there are no facts outlined.  And it is based on a very small

5   sample.  We are given a few examples, and the Court

6   acknowledges that they are in fact just examples, as the ISO

7   states.  These seem to be based on data that the Court would

8   say does appear to be outdated.  And likewise, the numbers that

9   are cited in the ISO, while they might appear large to a lay

10  person, when we look at the number of dispensed units in

11  accordance with the evidence that we heard today as to what the

12  overall figures are for dosage units, we note that for any one

13  year, that all dosage units for Morris & Dickson are six and a

14  half billion.  The number of controlled dosage units are

15  1.3 billion units.

16       So it appears to the Court that we have a small sampling

17  of the sales from which these conclusions are reached.  But the

18  Court doesn't know because the Court does not have the entire

19  administrative record in front of it.

20       But if all the DEA does have is what is set out in the

21  ISO, then there is certainly a substantial likelihood of

22  success on the merits for the plaintiff to prove that the

23  actions of the Acting Administrator in issuing the ISO without

24  a hearing were arbitrary and capricious.

25       The Court notes that Morris & Dickson is a wholesaler.

1   They are not a doctor issuing the prescriptions.  They are not

2   a pharmacy.

3       The Court notes that there is an admission by the

4   Government that there has been no action against a wholesaler

5   in the form of an ISO in more than five years.  That very fact

6   speaks to the Court of the unusual nature of the action that

7   was taken here.

8       Likewise, the ISO on its face, that is, without the

9   administrative record, is overly broad.  It applies to all

10  drugs, all controlled substances sold by Morris & Dickson.  We

11  know that the Government, the DEA, has the ability to limit an

12  ISO or any removal of registration to certain drugs or

13  categories of drugs.  This is overly broad; it's to all

14  controlled substances.

15      We know also that there is no evidence as to anything

16  going on in the Jefferson Parish facility and yet the ISO

17  applies to that facility as well.  There is nothing in the face

18  of the ISO of what's presented today.

19      Moreover, there has been no specific evidence of

20  diversion.  As the Court has noted, the ISO relies on a string

21  of conclusions based on a certain methodology which is unknown

22  to the Court to reach the conclusions that these unusually

23  large orders equal diversion, which then equals an imminent

24  danger to the public.

25      There is also the evidence put on today that the ISO only

```
1    involves pharmacies that are free-standing, or independent

2    pharmacies like we think of a pharmacy on the corner, as

3    opposed to the pharmacies that supply to hospitals or

4    alternative care facilities.  And I believe that the testimony

5    was that approximately 80 percent of the prescription -- or

6    that the supplies went to pharmacies that supplied hospitals or

7    alternative cares.  And I couldn't find that exact number in my

8    notes, but I do remember it was just a huge percentage.  And

9    yet the ISO only addresses these pharmacies, two of which were

10   out of business.

11        The second prong, then, is the substantial threat that the

12   plaintiff will suffer irreparable injury if the injunction is

13   not granted.  The Government has conceded this issue.  The

14   Court will note that this standard does not include harm to

15   others, that that is the public interest prong.  So the

16   argument of a lack of supply to Morris & Dickson's customers

17   doesn't belong in this category.

18        But we know that in order for the substantial threat to

19   constitute irreparable injury, we know it must be substantial.

20        Economic loss is usually not the basis for irreparable

21   injury, but may be if the harm is substantial and not

22   recoverable.  The Government concedes that in all likelihood

23   sovereign immunity does exist for any claim that Morris &

24   Dickson might have for being driven out of business by the

25   issuance of this ISO without a due process hearing.
```

1          The Court notes a fact it did not know until today and

2    that is that Morris & Dickson is a multi-line wholesaler.  It

3    was explained that what this means is that for it being a

4    primary supplier to a vast majority of their customers, that

5    those customers receive 90 to 100 percent of their products

6    from Morris & Dickson.

7          Mr. Dickson has offered the unrebutted testimony that the

8    issuance of the ISO would put him out of business well before

9    the July hearing that is scheduled to occur if Morris & Dickson

10   requests it.  So therefore the substantial harm has been proven

11   clearly by the Plaintiffs in this matter.

12         The next two factors overlap to a certain extent, a fact

13   that was also conceded by the Government.

14         The third is that the threatened injury outweighs the

15   threatened harm to the party whom he seeks to enjoin; that is,

16   that the harm to Morris & Dickson is worse than the harm to the

17   Government.

18         As the Court noted in this particular case, the

19   Government, the DEA, is acting on behalf of the public in its

20   capacity.  The Government also made an argument that by simply

21   questioning the conclusions in the ISO and by granting a TRO,

22   that this Court would be harming the DEA itself and its

23   authority.  This Court looks at that a little bit differently.

24   This Court looks that it is its job to evaluate the evidence

25   before it and to evaluate whether or not the actions of the

1    Acting Administrator were arbitrary and capricious, and that

2    that's the way our government works.

3         This Court, as I have stated, makes no determination that

4    after review of the entire administrative record that the Court

5    would, in fact, be concluding that the actions were arbitrary

6    and capricious.  But it is this Court's job to review that.

7         So we are left, then, under three, with looking at the

8    harm to the public.  And likewise the harm, four, also says

9    that granting the preliminary injunction will not disserve the

10   public interest.  In some ways this brings us back to the

11   imminent threat issue; in other ways, we know that the

12   Plaintiff has proven that there are other interests, public

13   interests, which would be not disserved by the issuance of a

14   TRO.  And these might include the number of jobs that Morris &

15   Dickson has in the area, their contribution to the economy in

16   the area, and their service to their customers who have

17   expressed a difficulty, maybe a temporary difficulty but a

18   difficulty, in being able to obtain a supply of drugs.

19        M&D argues that without the TRO, numerous patients would

20   be deprived of vital medications.  It asserts that it takes

21   between two weeks and one month for a healthcare provider to

22   switch controlled substance distributors.  There has been no

23   counter-evidence offered by the Government, although the

24   Government has argued that the hospitals would be able to

25   change and obtain new suppliers while their stock, their

1    current stock would remain.  But there has been no -- that was

2    the argument in the brief.  There has been no proof of that.

3         The Court notes that it is therefore its decision that the

4    Plaintiff has satisfied their burden of proof at this time for

5    the issuance of a TRO, subject to the Court's ability to review

6    the entire administrative record to make a determination as to

7    whether or not the conclusion of imminent harm to the public

8    was arbitrary and capricious by the Acting Administrator.

9         This brings us to several issues which we need to address

10   as practical matters.  One is the issue of security.  Issuing a

11   restraining order, the statute requires that the Court address

12   that issue.  I cannot think of any reason that the Government

13   would need security in this matter, but would hear from the

14   Government as to their position.

15        MS. VINCENT:  Your Honor, I can't think of why we

16   need security.  Its compliance with the regulation would be

17   more than security.  I mean, we would expect, as we, DEA always

18   expects their registrants to comply with the regulations.

19        THE COURT:  All right.  So the request -- there is a

20   concession by the Government that as far as the requirements of

21   the Code of Civil Procedure that there is no need for security.

22        MS. VINCENT:  Monetary.

23        THE COURT:  Monetary security.

24        MS. VINCENT:  Monetary security.

25        THE COURT:  Yes.

 1          The next practical matter that appears is the one of the

 2     timing of all of this.  The Code also only gives the Court

 3     authority to issue a temporary restraining order for 14 days.

 4     In this particular case, the Court is very -- with an extension

 5     of additional 14 days for good cause shown.

 6          This Court is concerned, based on the representations of

 7     the Government, that 14 days does not give us enough time for

 8     everyone to have the administrative record, review it, brief

 9     that to the Court, and then allow the Court to both review the

10     record and the briefing.  It is -- 14 days would put us at the

11     22nd of May.  An additional seven days would put us at the

12     29th of May.

13          And are we being realistic that we could in fact have the

14     record and have it briefed and the Court review it by the 22nd?

15     If that were the case, we would need it in a matter of days.

16          So the two possibilities.  The Court could certainly set

17     the hearing for 14 days from now, which is the 22nd.  And the

18     Court could always entertain a motion to extend it for an

19     additional 14 days if, in fact, the Government cannot produce

20     it and the Government's going to jam us all.

21          The Court would note that preliminary injunctions are a

22     matter of priority.  At the same time, the Court would also

23     note that on 14 days from the 22nd, the Court is in a

24     month-long criminal trial.

25          Another possibility -- but, you know, we can see how those

1   chips fall.

2        Another possibility is simply for the parties to agree

3   that we could extend it to the 29th.  The Court could set

4   deadlines for the Government to produce the records, which

5   would encourage the Acting Administrator to do it in a more

6   "front burner" timetable, and then a briefing schedule from the

7   individuals.

8        I also would note that the Court has no intention of

9   reviewing 8,000 pages within such a small time period and would

10  expect that the administrative record would be certified and

11  limited by the Acting Administrator to those documents which

12  were actually considered relevant and considered by him in

13  arriving at it.

14       I also have concerns as to whether or not there would

15  simply be a document dump on the parties and the Court, which

16  is related not only to the quantity but to the nature of these

17  documents.  If they're documents that I'm unable to tell what

18  they are, it does me little good to have them and doesn't help

19  with the Acting Administrator's case.  So, I make those

20  caveats.

21       So, may I hear from everyone, then, on the practical

22  scheduling issues?

23            MR. SPRUIELL:  Your Honor, we would just note on

24  behalf of Morris & Dickson that we would like the opportunity

25  to propound some discovery to the Government to address some

1    issues that allow us to obtain information from the DEA

2    regarding the ISO that may not actually be in the record

3    itself.  And we obviously would understand that we would have

4    to get that to the Government as soon as possible, and

5    certainly would do that within the next 48 hours.

6         And then we would obviously have to ask that the

7    Government respond to that discovery on an expedited basis in

8    light of the --

9              THE COURT:  So discovery is also a complicating

10   issue?

11             MR. SPRUIELL:  Yes, ma'am.

12             MS. VINCENT:  Your Honor, this is an APA case, as I

13   think we've all agreed, and it's on the record.  There is no

14   discovery.  There is a very limited exception for discovery in

15   APA cases and there's no allegation that that exception is

16   going to apply here.

17             THE COURT:  Well, and I don't know the answer to

18   that.

19             MS. VINCENT:  Well, for instance, we had a permit

20   case once before and there was an allegation that, you know,

21   that the agency and the permittee had acted improperly and

22   there was some collusion.  That is not the case here.  And

23   that's even -- even then, you'd have to go beyond the mere

24   allegation.  That's the only time there's discovery involved in

25   an APA case.  An APA case is just -- the whole reason is --

```
 1              THE COURT:  The record.  The Court is reviewing the

 2    record, and that is -- I mean, that is what you have argued

 3    here earlier.  But the Court would need to see the nature and

 4    extent of the discovery before the Court could make that

 5    ruling.  And I have no clue as to what the procedural answer is

 6    at this time.

 7              MR. SPRUIELL:  Then we could certainly address that.

 8    We will get that to the Court within 48 hours with some

 9    authority.

10              THE COURT:  All right.  But let's talk about the

11    schedule.  Do we want to say the 22nd or do we want to just go

12    ahead and say the 29th?  I cannot say the 29th unless you agree

13    and the -- because that's an extension of the 14-day period.

14    But -- and of course I can extend it, so I have that power to

15    do that, even if I only set it for the two weeks for the 14

16    days.  The advantage to everyone would be that we had a date

17    certain and we weren't subject to all of us -- if you had a

18    date certain, you could get your witnesses here and you could

19    get your act together in a better manner.  But I will listen to

20    what you all have to say and --

21              MS. VINCENT:  Your Honor -- oh, go ahead.

22              MR. SPRUIELL:  Sorry.  Your Honor, the 29th is fine

23    with us.  I think it gives us some breathing room.  And

24    certainly by doing it on the 22nd and not being prepared and

25    having it pushed off, I think compounds the problem; whereas,
```

1    picking the 29th and having more of a firm date, like you say,

2    so that we can have our witnesses prepared and lined up to be

3    here.  It also affords us the opportunity to get some

4    statistical experts involved, who we have already identified,

5    but we also have to get in touch with them fairly quickly.  But

6    we can't get them information until we get the record, so it's

7    important that we have a little breathing room.  And the

8    29th certainly gives us that more than the 22nd.

9            MS. VINCENT:  Your Honor, I'm not in a position today

10   to extend this to the 29th.  As I stated earlier, DEA -- DEA

11   will make this a priority and get the record.  It's their

12   position that the ISO was issued pursuant to the statute and

13   the regulation; and, therefore, I can't agree to the

14   29th today.  You can put some strict deadlines on the DEA, and

15   they will comply.  I mean, that's all I can do today.

16           THE COURT:  Can we say that the DEA would have the

17   administrative record limited to those things which were

18   considered relevant in 48 hours?  Is that an unreasonable

19   restriction?

20           MS. VINCENT:  As you can see, I am deferring to my

21   colleagues since they will likely be tasked with that.

22           THE COURT:  I mean, tick-tock.  I mean, if you are

23   saying you want it in two weeks.

24           MS. VINCENT:  I understand.

25        Could we do that?

1           MR. DEAN:  Yeah.  We just have to get home to be able

2      to do it.

3           MS. VINCENT:  Well, that's true.  They have to get

4      back.  And an order would help, you know, from the Court.

5           THE COURT:  All right.  The Court will -- today is

6      Tuesday, the 8th.  The Court will make an order that the DEA

7      will produce a certified administrative record to the Court and

8      to all parties by noon on the 10th.  And that it will be

9      provided to -- it'll be filed into the record and that the

10     Court will be provided with a courtesy copy.

11          MS. VINCENT:  Oh, Your Honor, I think now we were

12     discussing logistics.  The courtesy copy -- normally, you know,

13     this is a little different than the normal APA cases.  We

14     oftentimes have a CD, a disk.  Is that what you would envision?

15          THE COURT:  No.  I want a paper copy that I can write

16     on.  You have an office here in this building.  You can

17     certainly send it electronically to that office, who can hand

18     deliver it to me by the 10th at noon.  Because I don't want so

19     many pages.  I'm not reading 8,000 pages in two weeks.  I think

20     that and I think you admit that that was not used to arrive at

21     the decisions.

22        Sir, you rise?

23          MR. BEERBOWER:  Your Honor, just one logistical point

24     on that.  The only copy that I have, the statistical analysis

25     the DEA did, are in Excel spreadsheets.  They're hundreds of

```
 1    thousands of lines long.  We can print them, but I think the

 2    Court would find them to be voluminous.  But if we could

 3    present those to the Court on disk in electronic form, that

 4    would be much easier.

 5              THE COURT:  All right.  But you have a report that

 6    analyzes those?

 7              MR. BEERBOWER:  We have a summary and then the

 8    underlying transactional --

 9              THE COURT:  I think you need to have the underlying

10    transactional information.  You may give it to the Court in a

11    disk form, but the Plaintiffs are going to want it, the

12    underlying.

13              MR. SPRUIELL:  Oh, absolutely.

14              THE COURT:  So all of that by the 10th at noon, with

15    a copy -- with a disk.  I mean, you're filing it into the

16    record but you need to get the disk as well, with a courtesy

17    copy to Counsel as well.  All right?

18         And then what about briefing?

19              MR. SPRUIELL:  Monday is the 14th, so that would be

20    Thursday, the 17th.  How about the 18th by 5:00 p.m.?

21              THE COURT:  Do you want the Court to read this before

22    we have the hearing or not?

23              MR. SPRUIELL:  Well, I guess I better back it up --

24              THE COURT:  Yes, yes.

25              MR. SPRUIELL:  To the 16th?
```

1            THE COURT:  The 16th.  But then they have to respond.

2    Let's say the 15th is the deadline for the Plaintiff and then

3    we will give the Government until the 18th at noon to respond.

4        Yes, sir?

5            MR. JONES:  Disclosure and witnesses, actual

6    witnesses?

7            THE COURT:  What would be a reasonable date for that?

8            MR. SPRUIELL:  The 18th, Your Honor?

9            THE COURT:  Sounds reasonable.

10            MS. VINCENT:  And, Your Honor, witnesses as to any --

11    not on the Administrative Procedure Act part but the other

12    elements, the other factors.

13            THE COURT:  I don't understand.

14            MS. VINCENT:  Well, the APA part wouldn't require

15    witnesses.  But the other factors, the irreparable harm, those.

16    But the APA part, it's either arbitrary and capricious or it's

17    not, based on the record.

18            THE COURT:  Right.  Well --

19            MS. VINCENT:  But I'm not saying there aren't any;

20    I'm just saying I assume we're limiting it to that, to those

21    issues?

22            THE COURT:  Well, yes, but the Court doesn't know

23    what the administrative record says and neither does the

24    Plaintiff for us to be able to say who the witnesses would be

25    right now or what they would be limited to, in that I don't

1  know what's in the administrative record.

2          MS. VINCENT:  Well, I understand that.  But as far

3  as, for instance, any experts, I can understand why Plaintiff

4  would want the records and to be able to consult an expert, but

5  with regard to putting forth expert reports before this Court,

6  that's not appropriate in an APA case.

7          THE COURT:  Oh.  What the Court is asked to do in

8  deciding whether or not this is arbitrary and capricious is to

9  look at that methodology by which the Acting Administrator

10  reached its conclusions.  That would include the methodology,

11  it would include the facts upon which that methodology was

12  utilized.  I cannot -- the use of an expert witness would

13  facilitate this Court in understanding those things and whether

14  or not that methodology was arbitrary and capricious.

15          MS. VINCENT:  I respectfully disagree and we'll file

16  what we need, Your Honor, so that we get the issues before you.

17          THE COURT:  So what would be my inquiry?  I just look

18  at it and --

19          MS. VINCENT:  -- and you determine whether or not

20  there was an abuse of discretion based on the administrative

21  record.  If you find that was there was something that was not

22  in the administrative record or that for whatever reason,

23  should have been there, you remand it to the agency.

24          THE COURT:  But how do I evaluate that?  I'm not a

25  statistician.

1      MS. VINCENT:  Well, if there's something missing.

2  That's what I'm saying.  I understand what you're saying, but

3  you should be able to evaluate it.  I mean, the administrative

4  record should support the decision.

5      THE COURT:  I have an English degree, ma'am.  I do

6  disagree with you on that; and I certainly, though, would

7  entertain any authority that you have to the contrary.

8      MS. VINCENT:  (Nods head up and down.)

9      THE COURT:  And I will -- go ahead.  Is there

10  anything else on that?

11      MR. SPRUIELL:  Not on that issue, Your Honor.

12    There is one thing, a procedural matter in terms of the

13  lifting of the ISO so that, from a practical standpoint, my

14  client can get back to its business.

15      THE COURT:  I have drafted a language for a temporary

16  restraining order.  Time for the hearing on 5/22 since this

17  gentleman is putting this in there.

18    I would say 9:00 a.m.  Yes, 9:00 a.m.

19      MS. VINCENT:  And Your Honor, I assume we'll have

20  a -- I am writing down my notes, but we'll get a minute entry

21  also.

22      THE COURT:  Well, you'll get a minute entry but the

23  Court has in front of it, it was not going to allow you to

24  leave until we had reviewed some language for a temporary

25  restraining order.

1        I have -- I would like for you-all to take a look at it

2    and we can -- I have included language that the defendants are

3    directed to immediately return any registrations, licenses, or

4    forms to Morris & Dickson in order to make this Court's

5    temporary restraining order effective, and that Defendants

6    return or unseal any controlled substances seized or placed

7    under seal in connection with the immediate suspension of

8    registration.

9        And the Court was not clear about that.  Did Morris &

10   Dickson seal them or did the DEA seal them?  I don't think the

11   DEA seizes them anymore, do they?

12              MS. VINCENT:  No.  They sealed them.

13              THE COURT:  They sealed --

14              MS. VINCENT:  DEA sealed them.

15              THE COURT:  Okay.  Well, they would be -- so they're

16   still in your physical --

17              MS. VINCENT:  They're in the vault.

18              MR. SPRUIELL:  There's evidence tape across that

19   cannot broken by us, obviously.  And we would never endeavor to

20   do that.  That's why we need, if at all possible, the DEA agent

21   ordered to do that immediately so we can gain access to the

22   vault and fill orders for delivery as early as possible.

23              THE COURT:  All right.  So we could add the language

24   that they would -- effective immediately.  Effective

25   immediately.  Okay.

```
1          Set it for the 22nd at 9:00 a.m.  And the Plaintiff has

2    moved for a preliminary injunction.

3              MR. SPRUIELL:  (Nods head up and down.)

4              THE COURT:  I mean, in general terms.

5              MR. SPRUIELL:  Yes, ma'am.

6              THE COURT:  And the briefing should contain it.

7              MS. VINCENT:  Your Honor, I am being told by the

8    investigator that they can unseal it and they can start doing

9    what they need, but headquarters has to actually do something

10   with regard to some sort of automated system and they can do

11   that first thing in the morning.

12             MR. SPRUIELL:  I'm sorry, Your Honor, that --

13             THE COURT:  The Court's order says "immediately."

14             MS. VINCENT:  I just don't know if the system is -- I

15   mean, they can start filling, taking the product, but it's just

16   the system, the actual software system --

17             THE COURT:  Why doesn't that software system run at

18   night?

19             MS. VINCENT:  Your Honor, can the investigator --

20             THE COURT:  Yes, please.

21             MR. DUNN:  Judge, we were just talking about the CSOS

22   system, the Consolidated Ordering System for Schedule II's,

23   that has to be done manually by someone at headquarters who has

24   that ability.  I don't have the ability to do that from the

25   field.
```

1           THE COURT:  Well, can you call someone at

2    headquarters and tell them to do that?

3           MR. DUNN:  We can absolutely try to get a hold of

4    someone there.

5           THE COURT:  Yes.

6           MS. AVERGUN:  Your Honor, the client does not need

7    the ordering system tonight; they need the release.  So if it

8    can't be done, there won't be irreparable harm to us.  But as

9    long as they can remove the tape.  Somebody can go with

10   Mr. Dickson right after we finish talking, or even while we're

11   talking, and get the orders out on the trucks tonight, that

12   would be fine.  And they can flip the switch on the ordering

13   system so that more drugs can come in to their warehouse

14   tomorrow.

15          THE COURT:  I see.  So what you're referring to is

16   their supply?

17          MR. DUNN:  Yes, the electronic orders that would go

18   back and forth.

19          THE COURT:  Thank you, sir.

20      All right.  Mr. Murphree is making changes and I'm going

21   to review his changes and then give it to you-all to review, as

22   we speak.

23                    (Pause in proceeding)

24          THE COURT:  Okay.  Let's not -- we are still in

25   court.  Let's maintain some order.

```
 1                    (Pause in proceeding)

 2          THE COURT:  Do we want to go ahead and give them

 3   copies and we can look at all of this together.

 4                    (Pause in proceeding)

 5          THE COURT:  Does everyone have a copy?  They do?

 6      All right.  Please be careful and look at it.  I'm going

 7   to ask Mr. Murphree to add a sentence in there when we say it's

 8   issued for 14 days, that the Court notes that it can be

 9   extended for good cause.

10      Comments?

11          MR. SPRUIELL:  I'm sorry.  Plaintiff finds the order

12   acceptable, Your Honor.

13          THE COURT:  I'm sorry.  Say it again?

14          MR. SPRUIELL:  Plaintiff finds the order acceptable.

15          MS. VINCENT:  Your Honor, I think it summarizes your

16   ruling and the dates.

17          THE COURT:  Okay.  And everybody understands -- okay.

18      We have in here:  The record shall be provided to all

19   parties and a paper courtesy copy must be provided to the

20   Court.  The understanding that we have is that the underlying

21   data may be supplied to the Court on the disk and to Counsel,

22   opposing counsel, on a disk as well.  So we don't need to make

23   that part of the injunction but we'll have that as our

24   understanding.  All right?

25      All right.  If it's okay, then the Court will go ahead and
```

 1    sign the TRO.  And we'll file into the record.

 2        Oh, I know what he did.  Give that back to me, Ms. Keifer.

 3    He inserted the language about an extension may be asked for

 4    with good cause.

 5        Yeah, I see it.

 6        So what was inserted on the second page is:  The order

 7    remains in force until May 22nd, but the Court notes that the

 8    order may be extended an additional 14 days for good cause.  So

 9    the Court is signing that one.

10        Ms. Keifer, this is the signed judgment you want to enter

11    into the record at this time.

12        Is there anything further to come before the Court this

13    afternoon that we need to give our attention to?

14            MR. SPRUIELL:  No, nothing from the Plaintiff, Your

15    Honor.

16            MS. VINCENT:  Nothing from the Government, Your

17    Honor.

18            THE COURT:  Well, thank you for everyone's hard work

19    throughout this long day.

20                (The Clerk and the Court confer)

21            THE COURT:  Wait a minute; we may have a problem.

22        Ms. Keifer has noted that there is a typographical error

23    and it is that it is further ordered that the defendants are to

24    file with -- it should be "this Court" and it says "thus

25    Court."

 1        This Court is making that change manually on the signed

 2   copy.

 3        It takes a village, it takes a village.  We thank you all

 4   for your attention during this long day.  And we are adjourned.

 5                (Court was adjourned at 5:56 p.m.)

 6

 7

 8                        CERTIFICATE

 9        I, Barbara A. Simpson, RPR, CRR, Federal Official
     Court Reporter, do hereby certify this 11th day of May, 2018,
10   that the foregoing is, to the best of my ability and
     understanding, a true and correct transcript of proceedings had
11   in the above-entitled matter.

12   _____/s/ Barbara A. Simpson

13

14

15

16

17

18

19

20

21

22

23

24

25